# 18-1390-cr(L),
## 18-2522-cr(CON), 18-2783-cr(CON), 18-3852-cr(CON)

# United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

RAZHDEN SHULAYA, AKA Brother, AKA Roma, ZURAB DZHANASHVILI,
AKA Zura, AKAKI UBILAVA, AKA Ako, HAMLET UGLAVA,

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK IN CASE NO. 1:17-CV-350-27,
HONORABLE LORETTA A. PRESKA, U.S. DISTRICT JUDGE

## BRIEF AND SPECIAL APPENDIX
## FOR DEFENDANT-APPELLANT

MEGAN W. BENETT
KREINDLER & KREINDLER LLP
750 Third Avenue, 32nd Floor
New York, New York 10017
(212) 687-8181

– and –

ARTHUR K. WOMBLE JR.
ZEMAN & WOMBLE, LLP
66 Willoughby Street, 2nd Floor
Brooklyn, New York 11201
718-514-9100

*Attorneys for Defendant-Appellant*

MAMUKA CHAGANAVA, MIKHEIL TORADZE, AVTANDIL KANADASHVILI, NAZO GAPRINDASHVILI, AKA Anna, ARTUR VINOKUROV, AKA Rizhy, EVGHENI MELMAN, TIMUR SUYUNOV, ZURAB BUZIASHVILI, GIORGI LOMISHVILI, AZER ARSLANOUK, IVAN AFANASYEV, AKA Vanya, DENIS SAVGIR, BAKAI MARAT-UULU, ANDRIY PETRUSHYN, DIEGO GABISONIA, LEVAN MAKASHVILI, SEMYON SARAIDAROV, AKA Sammy, DENYS DAVYDOV, EREKLE KERESELIDZE, ALEX MITSELMAKHER, AKA Globus, YURIY LERNER, AKA Yuri, NIKOLOZ JIKIA, VACHE HOVHANNISYAN,

*Defendants,*

AVTANDIL KHURTSIDZE,

*Defendant-Appellant.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................iii

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF THE ISSUES PRESENTED............................................1

SUMMARY OF THE ARGUMENT .........................................................2

STATEMENT OF THE CASE ..................................................................6

I.  Government's Theory .................................................................7

II.  Government's Expert Witness Supervised the Shulaya Investigation....8

III.  Testimony Concerning the Shulaya Poker House...................................12

IV.  The Shulaya Enterprise and Khurtsidze's Alleged Role in it – Count One ...............................................................................................14

  A. The Two Assaults Directly Involving Khurtsidze .................................15

    i.  Kutsenko Slap...............................................................................15

    ii. Anton Assault ..............................................................................16

  B.  Shulaya's Assaultive Conduct.................................................................17

    i.  Natchkepia Assault.......................................................................17

    ii.  Pelman Assault .............................................................................19

    iii. Chaganava Assault .......................................................................19

  C. Evidence of the Casino Fraud Scheme – Count Five...........................21

V.  The Conscious Avoidance Jury Charge .................................................26

VI.  Khurtsidze Conviction and Sentencing...................................................29

i

ARGUMENT .........................................................................................35

I.   The Trial Court Abused its Discretion When Qualifying the Supervisor
     of the Shulaya Investigation as an Expert in the field of Eurasian
     Organized Crime .........................................................................35

  A. Agent Penza Lacked Sufficient Expert Qualifications and His "Expert"
     Knowledge was Significantly Based Upon the Shulaya Investigation...37

  B. As the Supervisor of the Shulaya Investigation, Agent Penza Should Not
     Have Been Permitted to Testify as the Government's Expert ................39

II.  The Trial Court Erred by Instructing the Jury as to Conscious Avoidance
     and this Error was Not Harmless Beyond a Reasonable Doubt ............41

  A. The Defense Never Asserted the Lack of Some Specific Act or Knowledge
     Required for Conviction...............................................................42

  B. The Appropriate Factual Basis Did Not Exist ......................................43

  C. The Court's General Conscious Avoidance Charge Undercut the Entire
     Theory of Defense and Thus Was Not Harmless...................................44

III. The Evidence on Count Five Was Insufficient .....................................45

IV. The District Court Committed Procedural and Substantive Errors When
     Imposing a Sentence Twice the Recommend Guidelines Range............48

  A. The Sentence was Procedurally and Substantively Unreasonable..........50

    i.  Unwarranted Sentencing Disparity ....................................................50

    ii. The Sentence was Substantively Unreasonable .................................55

  B. The District Court Erred When Singling Out Khurtsidze's National
     Origin and Immigration Status as Support for the Above-Guidelines
     Sentence....................................................................................57

CONCLUSION ....................................................................................59

ii

# TABLE OF AUTHORITIES

**Cases**

*Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179 (2d Cir. 2011) ...................................................................................................................38
*United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008) (*en banc*) ...........................49
*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ..................38
*Gall v. United States*, 552 U.S. 38 (2007) ....................................................... 49, 55
*In re Winship*, 397 U.S. 358 (1970)........................................................................46
*Jackson v. Virginia*, 443 U.S. 307 (1979)...............................................................45
*Kimbrough v. United States*, 552 U.S. 85 (2007) ....................................... 48, 49, 56
*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005)......................................37
*United States v. Alvarez*, 837 F.2d 1024 (11th Cir. 1988).....................................36
*United States v. Botti*, 711 F.3d 299 (2d Cir. 2013) ...............................................41
*United States v. Chu*, 714 F.3d 742 (2d Cir. 2013) ................................................49
*United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010) ...........................................49
*United States v. Dukagjini*, 326 F.3d 45 (2d Cir. 2003) .........................................36
*United States v. Eppolito*, 543 F.3d 25 (2d Cir. 1998) ...........................................46
*United States v. Ferguson*, 676 F.3d 260 (2d Cir. 2011).........................................42
*United States v. Feroz*, 848 F.2d 359 (2d Cir. 1988)..............................................42
*United States v. Finley*, 245 F.3d 199 (2d Cir.2001)..............................................46
*United States v. Fofanah*, 765 F.3d 141 (2d Cir. 2014)..........................................44
*United States v. Irizarry*, 553 U.S. 708 (2008) ......................................................51
*United States v. Jones*, 393 F.3d 107 (2d Cir.2004) ...............................................46
*United States v. Kaba*, 480 F.3d 152 (2d Cir. 2007) ........................... 50, 57, 58, 59
*United States v. Leung*, 40 F.3d 577 (2d Cir. 1994) ................................. 57, 58, 59
*United States v. Locascio*, 6 F.3d 924 (2d Cir. 1993).............................................36
*United States v. Lombardozzi*, 491 F.3d 61 (2d Cir. 2007) ............................. 37, 38
*United States v. Mahaffy*, 693 F.3d 113 (2d Cir. 2012)..........................................41
*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008)................................. 36, 37, 38
*United States v. Quattrone*, 441 F.3d 153 (2d Cir. 2006).......................................42
*United States v. Rangolan*, 464 F.3d 321 (2d Cir. 2006)........................................45
*United States v. Rattoballi*, 452 F.3d 127 (2d Cir. 2006) ......................................49
*United States v. Rodriguez*, 983 F.2d 455 (2d Cir. 1993)........................... 42, 43, 44
*United States v. Rodriguez*, 392 F.3d 539 (2d Cir. 2004)........................................45
*United States v. Zhou*, 428 F.3d 361 (2d Cir. 2005)...............................................46

**Statutes**

18 U.S.C. §1343 .........................................................................................................6

18 U.S.C. §1962.................................................................................6
18 U.S.C. § 3231 ..............................................................................1
18 U.S.C. § 3553(a) .............................................................. 6, 30, 48, 49
18 U.S.C. § 3742(a) ...........................................................................1
28 U.S.C. § 994(d) ...........................................................................57
28 U.S.C. § 1291 ..............................................................................1

## Rules and Other Authorities

Federal Rule of Evidence 702....................................................... 35, 36, 37
United States Sentencing Guideline § 5H1.10........................................57

**JURISDICTIONAL STATEMENT**

The District Court's jurisdiction was premised on 18 U.S.C. § 3231. This Court's jurisdiction is invoked under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). This appeal is from an Order of Judgment that the Honorable Katherine B. Forrest, United States District Judge, Southern District of New York, entered on Sep. 7, 2018, following defendant-appellant Avtandil Khurtsidze's conviction after trial on two counts charged against him in Indictment S9 17 Cr. 350. SPA\A1-7.[1]

A timely notice of appeal was filed on Sep. 20, 2018. A1891.

**STATEMENT OF THE ISSUES PRESENTED**

1.  Should the supervisor of the investigation leading to Khurtsidze's charges have been allowed to testify as an expert witness?

2.  Did the District Court err by giving the jury a conscious avoidance instruction?

3.  Was the evidence sufficient to support Khurtsidze's conviction for Count Five wire fraud conspiracy?

4.  Did the District Court commit procedural or substantive errors in sentencing Khurtsidze to 10 years in prison, twice the term recommended by the Sentencing Guidelines, particularly in

---

[1] References to the appendix are noted as "A" followed by the page number; the special appendix as "SPA" followed by the page number; the Presentence Investigation Report (contained in the Confidential Appendix) as "PSR" followed by the page number; trial transcript pages not included in the appendix as "Tr. Trans." followed by the page number; and trial exhibits not in the appendix as "[Party] Exhibit" followed by the marked exhibit number.

1

light of the commentary at sentencing misconstruing the factual record and singling out Khurtsidze for his national origin?

## SUMMARY OF THE ARGUMENT

Avtandil Khurtsidze, an accomplished professional boxer with no prior criminal record, was charged in 2017, along with more than 25 others, with one count of participating in a racketeering conspiracy (Count One) and one count of participating in a wire fraud conspiracy (Count Five). Khurtsidze and lead defendant Razhden Shulaya went to trial, where it was established that between 2014 and 2017 Shulaya was the head of a criminal enterprise centered in Brooklyn's Brighton Beach that operated gambling parlors, extorted payments from gamblers and local businesses, trafficked in stolen goods and contraband cigarettes, committed identity theft and credit card fraud, and engaged in a conspiracy to defraud casinos. As to Khurtsidze, the government argued, based largely on three brief recorded conversations and two video-recorded assaults (over the course of the three-year racketeering conspiracy), that Khurtsidze was Shulaya's primary "enforcer" in the racketeering conspiracy; and, based on Khurtsidze moving an electronic gambling device (that Shulaya and his team were attempting to manipulate) and one instance where Khurtsidze allegedly drove a co-defendant to a casino they were attempting to defraud, Khurtsidze was a knowing participant in the wire fraud conspiracy. Khurtsidze was convicted and

2

subsequently sentenced to 120-months in prison – more than twice the term recommended by the Sentencing Guidelines.

Four errors in this case warrant vacatur of Avtandil Khurtsidze's conviction and sentence.

First, the District Court qualified a case agent as an expert, which, in a trial that relied substantially on indirect evidence to establish the defendant's conspiratorial culpability, constituted manifest error and requires vacatur of Khurtsidze's convictions. Prior to trial, the government revealed that it intended to present a Federal Bureau of Investigation agent as an expert in Eurasian organized crime. This was the first time that witness had ever testified in a Eurasian organized crime trial and it was the first time he had ever been qualified as an expert in any area. Then, at trial, the defense discovered that the proposed expert had directly supervised the Shulaya investigation and the case agents who conducted that investigation (including the two lead case agents who testified at trial and were seated at the prosecution table throughout the trial). Despite his deficient qualifications and despite his role as supervisor of the FBI's Shulaya investigation, the District Court allowed the agent to testify as an expert about Russian organized crime. Doing so wrongly allowed the government to argue to the jury that despite the meager evidence implicating Khurtisdze as Shulaya's "enforcer," he filled a standard role within a defined criminal organization, and

3

then inappropriately suggested to the jury (who heard during the agent's direct examination of his role in the Shulaya investigation) that the agent, by virtue of his particular expertise, would only have been involved in the investigation leading to Khurtisidze's charges, if indeed, Khurtsidze was a member of a criminal organization.

Second, the District Court erred when it charged the jury on the concept of conscious avoidance as to Khurtsidze. The factual record did not support the instruction and the defense did not argue that Khurtsidze had avoided facts that a reasonable person would have appreciated. Rather, the defense theory as to Count One was that Khurtsidze's assaults and purported threats were not in furtherance of the racketeering conspiracy because of their limited scope and nature; and as to Count Five was that Khurtsidze was not present at key moments and that the witness who identified him had been mistaken. In granting the government's request for the instruction, the District Court relied on a wholly inaccurate characterization of the defense theory concerning Count Five. The instruction was not justified under the circumstances and given the meager evidence of Khurtsidze's role in Count Five, giving the instruction was not harmless beyond a reasonable doubt.

Third, the government presented no direct evidence that Khurtsidze had knowledge or reason to know of Shulaya's Count Five wire fraud conspiracy to

4

manipulate the gambling devices. (This, of course, is why the government sought – and won – the conscious avoidance instruction.) As defense character witnesses testified, during the relevant period, Khurtsidze's time was largely spent training for professional boxing matches or mentoring younger fighters at gyms on Long Island and in Brooklyn. The government contended that Khurtsidze carried a gambling device into Shulaya's poker house on at least one occasion, but there was no evidence that Khurtsidze witnessed the manipulation of the device's code, nor that he was present for any discussion of that scheme, except for a co-defendant's testimony about Khurtsidze driving him to a casino on a single occasion. But that witness admitted that he had a hard time distinguishing Khurtsidze from another co-defendant and, undisputedly, mistakenly identified Khurtsidze on other occasions. Given the absence of evidence that Khurtsidze was knowingly involved in a wire fraud conspiracy, no rational juror could have found the essential elements of that crime established by proof beyond a reasonable doubt and the Count Five conviction must therefore be vacated.

Finally, in sentencing Khurtsidze to twice the recommended Sentencing Guidelines term in prison, the Court committed both procedural and substantive errors that require that the sentence be vacated and the case remanded for resentencing. While the District Court sentenced all of Khurtsidze's co-defendants to a term within or below the applicable Guidelines range, including those involved

5

in acts of violence, threats and more of the predicate racketeering acts, the District Court sentenced Khurtsidze to double his range – 10 years in prison. In reaching its decision, the District Judge stated that it intended to use Khurtsidze, a well-known Georgian national, to send a "message" to other nationals of the former Soviet Republics; made factual errors and assumptions that were unsupported by the trial record when fashioning the sentence; and utterly failed to satisfy its obligations under 18 U.S.C. § 3553(a). Khurtsidze's sentence must be vacated and the case remanded for resentencing.

Accordingly, Khurtsidze's convictions for Counts One and Five should be vacated, and a new trial ordered. In the alternative, the 120-month sentence should be vacated and the case remanded for resentencing.

## STATEMENT OF THE CASE

In 2017, the federal government indicted defendant-appellant Avtandil Khurtsidze on one count of racketeering conspiracy in violation of 18 U.S.C. §1962 (Count One) and one count of wire fraud conspiracy in violation of 18 U.S.C. §1343 (Count Five) for his alleged participation between 2014 and June 2017 in a criminal enterprise run by co-defendant Razhden Shulaya, and for his alleged participation in a wire fraud conspiracy between September 2016 and May 2017. A173-185.

6

## I. Government's Theory

In its opening statement, the government argued that Razhden Shulaya was a *vor*, the leader of a Russian organized crime enterprise based in Brighton Beach Brooklyn. A242-243. Shulaya controlled various criminal ventures: trafficking in stolen goods and contraband cigarettes, running an illegal poker house, extortion, identity theft, credit card fraud, and attempts to defraud casinos by hacking the computer code of slot machines. A243-246. The government suggested at the outset that this "[t]rial is about Shulaya, the boss, Khurtsidze, his enforcer, and the crime empire they tried to build in this city." A242.

Throughout the opening statement, prior to presenting any evidence, the government alleged that Khurtsidze was the primary violent arm of the Shulaya Enterprise. Khurtsidze was the man "who bloodied others to help" Shulaya and was "a human weapon [who] pledged himself in the service of Shulaya." A242-243. Khurtsidze was described as Shulaya's "sword" and "hand." A246, 251. The government made specific reference to the contraband stolen goods and cigarettes scheme within the enterprise, claiming that when couriers of the contraband did not pay properly, Shulaya "turned to Khurtsidze, his enforcer, to sort out the problem." A246.[2]

---

[2] Despite the government's characterization, at trial no evidence was presented that Khurtsidze played any role in collecting payments or enforcement of the stolen goods or contraband cigarette conspiracies. A187-209.

The government's opening statement also alleged that Khurtsidze was involved in one particularly brutal assault. When "a cigarette worker" (co-defendant Mamuka Chaganava) attempted to shortchange Shulaya, "Shulaya and Khurtsidze held him in a room and battered him until his face swelled beyond recognition." A248.

## II.    Government's Expert Witness Supervised the Shulaya Investigation

In support of its trial theory, the government presented Federal Bureau of Investigation Special Agent John Penza as a prospective expert on Eurasian organized crime. A315-324. Following defense objection as to his qualifications (A324), the District Court allowed a brief *voir dire*, during which Agent Penza admitted that he had never received any training from the FBI in the area of Eurasian organized crime, had never testified in a Eurasian organized crime trial and had never been qualified as an expert in any area, let alone Eurasian organized crime. A361-371. Penza also admitted that he had learned about Eurasian organized crime from, among other things, his direct involvement in the Shulaya investigation – the very investigation leading to Khurtsidze's trial – and it would be "difficult for [him] to separate [his] knowledge from both sources." A371. Nevertheless, the District Court qualified Agent Penza as an expert in the area of Eurasian organized crime and allowed him to testify about *vors*, their common traits and operations. A379.

At the beginning of Agent Penza's testimony, the government unnecessarily elicited from him that he had supervised the Shulaya investigation. A323.[3] Agent Penza had been assigned as supervising agent of Squad C-24 within the FBI. A315-316. Squad C-24 was tasked with investigating "individuals associated with Eurasian organized crime who operate in the New York area." A316. As the supervising agent of C-24, Agent Penza's duties were "to lead and mentor agents and task force officers assigned to the squad as it relate[d] to investigative matters." A317. Squad C-24 was the very squad that was investigating the Shulaya Enterprise and Avtandil Khurtsidze, and Agent Penza had "supervisory authority over the investigation of […] Razhden Shulaya." A323.

Additionally, the two main case agents seated at the prosecution table throughout the trial, FBI Special Agents Robert Hanratty and Naushaun Richards, who had spent years trying to build a case against Shulaya, testified that they worked in Squad C-24 under the supervision of Agent Penza. A403, 1784. Defense counsel renewed the objection to Agent Penza acting as a government expert on Eurasian organized crime given that, as the supervisor of the Shulaya investigation, presenting him as an expert on *vors* to the jury would unnecessarily

---

[3] Though the government attempted to separate Agent Penza from this case, the 3500 material revealed that he had been involved in multiple email communications about it, including applications for pen registers and Title III warrants that were critical to building the case against Shulaya, which led to Khurtsidze's arrest and trial. A339-347.

9

and impermissibly attach a veneer of credibility to the government's entire investigation and case. A326-331.[4] The District Court rejected that argument. A348-355, 372.

Following his qualification as an expert, Agent Penza testified extensively about the terminology and hierarchy of criminal enterprises like the one he had investigated in the Shulaya case. He explained that *vor v zakonei* translates to thief in law and is "the highest level of [or title within] Eurasian organized crime that exists around the world." A380. *Obshchak* is a criminal fund established for the *vor* and "lower level individuals that operate under that *vor* have to push money up or kick money up to that *vor*." A383-384. *Krisha* is a roof or protection typically in the form of monetary payments to the *vor* by local businesses or individuals that allow them to avoid extortion or violence. A385. Agent Penza testified that *vor*s prefer to meet at *banyas* or bathhouses to make surveillance difficult, yet the government produced evidence of only a single relevant meeting that occurred in a *banya*, despite the investigation lasting from 2014 to 2017. A387-388, 1790-1791. Finally, Agent Penza explained that the common symbol of the *vor* is an eight-pointed star, most commonly in the form of a tattoo. A386-387.

---

[4] There was no justifiable reason for the government to have chosen the individual that they knew for four years prior to trial was the supervising agent on the case as their expert when they easily could have designated an expert with no direct involvement in this case. A359.

The government bolstered Agent Penza's testimony about Eurasian organized crime with testimony from other witnesses. Volodmir Oliynyk, known as "Slava," was involved in the investigation from its inception in 2014. A408. (Despite his consistent, direct involvement with Shulaya and his enterprise throughout, Slava never once mentioned Khurtsidze. A408.) The government also called Sasha Kutsenko, their other main confidential source, who was embedded within the Shulaya Enterprise as of 2015. A1176. Kutsenko also testified that he had worked with *vor*s during his extensive criminal past. A1264-1265. Kutsenko (who had little to say about Khurtsidze) testified about his knowledge of *obshchak*, *krisha*, eight-pointed stars and the general operations of *vor*s. A1262-1265.

Government cooperator Zurab Dzhanashvili testified about the terminology and common characteristics of *vor*s and their criminal operations. Dzhanashvili testified that Shulaya was a *vor*, "the [h]ighest honor in the criminal world." A1469. Dzhanashvili testified that Shulaya told him that he had been crowned in Italy, with Dzhanashvili explaining to the jury that a *vor* must be crowned in a ceremony by other *vor*s. A1472. Dzhanashvili testified about *obshchak* and explained how Shualaya ran this criminal fund. A1473. But Dzhanashvili's testimony about Khurtsidze was limited to knowing that he was a famous boxer and hearing from Shulaya – a notorious braggart – that Khurtsidze supposedly one time hit a person who disrespected Shulaya. A1695.

11

**III.    Testimony Concerning the Shulaya Poker House**

Much of the government's case was built upon information from its source Sasha Kutsenko.  Kutsenko, who had spent 16 years in prison for his role running a violent, criminal "brigade," promptly upon his release from custody "opened a friendly poker house business" in Brooklyn.  A1135.  Kutsenko was introduced to Shulaya through Dzhanashvili.  A1137-1138.  Shulaya began bringing people to Kutsenko's poker game, including Khurtsidze on at least one occasion.  A1147-1148.  Shulaya approached Kutsenko about the possible purchase of contraband cigarettes.  A1165-1166, 1342.  Shortly thereafter, Kutsenko went to the FBI, hoping to avoid any future criminal liability.  A1160.

After meeting with the government, Kutsenko signed a non-prosecution agreement that covered his involvement in illegal gambling and the FBI proceeded to use him to infiltrate Shulaya's illegal poker house on the second floor of a Brighton Beach Avenue building.  A1135-1136.  The FBI provided Kutsenko with poker tables, cards and chips to give to Shulaya, "to help boost [his] credibility for being a provider."  A498, 1170.  Shulaya initially asked Kutsenko to be a consultant at the poker house, but within a few months, asked him to manage the poker house.  A498-499, 1161-1162, 1188.  Shulaya promised Kutsenko that the profits of the poker house would be split between Shulaya, Kutsenko and others.

12

A1176-1177. The FBI also provided $1,000 in cash for Kutsenko to give to Shulaya as a gift in early 2016. A552.

As the manager of Shulaya's poker house, Kutsenko collected money from players who lost in order to pay the winners and provide a cut of the profits to Shulaya. A1188. Kutsenko's handler, Agent Hanratty, testified that he told Kutsenko that his role was "[t]o assist in collecting debts and to ensure that no violence occurs." A542. In this role, Kutsenko "was collecting debts fairly often." A624-625. One gambler, Sergei Demidenko, owed a debt to Shulaya's poker house in late 2016 and was supposed to meet Kutsenko to discuss payment. A1244. Agent Hanratty testified that he had "instructed Kutsenko to attend [this] meeting to collect this money and prevent violence." A496. Kutsenko testified that he set up the meeting with Demidenko himself and that he then invited Khurtsidze and another individual to it. A1247-1248. Kutsenko testified that at that September 1, 2016 meeting, Demidenko gave him money which he, in turn, gave Khurtsidze to hand over to Shulaya. A1247-1248.

Kutsenko also brought Khurtsidze to a subsequent meeting with Demidenko on September 7, 2016, where Demidenko gave money directly to Khurtsidze. A1247, 1426. Despite Kutsenko "collecting debts fairly often" in his role as the poker house manager, he admitted that the two September 2016 meetings with

13

Demidenko were the only times that Khurtsidze ever assisted him in collecting

debts.  A624-625, 1426.

**IV.    The Shulaya Enterprise and Khurtsidze's Alleged Role in it – Count
         One**

The investigation into the Shulaya organization, which began in 2014

(A557), gathered evidence of extensive criminal activities, nearly none of which

involved Avtandil Khurtsidze.

For example, Zurab Dzhanashvili, who spoke to Shulaya "[a]lmost every

day from 2013" testified about an incident at a pool hall in 2014 where Shulaya

told Dzhanashvili that he wanted to deal with a group of Armenians who had

disrespected him.  A1499.  He ordered Dzhanashvili to "get the guns" and "get all

the Georgians."  A1500, 1504.  Dzhanashvili turned to codefendant Artur

Vinikurov, who provided guns to Dzhanashvili.  A1501.  Dzhanashvili brought

codefendant Nikoloz Jikia to the pool hall where a group of thirty Georgians, beat

a group of five Armenians after Shulaya instructed them, "You know what to do."

A1504-1505.  Avtandil Khurtsidze was not present, and in fact, did not even meet

Zurab Dzhanashvili until next summer.  A1694.

Despite the government's assertions during opening statements that

Khurtsidze was the "hand" of Shulaya who brutally enforced the criminal

enterprise, they presented evidence of only five assaults allegedly connected to

Khurtsidze over the course of more than three years, despite Shulaya's nearly non-

14

stop criminal activities. Two were incidents where Khurtsidze slapped or punched an individual inside the Shulaya poker house and three were incidents where Khurtsidze was purportedly present when Shulaya committed assaults, but was not alleged to have touched the victim.

### A. The Two Assaults Directly Involving Khurtsidze

#### i. Kutsenko Slap

In July 2016, Shulaya "summoned" Sasha Kutsenko, then manager of Shulaya's poker house, to discuss accounting errors from a recent poker game. A1198-199. Surveillance video showed that when Kutsenko arrived, Shulaya was there with Dzhanashvili, Khurtsidze and two other individuals. A1550. Shulaya accused Kutsenko "of stealing money from the game." A1199. Kutsenko, who was across the table from Shulaya, pulled a knife out of his pocket and said "[i]f you truly believe I stole this money, just cut me with this knife […], kill me." A1200-1201. Kutsenko threw the knife onto the table and then leaned across the table. A616, 1200, 1414-1415, 1553, 1740. Khurtsidze, who was seated closest to Kutsenko (A1414), rose from his chair and slapped Kutsenko in the face. A522, 1205-1206, 1416, 1554, 1737. Kutsenko claimed that "Shulaya told [Khurtsidze] something in Georgian and after that, Avtandil hit me." A1416. Kutsenko, who had been working with the FBI for approximately one year at this point, was wearing a wire during this meeting. A1416. The transcript of this meeting shows

15

no statement by Shulaya directing or authorizing Khurtsidze to strike Kutsenko. A1416-1419.

Zurab Dzhanashvili testified that Shulaya told Khurtsidze to slap Kutsenko. A1554. Sam Sadov recounted a much longer conversation after Kutsenko drew his knife but before the slap. According to Sadov, Shulaya said, "I don't understand what kind of bodyguards I got" and that "[i]f something like that should happen […] [h]e should have been on the floor already." 1661. Sadov testified that "then a couple of minutes later, that is when [Khurtsidze] asked [Shulaya] can I just hit him, and he told him yes." A1740. Again the transcript from this meeting shows that Shulaya did not say anything to Khurtsidze prior to him striking Kutsenko. A1416-1418.

### ii. Anton Assault

Avtandil Khurtsidze also punched an individual while inside the poker house in September 2016. Surveillance video showed Khurtsidze in one of the side rooms of the poker house along with Akaki Ubilava and another man. A1538-1539. Zurab Dzhanashvili was the only government witness who could identify the assaulted individual, describing him as "Anton," a person who worked for co-defendant Artur Vinikurov. A1539-1541. Khurtsidze walked over to Anton, struck him once in the face and then hit him a second time in the stomach. A528. Agent Hanratty, the lead case agent on this investigation, testified that he did not

16

know who Anton was. A545. The government was unable to provide evidence establishing why Khurtsidze hit Anton.

### B. Shulaya's Assaultive Conduct

#### i. Natchkepia Assault

The government's first trial witness was Mark Nektalov, who was introduced to Shulaya through a "friend" named Zurab Natchkepia in 2014. A271-272, 1478. At some point after meeting Shulaya, Nektalov was with Natchkepia and overheard a phone conversation in which Natchkepia was speaking "disrespectful[ly]" towards Shulaya. A276-278. After Nektalov left Natchkepia, Shulaya called Nektalov and asked him to come to an apartment on Avenue X in Brooklyn. A278.

When Nektalov arrived, he saw approximately ten to fifteen people in the apartment as well as Zurab Natchkepia "on his knees, beat up, with bruises and blood on his face." A284-286. Shulaya was scolding Natchkepia for disrespecting him. A290-292. During his testimony, Nektalov examined a photo of Khurtsidze and claimed that he was in the apartment that day. A284-285. However, when asked whether he saw that same person in court, Nektalov said he did not.[5] A285. On cross examination, Nektalov admitted that he "connected" who was in the

---

[5] Khurtsidze was sitting at the defense table during the entirety of the trial, including during Mr. Nektalov's testimony.

17

apartment after seeing their photographs in the news stories relating to the arrests on this case. A313.

Sasha Kutsenko also testified about the Natchkepia assault, although he testified that Shulaya assaulted Natchkepia on two different days in the same Avenue X apartment. A1149-1157. Kutsenko testified that on the first occasion, Shulaya summoned him to the Avenue X apartment, and when he arrived, there were ten to fifteen people in the apartment, including Khurtsidze. A1149-1150. Shulaya then proceeded to assault Natchkepia verbally and physically because he had been disrespectful towards Shulaya. A1151-1153. Although Mark Nektalov was not present for this incident, he was present one month later when Shulaya apparently assaulted Natchkepia in the Avenue X apartment a second time. A1154-1158. Kutsenko did not recall Khurtsidze being present for the second Natchkepia assault. A1154-1158.

Zurab Dzhanashvili testified that he was also present in the Avenue X apartment when Mark Nektalov and Zurab Natchkepia arrived together. 1478-1479. The apartment belonged to Mamuka Chaganava, a longtime associate of Shulaya's and the person who was supposed to control the *obshchak* for Shulaya. A1474. Dzhanashvili recounted Shulaya's beating of Natchkepia, admitting that he picked Natchkepia up after he fell to the floor so that Shulaya could continue

18

assaulting him. A1480. Dzhanashvili said he did not recall Khurtsidze being in the apartment during the Natchkepia beating. A1478.

### ii. Pelman Assault

Sasha Kutsenko testified that he was at a restaurant for Zurab Dzhanashvili's birthday when he saw Shulaya slap an associate for selling drugs. A1166. Kutsenko testified that Khurtsidze was one of "like 10 people" who were present at the time, although he provided no detail beyond Khurtsidze's alleged general presence at the restaurant. A1166-1167.

### iii. Chaganava Assault

Mamuka Chaganava was deeply involved in Shulaya's contraband cigarette and stolen goods conspiracies. While Chaganava did not testify at trial, Sasha Kutsenko testified that on one occasion "I saw Shulaya come out of the office and behind him I saw the Mamuka" who was "bleeding from the nose and the lips" and his "cheek was swollen." A1189-1190. At Shulaya's order, Kutsenko went to get a cold can out of the refrigerator for Chaganava's face. A1191. When he came back to the office, he testified that he saw Khurtsidze inside the office and heard Shulaya "[ask] him why he hit him so hard." A1191. Kutsenko recalled that Zurab Dzhanashvili was sitting at the poker table in an entirely different room of the poker house during this incident. A1191. But this was inconsistent with Kutsenko's prior description of the Chaganava assault. Although Kutsenko

19

testified that Shulaya brought Khurtsidze to some of his early poker games (A1147), and in two prior debriefs had told the FBI that Khurtsidze was present at a Georgian holiday party in August 2015 (A1401-1402) and at Shulaya's birthday party in early February 2016 (1402), when Kutsenko debriefed with the FBI shortly after the Chaganava beating, he said nothing about Khurtsidze or Dzhanashvili being present, instead only describing Shulaya and "an unknown Georgian man." A1192, 1820.

Zurab Dzhanashvili testified that on the day of the Chaganava assault he arrived at the poker house and saw Chaganava and Khurtsidze inside the office of the poker house. A1528-1529. When Shulaya arrived, Dzhanashvili and Khurtsidze went into the hallway and left Shulaya and Chaganava inside the office. A1530. Through the closed door, Dzhanashvili testified that he could hear Shulaya yelling and "punching noise." A1530. Shulaya opened the office door and took a battered Chaganava to the bathroom to clean him up. A1531. Shulaya then asked Kutsenko to either take Chaganava home or to the hospital. A1534.

Curiously, however, Dzhanashvili admitted that he had been arrested on immigration charges six months before the Chaganava assault and that he was in custody for "nine months to a year" after his arrest. A1693. Therefore, Dzhanashvili would have been in immigration custody until at least May of 2016, and not at the poker house for the February 2016 Chaganava beating. A1527.

20

The evidence surrounding Khurtsidze's purported role in connection to the Chaganava beating was far from clear or consistent. What was clear, however was that the government's assertion that "Shulaya and Khurtsidze held [Chaganava] in a room and battered him until his face swelled beyond recognition" or that "Khurtsidze and Shulaya assaulted" Chaganava, as described during opening statements, was without any evidentiary support. A248, 250.

### C. Evidence of the Casino Fraud Scheme – Count Five

Over multiple years, Agent Hanratty provided approximately 510 cases of cigarettes to his confidential source, Slava Oliynyk, in order for Oliynyk to sell those cigarettes to Razhden Shulaya. A418, 800-801. Oliynyk gave "approximately $700,000 […] to the FBI after [cigarette] operations involving Shulaya." A441. Shulaya then used money from the sale of contraband cigarettes to purchase a Pelican Pete slot machine from Oliynyk. A713. Shulaya's plan was to hack the computer code of various slot machines in order to cheat and win using the same model of machines at casinos. A921-922.

Agent Hanratty purchased a Pelican Pete slot machine from a company in Florida and had Oliynyk deliver the slot machine to codefendant Hamlet Uglava on September 1, 2016. A473, 476. Uglava transferred the slot machine to codefendant Akaki Ubilava who drove the machine to the apartment building of codefendant Nazo Gaprindiashvili. A477-478, 493. The FBI was surveilling

21

Gaprindiashvili's apartment building and watched Ubilava and Khurtsidze carry the slot machine from a van into the building. A478. No demonstrations of the machine were observed, however.

The main government witness for the casino scheme was Evgheni Melman, whom Shulaya recruited in mid-2016. A915, 932. Melman met another of Shulaya's hackers, Diego Gabisonia, when they met Shulaya at Gaprindiashvili's apartment to try to hack the Pelican Pete slot machine. A918-921. Melman traveled to various casinos with members of the conspiracy to record videos of slot machines in order to hack their computer code. A936. Melman said that Khurtsidze "assist[ed] us a few times [with] the casino scheme." A960. During his direct testimony, Melman testified that Khurtsidze drove him to Harrah's in Atlantic City, but that Khurtsidze did not do anything at the casino. A959-961. Melman also said that on another date, Khurtsidze drove him to Ceasar's Palace in Atlantic City and that Khurtsidze walked around the casino with Melman and helped him find specific slot machines. A961. Although the government was able to produce surveillance video showing Hamlet Uglava and Diego Gabisonia recording slot machines inside of Harrah's Casino in Philadelphia, the government produced no video of Khurtsidze inside any casino. A883-888.

Melman explained how the recorded videos of the slot machines were used to further the scheme. Melman collected "videos of bonus games" because he

22

"needed to calculate the [seed] and predict the behavior." A937. When asked if a photo or short video showing "only one screen of symbols" was sufficient, Melman testified that "[w]e needed at least four of the screens." A937. Melman then testified about three short videos that were found on Khurtsidze's phone after it was seized following his arrest on June 7, 2017. A910, 986, 489. On direct testimony, Melman explained that the videos of a slot machine called Tiki Torch showed pay lines, and pay lines were important to the scheme. A910, 986. The government's suggestion was that Khurtsidze had taken these videos while at a casino in order to assist the conspiracy.

Melman admitted on cross-examination that the three slot machine videos discovered on Khurtsidze's phone were not actually taken by Khurtsidze's phone, but were sent to him by an individual named Merabo Dvarashvili. A1111-1112. Further, unlike the other, longer slot machine videos that were in evidence, the slot machine videos recovered from Khurtsidze's phone were short .mov file videos of two to three seconds. 1126-1127. Melman testified that he was familiar with the Apple iPhone live photo function, and that when this function is turned on and the user takes a photo with their iPhone, the phone creates a .jpg photo file as well as a two to three second .mov file. A1127. Melman admitted that the slot machine videos sent to Khurtsidze's phone by Merabo Dvarashvili had the exact same properties as an iPhone live photo. A1127.

23

Melman testified that he saw Khurtsidze when he went to Shulaya's poker house on September 21, 2016 to repair the Pelican Pete slot machine. A962-963. Melman also testified about a meeting at Galaxy Tire Shop in Brooklyn on January 27, 2017, where Shulaya gathered his crew to provide a demonstration for the FBI's confidential source, Slava Oliynyk. A1109-1110. At this meeting, Melman presented a demonstration of the casino scheme using the Pelican Pete slot machine. A924-929. Melman was "sure [Khurtsidze] was" at the Galaxy Tire Shop meeting. A1109-1110. Yet Agent Richards testified that Khurtsidze was not even in New York on that date ("he was on the West Coast"). A1792-1793, 1829-1830. The government eventually stipulated that Khurtsidze was not present at the Galaxy Tire Shop meeting on January 27, 2017. Trial Tr. 1773-1774.

The only other allegations linking Khurtsidze to the casino scheme was Agent Richards' testimony regarding his surveillance of a meeting between Oliynyk and Shulaya at the Mermaid Spa in Coney Island in December 2016. A1790, 1802. Oliynyk met Shulaya so that Shulaya could deliver the manipulated slot machine back to Oliynyk so he could transport it to Atlantic City for a demonstration. A1790. After Oliynyk entered the Mermaid Spa, Agent Richards noticed that his car was no longer where it had originally been parked. A1790. When Oliynyk's car returned, Agent Richards saw three people exit the vehicle, with Khurtsidze getting out of the driver's seat. A1790-1791.

24

The defense rebutted the government's theory that Khurtsidze knew of the wire fraud conspiracy because of his role working with Melman in several ways. First, the defense on cross examination elicited testimony from Melman misremembering Khurtsidze being at the Galaxy Tire Shop meeting, which was uncontrovertibly a mistake. A1110. Then, the defense established that Melman also could no longer recall two specific trips he previously had claimed he had taken with Khurtsidze to Harrah's and Ceasar's Palace. When pressed on his identification of Khurtsidze as a driver on the casino trips, Melman testified that Khurtsidze had driven him to a casino "at least once." A1084. But then Melman admitted that through his first four proffer meetings with the government between September 2017 and February 2018, even though he discussed traveling to casinos with Akaki Ubilava, Shulaya and other members of the conspiracy, Melman had never mentioned travelling with or being driven by Khurtsidze.[6] A1093-1094, 1096-1098. During his testimony about his fourth meeting with the government, the Court interjected the following:

> THE COURT: Let me ask you, was there any particular reason that you can recall as to why you didn't mention Khurtsidze until some subsequent meeting?

---

[6] FBI Special Agent Bruce Turpin witnessed Hamlet Uglava and Diego Gabisonia travel to Harrah's Casino in Philadelphia, PA, in April 2017. 809. The government produced video from Harrah's Casino showing Uglava and Gabisonia inside the casino, with Gabisonia apparently taking video of certain slot machines. 809-814. There was, however, no credible evidence showing Khurtsidze outside or inside any of the casinos.

25

[MELMAN]: Khurtsidze only drove me one time, as I recall. Mr. Akaki Ubilava drove me multiple times and also Khurtsidze didn't talk with me at all. So that kind of made me forget him a little bit.
THE COURT: All right.

A1098. That unsolicited judicial inquiry went directly to impede the defense's effort to impeach Melman's identification of Khurtsidze as his driver. Then, as discussed below, Melman's answer to the Court's question about Khurtsidze not talking with him during a single car ride seemingly formed the central, if not sole, basis for the Court's decision to charge the jury on conscious avoidance as to Khurtsidze.

## V. The Conscious Avoidance Jury Charge

Attorneys for Khurtsidze objected to the inclusion of a conscious avoidance charge. A1387. The government argued that the charge was warranted because Khurtsidze "drove in silence with [Melman] around to casinos from New York to other states, that they did not talk much, if at all during those trips." A1388. As noted in the previous section, however, Melman's statement that they rode in silence was elicited by the Court's *sua sponte* inquiry into why Melman, in his first four meetings with the government, had not mentioned Khurtsidze driving him to a casino. A1098. The defense had never argued that Khurtsidze avoided knowledge of the purpose of the casino trips by not conversing with Melman, but rather that Khurtsidze had never driven Melman to a casino at all. Trial Tr. 1908.

26

Over defense objection, the Court determined that a conscious avoidance charge would be included in the jury instructions for Khurtsidze only, but not for Shulaya. A1832. The Court held that "the cross-examination of Mr. Melman and the way in which that came out is suggestive of a factual basis for conscious avoidance" for Khurtsidze. A1832. More specifically, the Court found a sufficient basis for the charge "based upon, for instance, the proffer yesterday about the lack of conversation, for instance, with Mr. Melman in the vehicle." A1605.[7]

Instructing the jury about "conscious avoidance," the District Court explained that while

> the government is required to prove that a defendant acted knowingly …. In addition to a person actually being aware of a fact, the law also allows you to find that a defendant had knowledge of a fact required for conviction when the evidence shows that he was aware of a high probability of that fact but intentionally avoided confirming that fact. The law calls this "conscious avoidance" or "willful blindness." In determining whether the government has proven beyond a reasonable doubt that Mr. Khurtsidze acted knowingly with respect to the charges in the indictment against him, you may consider whether Mr. Khurtsidze deliberately closed his eyes to a fact required for conviction that would otherwise have been obvious to him. One may not willfully and intentionally remain ignorant of a fact important to his conduct in order to escape the consequences of criminal law. Thus, if you find that Mr. Khurtsidze deliberately acted with a conscious purpose to avoid learning some relevant fact, then you may treat him as though he knew that fact existed. However, guilty knowledge may

---

[7] While the government also cited Khurtsidze's help in moving the slot machine, none of the testimony concerning that conduct suggested that Khurtsidze would have known that the code on the device was being manipulated and would be placed in a casino. A1388-1389. Ultimately, the District Court cited only the silence during the Melman ride as a basis for the instruction.

27

not be established by demonstrating that a defendant was merely reckless, negligent, careless, or foolish.

…It is entirely up to you whether you find that a defendant deliberately closed his eyes and any inferences to be drawn from the evidence on this issue. Let me explain what the concept of willful blindness or conscious avoidance means with respect to conspiracy charges. There is a difference between knowingly participating in the conspiracy and knowing the object or objects of the conspiracy. "Conscious avoidance," as I have described it, cannot be used as a basis for finding that a defendant knowingly joined the conspiracy. It is logically impossible for the defendant to join a conspiracy unless he knows the fact that the conspiracy exists. However, if you find beyond a reasonable doubt that the defendant, Khurtsidze, chose to participate in a joint undertaking, you may consider whether the defendant deliberately avoided confirming otherwise obvious facts about the purpose of the agreement, which was to break the law as alleged.

That is, if you find beyond a reasonable doubt that a defendant -- here, Khurtsidze -- knew that there was a high probability that his coconspirators intended to break the law but that he deliberately avoided confirming this fact, you may treat this deliberate avoidance of positive knowledge as the equivalent of knowledge of the object of the charged conspiracy, unless you find that the defendant actually believed that he and his coconspirators were acting in a lawful manner.

A1833-35.

During summation, expecting the conscious avoidance instruction, the government noted that if the other evidence it presented to establish Khurtsidze's knowing involvement in the wire fraud conspiracy was not sufficient (that consisted of several 2-3 second videos an uncharged individual sent to Khurtsidze showing slot machines and a telephone call initiated by Shulaya while Khurtsidze was on the west coast training, during which Shulaya talked at Khurtsidze, with

28

Khurtsidze saying a mere 37 words)[8] that Khurtsidze consciously avoided criminal knowledge when he and Melman "drove in silence to those casinos where they collected data for the scam." Trial Tr.1847. Khurtsidze's attorneys argued during summation, not that the silent car ride did not establish knowledge, but that Melman failed to mention Khurtsidze driving him to casinos the first four times he met with the government because Khurtsidze had never driven him to a casino. Trial Tr. 1908-1909. The government's rebuttal returned to Melman's silent car ride testimony, claiming that Khurtsidze "[drove] with Melman in silence to casinos." Trial Tr. 1930.

The Court then instructed the jury generally as to conscious avoidance, without specifying that it was tethered to any specific charge or predicate act. A1833-1835.

## VI. Khurtsidze Conviction and Sentencing

On June 19, 2018, the jury convicted Avtandil Khurtsidze on Counts One

---

[8] *See* Trial Tr. 1846-47; *see also* Government Exhibit 231-T. The government also argued that because he had "hauled" the machine "from apartment to apartment, under blankets, through Manhattan, to Brooklyn," Khurtsidze "knew it was fraud." Trial Tr. 1844. But no evidence supported the claim that Khurtsidze traveled to Manhattan or, even, that he had hauled the machine repeatedly. Rejecting defense counsel's objection to the government's arguing facts not in evidence, the District Court said that Khurtsidze should "just build that into your summation." Trial Tr. 1859.

and Five, and Razhden Shulaya on Counts One through Five. Trial Tr. 2077-2078.

The Presentence Investigation Report (PSR) established, correctly, that Khurtsidze

had no prior criminal history and that his Guideline sentencing range was 57 to 71

months. PSR19. Probation recommended a sentence of 57 months. PSR24.

Counsel for Khurtsidze argued for a below Guideline-sentence based on various 18

U.S.C. § 3553(a) factors, including Khurtsidze's rise from a destitute childhood in

the former Soviet Republic of Georgia through immense hard work and dedication

to a successful sports professional who financially supported his extended family

and mentored a new generation of Georgian youth. *See* 17-cr-350 (S.D.N.Y.) ECF

No. 989.

At the sentencing hearing, despite the trial evidence that Khurtsidze had hit

or punched only two individuals and the inconsistent allegations that he was

present when Shulaya committed three other assaults, and offering no new

sentencing evidence, the government described Khurtsidze as "the single most

violent individual, other than Shulaya himself, within the context of the Shulaya

enterprise." A1845-1846. The government argued for an above-Guidelines

sentence. A1847.

The Court, in explaining its sentencing determination, took issue not only

with Khurtsidze but also with the Sentencing Guidelines themselves. The Court

determined that Khurtsidze was Shulaya's "primary" enforcer and that "when the

30

guidelines are grouping together violent conduct, there is a substantial argument that the grouping analysis does not adequately take into consideration the level […] of the bodily injury that occurred again and again and again and again." A1865, 1873. This reference to bodily injury concerned the Chaganava assault – but following the trial it was clear that (contrary to the government's representations in its opening statement) Khurtsidze had certainly not punched Chagnava and perhaps had not even been present at the time. A1189-1192, 1528-1534. Despite the contradictory evidence surrounding this incident, the Court chose not only to adopt Zurab Dzhanashvili's version of the event (ignoring his testimony establishing that he was in immigration custody at the time and thus could not have witnessed the assault), but also decided to add culpable conduct that had no basis in the record, finding that Khurtsidze "did participate in bringing Mr. Chaganava to the location" despite there being no evidence to support this. A1866.

As to Khurtsidze's place in the Shulaya Enterprise, the Court held that he "had a knowledge of the breadth and the role of Mr. Shulaya in the scheme that was really quite unique." A1865, 1869. The Court determined that "there are very separate and sufficient roles unto themselves that [he] played that are not adequately taken into consideration in the guidelines" and that the Guidelines failed to account for Khurtsidze's "willingness to participate in such a broad array of conduct over time." A1873-1875. Again, however, this substantially

31

mischaracterized the evidence, as Khurtsidze was not even alleged to have been involved in Shulaya's conspiracies involving contraband stolen goods, cigarettes, identity theft or credit card fraud, which formed the basis for Shulaya's charges and convictions on Counts Two through Four.

The Court also wanted to send a message through Khurtsidze's sentence to immigrants and specifically to those coming from Russia or former Soviet Republics. A1877. The Court explained that this was:

> a case that may well be watched by the Georgian community, both here and abroad. … And individuals who are willing to engage and to support and facilitate organized crime within the United States need to understand that the legal just system here, the criminal justice system here will deal with it extraordinarily seriously. You cannot come to the shores of the United States, act lawlessly, and then because of the willingness to return to your home country, escape the full significance of that conduct. There needs to be a message sent out that you will face very serious consequences here in the United States. That Russian organized crime that seeks to come to the shores of the United States, should pay quite a bit of attention to the fact that individuals who are caught will be dealt with, with the power of our criminal justice system.

A1877-78. For that reason, the Court believed an upward variance was appropriate, especially because Khurtsidze was a world champion boxer who would be "able to convey and be a vehicle for a message of general deterrence." A1886-1887.

The Court then sentenced Khurtsidze to 10 years in prison. A1878.

32

Khurtsidze's attorneys objected to the sentencing disparity between Khurtsidze and his codefendants. A1882. The Court attempted to justify the disproportionately higher sentence it gave Khurtsidze by the role it believed Khurtsidze played in Shulaya's beating of Mamuka Chaganava – despite the contradictory testimony about Khurtsidze's presence and the undisputed fact that Khurtsidze had not beaten or held down Chaganava during any assault[9] – stating that "the guidelines don't take into account that kind of brazen willingness to stand there and allow someone else, to have Mr. Chaganava, for instance, as just a for instance, their face completely rearranged in a gruesome way, to allow to occur without batting an eye as far as I can tell." A1883. The District Court considered Khurtdize's role in the Shulaya enterprise to be "breathtaking and extraordinary," though it was similar to (and, with respect to the identity theft, stolen goods, extortion, counterfeit cigarette trafficking and wire fraud, less than) the misconduct of many of his codefendants. A1883.

Khurtsidze's sentence of 120 months stands as a stark outlier in this case. Khurtsidze's codefendants received the following sentences:[10]

---

[9] Perhaps the District Court was relying on the version of events set forth in the government's opening. The florid description of Khurtsidze's role as the primary "enforcer" was not, however, supported by the trial evidence.

[10] Co-defendants Mamuka Chaganava and Evgheni Melman have not yet been sentenced. Chaganava fled the United States and was arrested in Paris, France and

| Defendant | Sentencing Guidelines Range | Actual Sentence |
|---|---|---|
| Levan Makashvili | 0-6 months | 6 months[11] |
| Avtandil Kanadashvili | 12-18 months | 1 year & 1 day[12] |
| Mikael Toradze | 12-18 months | 1 year & 1 day[13] |
| Hamlet Uglava | 18-24 months | 18 months[14] |
| Artur Vinikurov | 21-27 months | 21 months[15] |
| Diego Gabisonia | 21-27 months | 21 months[16] |
| Azer Arslanouk | 21-27 months | 27 months[17] |
| Akaki Ubilava | 30-37 months | 30 months[18] |
| Nazo Gaprindiashvili | 46-57 months | 57 months[19] |

---

faces extradition to the Southern District of New York. A. 156, Dkt. 976. Melman has not had a sentencing date scheduled. A. 162, Dkt. 1033.

[11] A. 157 (ECF No. 987.)

[12] A. 145 (ECF No. 875.)

[13] A. 148 (ECF No. 907.)

[14] A. 125 (ECF No. 686.)

[15] A. 131 (ECF No. 733.)

[16] A. 150 (ECF No. 914.)

[17] A. 154-155 (ECF No. 965.)

[18] A. 135 (ECF No. 777.)

[19] A. 138 (ECF No. 806.)

| Nikoloz Jikia[20] | 120 months | 120 months[21] |
| Razhden Shulaya | Life | 45 years[22] |

Khurtsidze is the only defendant in this case who received an above-Guideline term, sentenced to more than four years over the top of his Guideline range. A1862, 1878.

## ARGUMENT

**I.     The Trial Court Abused its Discretion When Qualifying the Supervisor of the Shulaya Investigation as an Expert in the field of Eurasian Organized Crime**

Federal Rule of Evidence 702 allows expert testimony where "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue." Such an expert witness may be qualified so long as "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id*. This Court applies an abuse of discretion standard to reviewing a district court's

---

[20] Jikia, along with codefendant Bakai Marat-Uulu, pled guilty to selling firearms to federal agents and engaging in a murder-for-hire conspiracy. Marat-Uulu was sentenced to 164 months despite his sentencing guideline being 204 months.

[21] A. 111 (ECF No. 581.)

[22] A. 165-166 (ECF No. 1070.)

35

decision to allow expert testimony and "will sustain the admission unless 'manifestly erroneous.'" *United States v. Locascio*, 6 F.3d 924, 936 (2d Cir. 1993)

When considering the use of "officer experts," this Court has held that properly qualified experts could testify about the terms and structure of "oft-impenetrable" criminal organizations, but the testimony must still rest upon a reliable foundation." *United States v. Mejia*, 545 F.3d 179, 190 (2d Cir. 2008).

In addition to the traditional gate-keeping role of Rule 702, the use of officer experts presents additional concerns because of the "increasingly thinning line" between legitimate expert testimony and the use of officer experts to impermissibly summarize case-specific facts. *Id.*, at 190. This concern is at its apogee when the officer expert "happen[ed] to be one of the Government's own investigators" because of the likelihood that expert qualification would lend "unmerited credibility" to the factual testimony. *Id.*, at 191-192 citing *United States v. Alvarez*, 837 F.2d 1024, 1030 (11th Cir. 1988) ("When the expert is a government law enforcement agent testifying on behalf of the prosecution about participation in prior and similar cases, the possibility that the jury will give undue weight to the expert's testimony is greatly increased.")

This Court has warned against two scenarios when officer expert testimony may "stray from the scope of [the witness's] expertise." *Mejia*, 545 F.3d at 192, quoting *United States v. Dukagjini*, 326 F.3d 45, 55 (2d Cir. 2003). In *Dukagjini*,

36

this Court held that the officer expert's testimony "about the meaning of conversations in general, beyond the interpretation of code words," for example, was improper  *Id*., at 54.  Another example of impermissible officer expert testimony came from *United States v. Lombardozzi*, 491 F.3d 61 (2d Cir. 2007), where the government called an investigator from its own office to testify about the general structure of *La Cosa Nostra* in New York.  *Id*. at 72.  The officer expert strayed beyond the scope of permissible expert testimony by stating that the defendant was "a soldier in the Gambino crime family."  *Id*.

In addition to Penza's lack of expert qualifications, it is also the risk that granting vaunted expert status to the supervising agent in this case – a fact that the government had Penza tell the jury –impermissibly impacted the jury's credibility determinations and verdict that mandates vacatur of Khurtsidze's convictions in this case.

### A. Agent Penza Lacked Sufficient Expert Qualifications and His "Expert" Knowledge was Significantly Based Upon the Shulaya Investigation.

When a court is petitioned to qualify a witness as an expert, the first test is "the threshold question of whether a witness is 'qualified as an expert by knowledge, skill, experience, training, or education' to render his or her opinions." *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005) (quoting Fed. R. Evid. 702).  Once a court has found a potential expert witness to be qualified, that

37

does not end the inquiry. The court must then determine "whether the proffered testimony has a sufficiently 'reliable foundation' to permit it to be considered." *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2011) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)). This Court has "determined that an officer expert's testimony violates [Confrontation Clause of the Sixth Amendment recognized in] *Crawford* 'if [the expert] communicated out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of an expert opinion.'" *Mejia*, 545 F.3d at 198 (quoting *Lombardozzi*, 491 F.3d at 72.

Agent Penza testified generally as to his participation in the debriefing of confidential sources and the execution of search warrants in "[a]t least ten […] investigations of Eurasian organized criminal groups." A378. Penza admitted, however, that it was difficult for him to separate the knowledge he obtained from prior Eurasian organized criminal investigations from the knowledge he obtained during the four years that he had supervised the Shulaya investigation. A371. During *voir dire* Penza admitted that he had received no training from the FBI in Eurasian organized crime, had never testified in a Eurasian organized crime trial, had authored no publications and had never been previously qualified as an expert in any field. A365-66.

The District Court's decision to qualify Agent Penza as an expert in *vors* and

38

their customs allowed the government to elicit "expert" testimony that impermissibly established the context for Khurtsidze's involvement in the Shulaya organization. The decision to qualify Penza despite his lack of qualifications and his admission that his expert opinion was, at least in part, based upon his years supervising the Shulaya investigation, was error.

### B. As the Supervisor of the Shulaya Investigation, Agent Penza Should Not Have Been Permitted to Testify as the Government's Expert

Agent Penza not only testified about his experience as the supervisor of Squad C-24, the FBI's New York unit investigating Eurasian organized crime, but also that he supervised the Shulaya investigation. Despite pretrial litigation on whether Agent Penza should be allowed to testify as an expert, the defense first learned that he had supervised the Shulaya investigation during his trial testimony.[23]

The District Court determined that although Agent Penza had told the jury that he "had supervisory authority over" the Shulaya investigation, he was not actually "running" the investigation. A323, 357. And after further argument and

---

[23] Prior to trial, the government's notice that they intended to call Penza as an expert failed to mention that he was a supervisor of C-24 or this investigation. A214-215. The government's response to defense counsel's motion *in limine* to preclude Penza (filed approximately two weeks prior to trial), while for the first time mentioning that Penza was a supervisor of C-24, failed to mention that he supervised this very investigation. A227-239.

39

renewed objection, the District Court qualified Agent Penza as an expert in the area of Eurasian organized crime. Agent Penza's expert testimony about *vors*, *obshchak* and eight-pointed stars was cumulative and unnecessary, as the government also elicited testimony about the codes and language of Eurasian criminal organizations from two other cooperating government witnesses, Sasha Kutsenko and Zurab Dzhanashvili.[24] Thus, while the value of Penza's testimony was, at best, slight, the prejudice to Khurtsidze was substantial.

Although Penza claimed that he did not provide case-specific factual testimony,[25] the District Court's decision to grant Penza expert status infused the entire government case with widespread unmerited credibility. The jury heard that Penza supervised the Shulaya investigation and oversaw the case agents who conducted the investigation and testified during trial (including the two lead case agents who were seated at the prosecution table throughout the trial, Agents Richards and Hanratty), and that revelation was not redressed by the standard jury instruction on the limited purpose of Penza's testimony. The credibility conferred upon Agent Penza necessarily granted the government's investigation and

---

[24] Of course, the government could have designated a different expert instead of using the supervisor of the Shulaya investigation, but simply chose not to do so.

[25] Agent Penza's admission that he was unable to determine whether the source of his expertise came from prior case experience or from the Shulaya investigation makes it impossible to know whether his "opinions" were based on the Shulaya investigation or another source.

40

prosecution a patina of unmerited credibility.

The decision to qualify Agent Penza as an expert despite his deficient qualifications, even after he told the jury that he supervised the Shulaya investigation and its case agents, was an abuse of discretion, violated Khurtsidze's right to a fair trial and was not harmless beyond a reasonable doubt.

## II.    The Trial Court Erred by Instructing the Jury as to Conscious Avoidance and this Error was Not Harmless Beyond a Reasonable Doubt

Where, as here a defendant objected to the conscious avoidance instruction at trial, this Court reviews the issue *de novo*, applying a harmless error standard. *See United States v. Botti*, 711 F.3d 299, 308 (2d Cir. 2013). Under the harmless error standard, "a conviction will be affirmed only 'if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.' " *Botti*, 711 F.3d at 308, quoting, *United States v. Mahaffy*, 693 F.3d 113, 136 (2d Cir. 2012) (citations and additional internal quotation marks omitted).

This Court employs a two-prong test for determining whether trial facts go to a defendant's criminal intent or conscious avoidance such that:

> [A] conscious avoidance charge instruction may be given only
> (i) 'when a defendant asserts the lack of some specific aspect of knowledge required for conviction,' and
> (ii) 'the appropriate factual predicate for the charge exists, i.e., the evidence is such that a rational juror may reach the conclusion beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact.'

41

*United States v. Ferguson*, 676 F.3d 260, 278 (2d Cir. 2011), quoting *United States v. Quattrone*, 441 F.3d 153, 181 (2d Cir. 2006).

### A. The Defense Never Asserted the Lack of Some Specific Act or Knowledge Required for Conviction

A conscious avoidance charge requires that the "defendant asserts the lack of some specific aspect of knowledge required for conviction." *Quattrone*, 441 F.3d at 181. The lack of knowledge can also be seen as "deliberate ignorance." *United States v. Feroz*, 848 F.2d 359, 360 (2d Cir. 1988). "That emphasis on 'deliberate ignorance' [is] significant because it captured the thought essential to the concept of *conscious* avoidance, that the defendant must be shown to have *decided* not to learn the key fact, not merely to have failed to learn it through negligence." *United States v. Rodriguez*, 983 F.2d 455, 458 (2d Cir. 1993), quoting *United States v. Feroz*, 848 F.2d 359, 360 (2d Cir. 1988) (emphasis in original). No facts or argument supported a finding that Khurtsidze had been deliberately ignorant such as to warrant a conscious avoidance instruction.

During cross-examination, the defense countered Melman's allegation that Khurtsidze had driven him to multiple casinos by eliciting admissions from Melman that though he had discussed casino trips during his first four meetings with the government, he never mentioned at those meetings that Khurtsidze had driven him. This was directly relevant to the defense theory that Melman had consistently misidentified Khurtsidze – saying he was at the Galaxy Tire meeting

42

when, as the government had stipulated, he was not, for example. During this critical moment of cross-examination, the Court on its own initiative asked Melman why he had failed to mention Khurtsidze during those meetings, to which Melman responded that Khurtsidze had not spoken during the one trip that Melman continued to maintain involved Khurtsidze.

While the government argued that by physically moving the slot machine a few times Khurtsidze demonstrated deliberate ignorance of the wire fraud scheme, this did not satisfy the legal requirement for a conscious avoidance instruction. Unlike a drug courier found in possession of a suitcase with four pounds of cocaine sewn into the lining, which could not be missed but had to be deliberately ignored (*see Rodriguez*, 983 F.2d at 456), Khurtsidze simply moved a slot machine. The government did not provide evidence other than the very short 2-3 second clips on Khurtsidze's phone (that no one testified he took or sent) that Khurtsidze ever even saw a slot machine in action. Thus, the defense was not that Khurtsidze lacked specific knowledge but, rather, that the facts were not sufficient to support the government's charge that he moved the slot machine to further a wire fraud conspiracy; and that Melman had erred in identifying Khurtsidze as his driver.

## B. The Appropriate Factual Basis Did Not Exist

Even if a court finds that a defendant has asserted some lack of specific knowledge, there must still be an "appropriate factual predicate" for the conscious

43

avoidance charge. *Rodriguez*, 983 F.2d at 458. That is, the trial record must contain evidence "such that a rational juror may reach the conclusion beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact." *United States v. Fofanah*, 765 F.3d 141, 144-145 (2d Cir. 2014).

The District Court's reliance upon Melman's silent car ride testimony as the factual predicate upon which to base the conscious avoidance charge is difficult to understand. The defense never suggested that a silent car ride with Melman kept Khurtsidze from learning some fact. Instead, the defense consistently argued that there was no credible evidence that Khurtsidze ever drove Melman to a casino, silent or otherwise.

Neither the disputed silent car ride nor the movement of the slot machine provided the appropriate factual predicate to support the Court's decision to charge the jury on conscious avoidance. It was therefore error for the District Court to give the conscious avoidance charge.

## C. The Court's General Conscious Avoidance Charge Undercut the Entire Theory of Defense and Thus Was Not Harmless

Nor was the erroneous instruction harmless beyond a reasonable doubt. The instruction that the District Court gave was so overly broad that the jury could reasonably have understood it to pertain to both charges against Khurtsidze. The overly broad charge impermissibly undercut the entire defense theory on the

44

racketeering conspiracy – that Khurtsidze's actions were never intended to further the enterprise conspiracy. By failing to instruct the jury that the conscious avoidance charge related solely to the wire fraud charge, the jury was also implicitly told that it could apply conscious avoidance to the entire case against Khurtsidze. The Court's error confused the criminal intent required for a conspiracy conviction, the foundation of the theory of defense.

The Court erred by determining that a disputed silent car ride was an appropriate factual predicate for a conscious avoidance charge, despite the fact that the defense never asserted that Khurtsidze consciously avoided a key fact. This error was compounded by the court's decision to give a general conscious avoidance charge only for Khurtsidze but not Shulaya. Given the relatively weak evidence as to the wire fraud count, as discussed below, the District Court's erroneous conscious avoidance instruction cannot be considered harmless beyond a reasonable doubt.

## III.   The Evidence on Count Five Was Insufficient

A challenge to the sufficiency of the evidence is reviewed *de novo* on appeal. *United States v. Rangolan*, 464 F.3d 321, 324 (2d Cir. 2006). In reviewing for insufficiency, a court need consider "only 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" *United States v. Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2004) (quoting *Jackson v. Virginia*, 443

45

U.S. 307, 318 (1979)). The trial evidence is considered in the light most favorable

to the prosecution, crediting "every inference that the jury may have drawn" in the

governments favor. *United States v. Finley*, 245 F.3d 199, 202 (2d

Cir.2001) (internal quotation and quotation marks omitted.) A conviction will thus

be upheld so long as any rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt. *Id*.

But while Mr. Khurtsidze's burden on a sufficiency challenge is heavy, it is

"not an impossible one." *United States v. Jones*, 393 F.3d 107, 111 (2d

Cir.2004). Indeed, the courts "are bound by the fundamental principle that 'the

Due Process Clause protects the accused against conviction except upon proof

beyond a reasonable doubt of every fact necessary to constitute the crime with

which he is charged.'" *United States v. Zhou*, 428 F.3d 361, 375 (2d Cir.

2005) (reversing for lack of evidence on element of extortion conviction)

(quoting *In re Winship*, 397 U.S. 358, 364 (1970).) Although "it is the task of the

jury, not the court, to choose among competing inferences that can be drawn from

the evidence," (*United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 1998),

"specious inferences are not indulged." *United States v. Jones*, 393 F.3d 107, 111

(2d Cir. 2004). Thus, when the trial record contains no evidence of an element of

the crime, insufficiency is established as a matter of law. *Zhou*, 428 F.3d at 377.

Avtandil Khurtsidze's connection to the wire fraud conspiracy was based upon nothing more than mere presence and the carrying of a slot machine. The trial evidence did not support that Khurtsidze, at any point, intended to further the wire fraud conspiracy, nor that he even appreciated the nature of it, and was, thus, insufficient to support his conviction on Count Five. Although the government had several confidential sources and cooperating witnesses who were intimately involved with the wire fraud conspiracy, the only (often inconsistent) evidence over the entire course of the wire fraud conspiracy, established, at most, that:

- Khurtsidze and Akaki Ubilava physically carried the slot machine into Nazo Gaprindiashvili's apartment once.

- Khurtsidze walked in front of two individuals who carried the slot machine into the poker house once.

- Khurtsidze was present when co-defendant Evgheni Melman came to the poker house to repair the slot machine once.

- Khurtsidze, along with two other individuals, placed the slot machine into the confidential source's vehicle once.

- Khurtsidze drove Melman to a casino.

- During a phone call, Khurtsidze listened to Shulaya talk about a previous demonstration where co-defendants attempted to hack the slot machine.

47

● An individual texted Khurtsidze three photos of slot machines.

Even taking every allegation as true, a finding that Khurtsidze intended to further the casino scheme was based upon specious inferences. There was no evidence that Khurtsidze was present during a demonstration of the hacking of the slot machine or that he had any knowledge of Shulaya's fraudulent plan. The government introduced no evidence that Khurtsidze was present during any slot machine demonstrations or participated in any conversations about the scheme. Any inference that Khurtsidze appreciated that Shulaya and his team were manipulating the machine's code (which was necessary for Khurtsidze to have knowingly entered into and participated in the wire fraud conspiracy), as opposed to helping install an electronic gambling device in the poker house for use by patrons there, was specious.

Accordingly, there was insufficient evidence to sustain Khurtsidze's conviction for the wire fraud conspiracy and the conviction for Count Five must be vacated.

## IV. The District Court Committed Procedural and Substantive Errors When Imposing a Sentence Twice the Recommended Guidelines Range

The "overarching" statutory directive to sentencing courts under 18 U.S.C. § 3553(a) is the "parsimony" clause – the duty to "impose a sentence sufficient, but not greater than necessary" to accomplish the goals of the federal sentencing regime. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007); *United States v.*

48

*Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010); 18 U.S.C. § 3553(a). To fulfill this mandate, the sentencing court must "consider every convicted person as an individual and every case as a unique study in human failings" that either mitigate or aggravate the punishment, and then impose the lowest sentence sufficient to satisfy the Section 3553(a)(2) sentencing goals. *Gall v. United States*, 552 U.S. 38, 52-53, 59 (2007) (citation omitted).

Appellate review of a sentence encompasses two components: procedural and substantive reasonableness. *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*). When a district court "selects a sentence based on clearly erroneous facts" or "fails to consider the § 3553(a) factors," that sentence is procedurally unreasonable. *United States v. Chu*, 714 F.3d 742, 746 (2d Cir. 2013) (internal quotation marks omitted); *see also Gall,* 552 U.S. at 51. Reasonableness review "amounts to review for abuse of discretion." *Cavera*, 550 F.3d at 187 (citing, among other authorities, *Gall*, 552 U.S. at 46; *Kimbrough*, 552 U.S. at 111). Although the standard implies deference to the district court, it does "not equate to a 'rubber stamp.'" *United States v. Rattoballi,* 452 F.3d 127, 132 (2d Cir. 2006).

When, however, a challenge is made to a sentencing court's consideration of a defendant's protected category, such as national origin or immigration status, this

49

presents "a pure question of law" and must be "review[ed] … *de novo*." *United States v. Kaba*, 480 F.3d 152, 156 – 57 (2d Cir. 2007).

In this case, the District Court relied on mischaracterizations of the factual record; it failed to articulate a warranted basis for the unquestionable disparity between Khurtsidze's sentence and those of his co-defendants determinations; and it improperly treated Khurtsidze's national origin and immigration status as adverse sentencing factors. For these reasons, the sentence must be vacated.

## A. The Sentence was Procedurally and Substantively Unreasonable

Avtandil Khurtsidze's sentence is this case was unwarrantedly disproportionate to the sentences assigned to co-defendants; varied unreasonably above the Guidelines; and was based on the District Court's misconstrual of the factual record. All of those errors, individually as well as cumulatively, constitute error warranting vacatur of the sentence.

### i. Unwarranted Sentencing Disparity

Khurtsidze was the only defendant in this case sentenced above Guidelines. His 120-month sentence is more than double the bottom and over four years higher than the top of his Guideline range of 57 to 71 months. Although prior notice of a Court's consideration of an above-Guideline sentence is no longer required, "[s]ound practice dictates that judges in all cases should make sure that the information provided to the parties in advance of the hearing, and in the

50

hearing itself, has given them an adequate opportunity to confront and debate the relevant issues." *United States v. Irizarry*, 553 U.S. 708, 715 (2008).  Judge Forrest provided no notice of her intent to make Khurtsidze the only defendant in this case to receive an above-Guideline sentence, let alone of her consideration of a substantially above-Guidelines sentence.  To the extent that the District Court premised the sentence on its belief that the Guidelines failed to adequately account for the two relatively-minor assaults with which Khurtsidze was directly involved and the three at which he was allegedly present, that purported objection to the Guidelines is wholly undermined by the sentence the same Court imposed on codefendant Nikoloz Jikia.

That defendant was convicted of a murder-for-hire conspiracy involving the sale of firearms to federal agents, and sentenced also to 120 months.  The only explanation the District Court gave as to why the violence in Khurtsidze's case (but not, for example, Jikia's) warranted an above-Guidelines sentence was the general view that the Guidelines are weak when it comes to crimes of violence and serious physical injury caused by a co-defendant.

But the proof at trial and sentencing of the violent conduct by Khurtsidze that the District Court considered "breathtaking and extraordinary" was, in fact, quite limited and comparable to the conduct of other defendants in this case.

The government alleged that Khurtsidze struck two people over the course

51

of this multi-year investigation – Kutsenko and Anton. There was no allegation that either Kutsenko or Anton were injured as a result. To anchor its view of Khurtsidze's "assaultive conduct" as "breathtaking and extraordinary," the District Court erroneously conflated three assaults by Shulaya with Khurtsidze, blaming Khurtsidze for his presence at those assaults – blaming Khurtsidze more than the codefendants who were also present at the Chaganava beating, with no reasonable explanation for doing so.

Further, all of the assaults presented substantial evidentiary questions that were not answered at sentencing.

In connection with the incident involving Zurab Natchkepia, one government witness who claimed Khurtsidze was there could not identify Khurtsdize in the courtroom and said that he based his assumption about Khurtsidze's presence on a photograph in a newspaper. Another government witness testified that Shulaya committed two almost identical assaults of Natchkepia on different dates, and Khurtsidze was only present at the first. A third government witness testified not only that he did not recall Khurtsidze being at a Khurtsidze assault, but that he did not even meet Khurtsidze until the summer of the following year. Even if he had been present at a Natchkepia assault, Khurtsidze was one of "10 to 15" people there, including several codefendants who received within- or below-Guidelines sentences.

52

A second Shulaya assault where Khurtsidze was accused of being present occurred at co-defendant Zurab Dzhanashvili's birthday. One of the government's confidential sources testified that Shulaya slapped an associate and that Khurtsidze was one of approximately 10 Shulaya associates at the restaurant where that happened – 10 people including codefendants who received within- or below- Guidelines sentences.

The third assault was Shulaya's beating of Mamuka Chaganava inside the poker house. This assault, not committed by Khurtsidze and facilitated by several other co-defendants, as well, carried considerable weight in the Court's sentencing determination. A1883. But the District Court's absolute certainty about Khurtsidze's role in the Chaganava beating was contradicted by the trial evidence. Although government informant Kutsenko testified that Khurtsidze was at the poker house when the assault occurred, when Kutsenko debriefed with the FBI mere days after the assault, he only said that Shulaya and an "unknown Georgian man" were there – though at that point he knew Khurtsidze, so the unknown man had to have been someone else. The only other witness who placed Khurtsidze in the poker house, Zurab Dzhanashvili, testified that he was in immigration custody on the date of the Chaganava assault, rendering his testimony about Khurtsidze's presence questionable. Even if crediting Dzhanashvili's testimony, however, he said that Khurtsidze was not even in the room with Shulaya and Chaganava when

53

the assault occurred. While being at the poker house when the Chaganava beating occurred may justify criminal liability, it does not support the District Court's finding that Khurtsidze was "brazen[ly willing[]" to have Chaganava's "face completely rearranged in a gruesome way, to allow to occur without batting an eye as far as I can tell." A1883. The District Court simply got the record wrong in believing that Khurtsidze, by being in the same building where the assault occurred, was "brazenly willing" to participate in a brutal beating.

As to the wire fraud conduct, the full extent of Khurtsidze's involvement in the casino scheme was, at most: moving the slot machine or being present when it was moved twice; being at the poker house when Melman was also at the poker house to repair the machine; placing the machine in a vehicle; driving Melman to a casino one time; receiving some 2-3 second videos of slot machines via text message; and taking a call from Shulaya during which Shulaya talked at Khurtsidze for several minutes. Those acts were substantially less extensive than those committed by Khurtsidze's codefendants in the gambling device fraud, yet those codefendants received within- or below-Guidelines sentences. (Diego Gabisonia, for example, who, along with Melman, manipulated the code, received only a 21-month sentence.) Notwithstanding Khurtsidze's relatively minor culpability for the wire fraud conspiracy, the District Court imposed a sentence of 10 years on Count Five.

54

When "justifying" the undeniable sentencing disparity between Khurtsidze and his co-defendants, the District Court explained that Khurtsidze deserved such a disparately long term because his willingness to engage in assaultive conduct was "really quite breathtaking and extraordinary" – despite the limited testimony of his direct or indirect involvement in specific acts of violence over the three-year conspiracy. The District Court also rested the disparity on its perception that Khurtsidze "[stood] differently" from his codefendants because he was "a world champion boxer" and was "an individual when he showed up on the shores of the United States was recognized. He is somebody who can walk into various places, within the Georgian community here in the United States and be recognized and be seen. And therefore, he is able to convey and be a vehicle for a message of general deterrence." A1886-1887. As discussed below, however, a defendant's nationality can play no adverse role at sentencing; that Khurtsidze was a well-known member of the Georgian expatriate community could not legally justify the sentencing disparity in this case.

### ii. The Sentence was Substantively Unreasonable

The 120-month sentence imposed here was a "major departure" from the Sentencing Guidelines requiring "a more significant justification than a minor [departure]." *Gall*, 552 at 597. Khurtsidze was a mine-run defendant and the District Court's 120-month sentence should "invite closer appellate review." *Id.,*

55

at 193 (citing *Kimbrough*, 552 U.S. at 575.)

Khurtsidze's involvement in the racketeering conspiracy was very much on par with a number of his Guideline-sentenced codefendants, while his role in the wire fraud conspiracy was far less than that of his codefendants.

The District Court was simply wrong in stating that Khurtsidze "spent an extraordinary amount of time with Mr. Shulaya" and that he was involved in "a breadth of activity" that suggested "a willingness to engage in a broad array of criminal conduct … ." A1875, 1884.  As several witnesses, including Khurtsidze's character witnesses, had testified, Khurtsidze spent much of his time training and fighting in professional matches overseas and around the United States.  Dzhanashvili explained that though he knew Shulaya from at least 2014, he only met Khurtsidze in the summer of 2015 and based on Dzhanashvili's testimony it would appear that most times he saw Shulaya, Khurtsidze was not present.  Contrary to the District Court's belief, Khurtsidze did not play an integral part in the Shulaya enterprise.  He of course had no involvement in the $700,000 contraband cigarette scheme, the longest running part of the entire enterprise. The confidential source who sold over 500 cases of cigarettes to Shulaya and various codefendants never even mentioned Khurtsidze.  Khurtsidze also had no involvement in Shulaya's stolen goods conspiracy nor his identity theft and credit card fraud scheme.

56

A sentence of 10 years for this conduct is wholly unsupportable and was substantively unreasonable.

**B.     The District Court Erred When Singling Out Khurtsidze's National Origin and Immigration Status as Support for the Above-Guidelines Sentence**

A defendant's "nationality may play no adverse role in the administration of justice, including at sentencing." *United States v. Leung,* 40 F.3d 577, 586 (2d Cir. 1994) (citations omitted); *see also* 28 U.S.C. § 994(d); U.S.S.G. § 5H1.10.  Thus, when there is even the appearance that a sentence reflects a defendant's ethnicity, resentencing is required. *Leung*, 40 F.3d at 586 (vacating sentence that could reasonably be construed to be based, in part, on defendant's national origin.)  And "[a]lthough deterrence is undoubtedly a proper consideration in imposing sentence … a defendant's ethnicity or nationality" cannot "be taken into account in selecting a particular sentence to achieve the general goal of deterrence." *Leung,* 40 F.3d at 586 (citations omitted). Nor is proof of actual bias necessary to warrant vacatur of the sentence. Because " 'justice must satisfy the appearance of justice,' even the appearance that the sentence reflects a defendant's race or nationality will ordinarily require a remand for resentencing." *Kaba*, 480 F.3d at 156 (internal citations omitted)).

Here, the District Court was not subtle in explaining the adverse role Khurtsidze's national origin and immigration status played in the sentencing

57

decision. Noting that this case drew press attention, the judge wanted to send a

message to "the Georgian community, both here and abroad" that:

> [I]ndividuals who are willing to engage and to support and facilitate
> organized crime within the United States need to understand that the
> legal justice system here, the criminal justice system here will deal
> with it extraordinarily seriously. You cannot come to the shores of
> the United States, act lawlessly, and then because of a willingness to
> return to your home country, escape the full significance of that
> conduct. There needs to a be a message sent out that you will face
> very serious consequences here in the United States. That Russian
> organized crime that seeks to come to the shores of the United States,
> should pay quite a bit of attention to the fact that individuals who are
> caught will be dealt with, with the power of our criminal justice
> system.

A1876-1877. It was the District Court's belief that this was "a case that may well

be watched by the Georgian community, both here and abroad." A1877.

Accordingly, the District Court believed that the substantial sentence would "be a

message sent out that you will face very serious consequences here in the United

States." A1877. That message would be particularly well-conveyed because of

Khurtsidze's national origin, and it would be a message sent to "Russian organized

crime that seeks to come to the shores of the United States." A1877. Khurtsidze

as a Georgian national from a former Soviet Republic with a wide audience would

therefore be "able to convey and be a vehicle for a message of general deterrence."

A1886-1887.

The comments of the district court that led to remands in *Leung* and *Kaba* are

strikingly similar to those at issue here. In all of these cases, "the district court

58

referred to the publicity a sentence might receive in the defendant's ethnic community or native country and explicitly stated its intention to seek to deter others sharing that national origin from violating United States laws in the future." *Kaba*, 480 F.3d at 157 – 58 ("I hope that that has some effect here that will deter other people from that background from doing what you've done here."… ("Ms. Kaba, I suggest that you go around telling people, look, watch yourself here. If you come to this country, it gives you great opportunity to build a restaurant and make a life for yourself, but if you violate our laws, they're going to dump on you."); *Leung,* 40 F.3d at 585 ("I want the word to go out from this courtroom that we don't permit dealing in heroin and it is against president [sic] law, it is against the customs of the United States, and if people want to come to the United States they had better abide by our laws.")).

Whether or not the District Court in this case harbored bias is immaterial. By creating "at least the appearance of unfairness," the explicit reliance on Khurtsidze's national origin and how that played an adverse role in his sentencing "requires a remand for re-sentencing." *Kaba*, 480 F.3d at 158.

## CONCLUSION

For all the reasons above, Avtandil Khurtsidze asks that his convictions for Count One and Count Five be vacated; or, in the alternative his sentence be vacated and the matter remanded for resentencing.

59

Dated this 12th day of April 2019.

By: _____ /s/ Megan Wolfe Benett
Megan Wolfe Benett, Esq.
750 Third Avenue
New York, NY 10017
Telephone: (212) 973-3406
Facsimile: (212) 972-9432

By: _____ /s/ Arthur Ken Womble
Arthur Ken Womble, Esq.
66 Willoughby Street
Brooklyn, NY 11201
Telephone: (718) 514-9100
Facsimile: (917) 210-3700

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Local Rule

32.1(a)(4)(a) because it contains 13,773 words.

This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in a proportionally spaced typeface using Microsoft Word

2013 in the Times New Roman font, size 14.

Dated April 12, 2019

By:   /s/ Megan Wolfe Benett
      Megan Wolfe Benett, Esq.

# SPECIAL APPENDIX

i

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

**Page**

Judgment, entered September 11, 2018, Appealed
From........................................................................ SPA-1

**SPA-1**

AO 245B (Rev. 09/17)   Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | |
| Avtandil Khurtsidze | Case Number:  S9 17 Cr. 350- 027 (KBF) |
| | USM Number:  91177-054 |
| | Ken Womble |
| | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)     1s, 5s _____
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18:1962-7480.F | RACKETEERING CONSPIRACY | 6/30/2017 | 1s |
| 18:1349.F | WIRE FRAUD CONSPIRACY | 5/31/2017 | 5s |

The defendant is sentenced as provided in pages 2 through ___7___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☑ Count(s)    ALL UNDERLYING COUNTS    ☐ is    ☑ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

9/7/2018
Date of Imposition of Judgment

_Signature of Judge_

Hon. Katherine B. Forrest, U.S.D.J.
Name and Title of Judge

9/10/18
Date

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/11/18

SPA-2

AO 245B (Rev. 09/17)   Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page   2   of   7

DEFENDANT:  Avtandil Khurtsidze
CASE NUMBER:  S9 17 Cr. 350- 027 (KBF)

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

120 months on both counts 1 and 5 to run concurrently.

☑   The court makes the following recommendations to the Bureau of Prisons:

The Court orders that the defendant not be housed in the same facility as Razhden Shulaya. The Court recommends that defendant be housed in a facility in the Northeast. The Court recommends that defendant be housed in a facility with ESL capabilities in order to assist the defendant with learning English.

☑   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

    ☐   at _____ ☐ a.m.  ☐ p.m.   on _____ .

    ☐   as notified by the United States Marshal.

☐   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐   before 2 p.m. on _____ .

    ☐   as notified by the United States Marshal.

    ☐   as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

SPA-3

AO 245B (Rev. 09/17)   Judgment in a Criminal Case
                   Sheet 3 — Supervised Release

Judgment—Page    3    of    7

DEFENDANT:   Avtandil Khurtsidze
CASE NUMBER:   S9 17 Cr. 350- 027 (KBF)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :

2 years of supervised release on both counts 1 and 5 to run concurrently.

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.

2.  You must not unlawfully possess a controlled substance.

3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    - ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*

4.  ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*

5.  ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*

6.  ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*

7.  ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

**SPA-4**

AO 245B (Rev. 09/17)   Judgment in a Criminal Case
Sheet 3A — Supervised Release

|  | Judgment—Page | 4 | of | 7 |

DEFENDANT: Avtandil Khurtsidze
CASE NUMBER: S9 17 Cr. 350- 027 (KBF)

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____     Date _____

SPA-5

AO 245B (Rev. 09/17)   Judgment in a Criminal Case
Sheet 3B — Supervised Release

Judgment—Page  5  of  7

DEFENDANT:  Avtandil Khurtsidze
CASE NUMBER:  S9 17 Cr. 350- 027 (KBF)

## ADDITIONAL SUPERVISED RELEASE TERMS

The defendant is to provide the Probation Department access to any and all requested financial information.

The defendant shall submit his person, residence, place of business, vehicle, or any other premises under his control to a search on the basis that the probation officer has reasonable belief that contraband or evidence of a violation of the conditions of the release may be found. This search must be conducted at a reasonable time and in a reasonable manner. Failure to submit to a search may be grounds for revocation. The defendant shall inform any other residents that the premises may be subject to search pursuant to this condition.

The defendant shall comply with the immigration law and cooperate with the Department of Homeland Security, Bureau of Citizenship and Immigration Services (BCIS).

The defendant shall be supervised by the district of residence.

SPA-6

AO 245B (Rev. 09/17)   Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page ___6___ of ___7___

DEFENDANT: Avtandil Khurtsidze
CASE NUMBER: S9 17 Cr. 350- 027 (KBF)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **JVTA Assessment*** | **Fine** | **Restitution** |
|---|---|---|---|---|
| **TOTALS** | $ 200.00 | $ | $ 30,000.00 | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss**** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| **TOTALS** | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

   ☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

   ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

SPA-7

AO 245B  (Rev. 09/17)  Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page ___7___ of ___7___

DEFENDANT:  Avtandil Khurtsidze
CASE NUMBER:  S9 17 Cr. 350- 027 (KBF)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $ __200.00__ due immediately, balance due

    ☐  not later than _____ , or
    ☐  in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

B  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

C  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

    Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.