# 18-1390(L) 18-2522;
# 18-2783; 18-3852

In The

# United States Court Of Appeals
### For The Second Circuit

**UNITED STATES OF AMERICA,**

*Appellee,*

**v.**

**ZURAB DZHANASHVILI, AKA ZURA, AKAKI UBILAVA, AKA AKO, HAMLET UGLAVA, MAMUKA CHAGANAVA, MIKHEIL TORADZE, NAZO GAPRINDASHVILI, AKA ANNA, EVGHENI MELMAN, TIMUR SUYUNOV, ZURAB BUZIASHVILI, GIORGI LOMISHVILI, IVAN AFANASYEV, AKA VANYA, DENIS SAVGIR, BAKAI MARAT-UULU, ANDRIY PETRUSHYN, DIEGO GABISONIA, LEVAN MAKASHVILI, SEMYON SARAIDAROV, AKA SAMMY, DENYS DAVYDOV, EREKLE KERESELIDZE, ALEX MITSELMAKHER, AKA GLOBUS, YURIY LERNER, AKA YURI, AVTANDIL KANADASHVILI, NIKOLOZ JIKIA, VACHE HOVHANNISYAN, ARTUR VINOKUROV, AKA RIZHY,**

*Defendants,*

**and**

**AZER ARSLANOUK, RAZHDEN SHULAYA, AKA BROTHER, AKA ROMA, AVTANDIL KHURTSIDZE,**

*Defendants – Appellants.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (NEW YORK CITY)**
The Honorable Katherine Bolan Forrest, Case No. 1:17−cr−00350−LAP−1

———————

### OPENING BRIEF FOR APPELLANT RAZHDEN SHULAYA

———————

**FELDMAN and FELDMAN**
**Attorneys at Law**
**1129 Northern Boulevard**
**Manhasset, NY 11030**
**Suite 404**
**(516) 441-0452**

*Arza Feldman,*
*Counsel for Appellant Razhden Shulaya*

*Gibson*Moore Appellate Services, LLC
206 East Cary Street ♦ P.O. Box 1460 (23218) ♦ Richmond, VA 23219
804-249-7770 ♦ www.gibsonmoore.net

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . i

STATEMENT OF SUBJECT MATTER
AND APPELLATE JURISDICTION.. . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES.. . . . . . . . . . . . . . . . . . . . . . . . . 2

STANDARD OR SCOPE OF REVIEW.. . . . . . . . . . . . . . . 3

STATEMENT OF THE CASE.. . . . . . . . . . . . . . . . . . . . . . 5

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . 6

SUMMARY OF ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . 23

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

POINT I:

    WHEN THE JURY FOREMAN COMPLAINED
    TO THE COURT, IN A JURY NOTE, THAT A
    HOLDOUT JUROR WAS "USING NON-LAW
    PRINCIPLES," THE DISTRICT COURT
    COMMITTED STRUCTURAL ERROR WHEN IT
    FAILED TO INSTRUCT THE JURY THAT NO
    JUROR SHOULD YIELD A CONSCIENTIOUS
    CONVICTION HE MAY HAVE AND, INSTEAD,
    MERELY INSTRUCTED IT, OVER OBJECTION,
    ON GENERAL PRINCIPLES OF LAW. . . . . . . . . . 25

POINT II:

    APPELLANT'S SENTENCE OF 45 YEARS'
    IMPRISONMENT WAS SUBSTANTIVELY
    UNREASONABLE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

POINT III:

THE DISTRICT COURT ABUSED ITS
DISCRETION WHEN IT REFUSED TO GRANT A
SENTENCING ADJOURNMENT TO INCOMING
RETAINED COUNSEL. . . . . . . . . . . . . . . . . . . . . . . 42

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

CERTIFICATE OF COMPLIANCE WITH
    FRAP RULE 32.. . . . . . . . . . . . . . . . . . . . . . . . . . . 49

CERTIFICATE OF COMPLIANCE WITH
LOCAL RULE 32(a)(1)(E). . . . . . . . . . . . . . . . . . . . . . . . 50

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . 51

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Allen v. United States*, 164 U.S. 492,
41 L. Ed. 528, 17 S. Ct. 154 (1896).. . . . . . . . . . . 30, 31, 33, 35

*Lowenfield v. Phelps*, 484 U.S. 231,
98 L. Ed. 2d 568, 108 S. Ct. 546 (1988). . . . . . . . . . . . . . . . 34

*Smalls v. Batista,* 191 F.3d 272 (2d Cir. 1999). . . . . . . . . . . . . 31, 35

*Smalls v. Batista,* 6 F. Supp. 2d 211 (S.D.N.Y. 1998),
*aff'd, Smalls v. Batista*, 191 F.3d 272 (2d Cir. 1999). . . . . . . 36

*Spears v. Greiner,* 459 F.3d 200 (2d Cir. 2006),
*cert. denied*, 549 U.S. 1124, 127 S. Ct. 951,
166 L. Ed. 2d 725 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Ungar v. Sarafite*, 376 U.S. 575, 11 L. Ed. 2d 921,
84 S. Ct. 841 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States v. Amuso,* 21 F.3d 1251 (2d Cir. 1994).. . . . . . . . . 3, 28

*United States v. Cavera,* 550 F.3d 180 (2d Cir. 2008). . . . . . . . . . . 38

*United States v. Ellenbogen,* 365 F.2d 982 (2d Cir. 1966). . . . . . . . 44

*United States v. Fawwaz,* 116 F. Supp. 3d (S.D.N.Y. 2015). . . . . . 46

*United States v. Ford,* 435 F.3d 204 (2d Cir. 2006). . . . . . . . . . . 3, 28

*United States v. Ganim,* 510 F.3d 134 (2d Cir. 2007).. . . . . . . . . . . 33

*United States v. Garcia,* 665 F. App'x 62 (2d Cir. 2016). . . . . . . . . 37

*United States v. Johnson,* 567 F.3d 40 (2d Cir. 2009). . . . . . . . 38, 39

i

*United States v. Kahaner,* 317 F.2d 459 (2d Cir. 1963). . . . . . . . . .  29

*United States v. Martinez,* 446 F.2d 118 (2d Cir.),
    *cert. denied*, 404 U.S. 944, 92 S. Ct. 297,
    30 L. Ed. 2d 259 (1971).. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

*United States v. Miller*, 626 F.3d 682 (2d Cir. 2010). . . . . . . . . . . .  44

*United States v. O'Connor,* 650 F.3d 839 (2d Cir.  2011).   3, 4, 44, 45

*United States v. Rao,* 394 F.2d 354 (2d Cir. 1968). . . . . . . . . . . . . .  29

*United States v. Razhden Shulaya,*
    No. 17 CR 350 (LAP), 2019 U.S. District LEXIS 73031,
    (S.D.N.Y. Apr. 30, 2019).  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

*United States v. Regalado,* 518 F.3d 143 (2d Cir. 2008).  . . . . . .  3, 38

*United States v. Stringer,* 730 F.3d 120 (2d Cir. 2013).  . . . . . . .  3, 44

*United States v. Thavaraja,* 740 F.3d 253 (2d Cir. 2014).. . . . . . . .  38

*United States v. Tin Yat Chin,* 476 F.3d 144 (2d Cir. 2007). . . . . . .  45

*United States v. Vargas-Cordon,* 733 F.3d 366 (2d Cir. 2013).  . . .  34

*United States v. Verkhoglyad,* 516 F.3d 122 (2d Cir. 2008). . . . . . .  38

*United States v. White,* 324 F.2d 814 (2d Cir. 1963).  . . . . . . . . . . .  46

## FEDERAL STATUTES

18 U.S.C. § 371. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

18 U.S.C. § 1028A.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

18 U.S.C. § 1349. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

ii

18 U.S.C. § 1962. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

18 U.S.C. § 3231. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

### CONSTITUTIONAL AMENDMENT

U.S. Const. amend VI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43f

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

The basis for subject matter jurisdiction in the District Court was 18 U.S.C. § 3231 ("The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States.").

The basis for jurisdiction in this Court is 28 U.S.C. §1291 (this Court only hears "appeals from ... final decisions' of the federal district courts.").

The District Court entered judgment on December 20, 2018, (App. 296), and Appellant filed a notice of appeal the same day, (App. 303), making this appeal timely.

This appeal is from a final judgment that disposes of all claims with respect to Razhden Shulaya.

1

STATEMENT OF ISSUES

1. When the jury foreman complained to the Court, in a jury note, that a holdout juror was "using non-law principles," did the District Court commit structural error when it failed to instruct the jury that no juror should yield a conscientious conviction he may have and, instead, merely charged it, over objection, on general principles of law?

2. Was Shulaya's sentence of 45 years' imprisonment substantively unreasonable?

3. Did the District Court abuse its discretion when it refused to grant a sentencing adjournment to incoming retained counsel?

2

<u>STANDARD OR SCOPE OF REVIEW</u>

This Court reviews jury charges that were objected to at trial *de novo*, and will reverse "where a charge either failed to inform the jury adequately of the law or misled the jury about the correct legal rule," *United States v. Ford*, 435 F.3d 204, 209-10 (2d Cir. 2006)(citation omitted), and is not harmless. *United States v. Amuso*, 21 F.3d 1251, 1261 (2d Cir. 1994).

Shulaya's sentence is reviewed for abuse of discretion. *United States v. Regalado*, 518 F.3d 143, 147 (2d Cir. 2008)("As the Supreme Court recently explained in *Gall v. United States*, 'the appellate court must review the sentence under an abuse-of-discretion standard.'").

The denial of Shulaya's sentencing motion for a continuance is also reviewed for abuse of discretion. *United States v. Stringer*, 730 F.3d 120, 127 (2d Cir. 2013)("Appellate review of a trial court's refusal to delay trial is for abuse of discretion," and an appellate court "will find no such abuse unless the denial was an arbitrary action that substantially impaired the defense" (*quoting United States v. O'Connor*, 650 F.3d 839, 854

3

(2d Cir. 2011)). "A defendant must show 'both arbitrariness and prejudice in order to obtain reversal of the denial of a continuance.'" *Id*. at 128 (citation omitted).

## STATEMENT OF THE CASE

On June 6, 2017, a grand jury in the Southern District of New York returned an indictment against Razhden Shulaya, charging him with participation in a racketeering conspiracy (the "Shulaya Enterprise"), under 18 U.S.C. § 1962, and wire fraud conspiracy, under 18 U.S.C. § 1349.

The same indictment charges Shulaya with conspiracy to transport and sell stolen goods, in violation of 18 U.S.C. § 371, conspiracy to transport and sell contraband, cigarettes, in violation of 18 U.S.C. § 371, and identity fraud conspiracy, in violation of 18 U.S.C. § 1028A.

Shulaya was convicted of racketeering conspiracy, conspiracy to violate the federal law, stolen property, conspiracy to violate federal law, contraband cigarettes, conspiracy to commit fraud relating to identity documents, and wire fraud conspiracy. He was thereafter sentenced to 45 years' imprisonment. (*Loretta A. Preska,* Senior U.S.D.J.).

5

STATEMENT OF FACTS

The Government's Case

The Structure of Eurasian Organized Crime

John Penza, a Special Agent with the Federal Bureau of Investigation who investigated Eurasian criminal gangs, was assigned to supervise the investigation of Razhden Shulaya (App. 71, 79). He debriefed witnesses and sources of at least ten Eurasian organized criminal groups, and gathered intelligence about their structure, terminology and symbolism (App. 79, 80, 81).

Penza testified that a "vor v zakone," or a thief-in-law, and a "vor," a crime leader, is the highest level of Eurasian organized crime that exists in the world (App. 82-84). A vor oversees criminal operations, and must be crowned by other vors (App. 84, 87).

Lower level members in his jurisdiction are required to remit a share of their criminal proceeds to the Vor (App. 86). An obshchak fund is established up for the vor, to support his family members and pay legal fees (App. 85).

6

Untaxed Cigarettes

Robert Hanratty, a special agent with the Federal Bureau of Investigation ["FBI"], who was a member of the Eurasian organized crime squad (App. 93), was assigned to investigate Shulaya (App. 93). He relied on a confidential source, Volodymyr "Slava" Oliynyk (App. 94). Oliynyk, who had been charged with selling two guns and forged documents, entered into a cooperation agreement with the government (App. 132, 133) and began to work with agents of the FBI in 2005 (App. 133). Years later, they embedded him in the alleged Shulaya organization (App. 134).

On April 1, 2015, Hanratty instructed Slava to meet with Shulaya, or his associate, Mamuka Chaganava, and deliver five cases of untaxed cigarettes. Each case was valued at $2,160 (App. 97-99, 105). Slava also instructed him to sell more cigarettes to Chaganava on May 24, 2015 (App. 101-103).

Hanratty then took surveillance pictures of Slava moving cigarettes from the trunk of his car to the trunk of Artur Vinokurov's car, as Shulaya supervised (App. 104).

7

The FBI also purchased cigarettes from Shulaya (App. 106). On both October 16, 2016 and again, on November 11, 2015, another confidential source, Sasha, paid Shulaya $13,500, for five cases of cigarettes (App. 106).

Slava then met Shulaya on August 27, 2015 at Woodland restaurant on 282 Flatbush Avenue, where Slava sold him more cigarettes (App. 106-107). Slava again met Shulaya on September 23, 2015 and sold him additional cigarettes (App. 108).

On October 8, 2015, Slava once again met Shulaya and sold cigarettes for cash (App. 109). This time, Shulaya arrived in a vehicle registered to Jerome J. Gauthier and Nazo Gaprindashvili (App. 110). The parties stipulated that Gaprindashvili had worked as a home health care aid for Gauthier, and he let her use his cars (App. 100).

On October 16, 2015, Slava also sold five cases of cigarettes to Misha Toradze, in the vicinity of Bay 35th Street and Benson Avenue in Brooklyn (App. 111).

Then, on March 15, 2016, Shulaya directed Slava to meet with Hamlet Uglava in Brooklyn and sell him cigarettes (App. 112).

8

In recorded telephone calls between Slava and Mamuka Chaganava about stolen cigarettes, Mamuka told Slava that a portion of the goods should be sent Shulaya (App. 146-147).

When Mamuka allegedly stole cigarette profits from Shulaya (App. 165), Shulaya attacked him. Zurab Dzhanashvili, who was involved in gambling, burglaries, narcotics and credit card fraud (App. 220-221), and testified pursuant to a cooperation agreement (App. 237), testified he saw Shulaya beat and bloody Mamuka (App. 235).

Dzhanashvili then saw Shulaya make a video phone call and, when the person asked if that was the same Mamuka, Shulaya said yes (App. 235-236). Shulaya then took a photograph of Mamuka (App. 236). He later showed a picture of a bloodied Mamuka Chaganava to Slava and said "[t]his is what he looked like after the meeting with me" (App. 165).

<u>Gambling-the Slot Machines</u>

After Slava sold Shulaya cigarettes, Shulaya asked him if he could sell him a slot machine (App. 148). The FBI then obtained one for him in Florida (App. 113).

When Slava brought the slot machine to Brooklyn, he parked on the sidewalk, but did not see Shulaya standing in the back, who he hit a "little bit" (App. 162). Shulaya screamed at him "[y]ou practically killed the thief, the vor" (App. 163).

On September 1, 2016, Slava gave the slot machine to Akaki Ubilava (App. 114-115). The FBI observed co-defendant Avtandil "Chuqueha Hammer" Khurtsidze and Ubilava carrying the slot machine into an apartment building at 1706 Cropsey Avenue in Brooklyn (App. 116). That address houses Tropport LLC, where Anna Nazo Gaprindashvili is the manager (App. 119). Tropport LLC imported vodka, and, according to Melman, the company was gifted to Shulaya (App. 195).

On May 3, 2017, Hanratty met Slava in Edgewater, New Jersey to receive a program to beat slot machines (App. 131). Slava spoke with Shulaya about the program, and he said "I am working on it right now" (App. 158).

Shulaya told Slava he obtained the program from a computer hacker, who he had taken hostage (App. 159). Shulaya explained to Slava that the program was like a twin to the slot

10

machine itself, and when the program was used, the player knew when to press a button on the machine to win (App. 160-161).

Evgheni Melman, who pleaded guilty to a racketeering and wire fraud conspiracy and testified pursuant to a cooperation agreement (App. 189), fixed flaws in the slot machine software (App. 190).

Shulaya told Melman he had extorted the software from the original creator of the software in Russia (App. 191). At the time, he was guarded, in a life-threatening situation, by many men with guns (App. 191).

Shulaya also told Melman they could make billions of dollars in profits (App. 192). Melman was able to program the software to successfully predict the behavior for both the Pelican Pete and Miss Kitty slot machine games (App. 193). Shulaya told Slava said he would receive 30 percent of the profits, while 20 percent would to go to the gamblers and five percent would go to Slava (App. 164).

On September 22, 2016, undercover FBI agent Nick Yiannos met Shulaya in Brighton Beach, Brooklyn, where he told

11

him his friends in Russia had developed a program that could beat slot machines (App. 170, 171-182).

On January 27, 2017, Yiannos and Slava again went to Brooklyn, where they played a slot machine each time an Iphone beeped (App. 177). Sometimes it won; other times it did not (App. 177).

Over a sushi lunch, they then talked mainly about the scheme to defraud the casinos with a program for the Pelican Pete slot machine (App. 177-178). Shulaya told Yiannos they could make $50,000 per day at the casinos (App. 178). In fact, the total slot machine casino earnings were less than $6,500 (Probation Report: ¶ 101).

<u>Gambling-the Poker House and Assaults</u>

Another confidential informant, Sasha, helped Shulaya operate a gambling house in December 2015 at 125 Brighton Beach Avenue, in Brooklyn, New York, above the Georgian House restaurant (App. 124).

FBI Agent Hanratty reviewed screen shots of surveillance video on Sasha's telephone, and saw the two confidential sources,

Slava, standing in the doorway and Sasha, standing by a podium, as Shulaya stood in the back of the room (App. 125-127). He also saw co-appellant, Avtandil Khurtsidze at the poker house (App. 128).

On one occasion, Hanratty saw Khurtsidze hit Sasha in the face (App. 129). At the time, Sasha had his hands behind his back for about 45 to 50 minutes (App. 129-130). He then saw Shulaya hit Sasha in the face (App. 118).

Later that evening, on September 1, 2016 the FBI took photographs in the vicinity of the Lotus Café, on 2 Neptune Avenue, in Brooklyn, New York, of a meeting between Sasha, Akaki Ubilava, Avtandil and a gambler, Sergei Demidenko, who had lost a significant amount of money (App. 120-123).

Shulaya later met Aleksandr Kutsenko, who ran another illegal poker house (App. 196). Shulaya told him he was a thief-in-law (App. 196). Shulaya asked him what profits he made, because he Kutsenko was required to pay a tribute, to the vor (App. 197-198, 209). Shulaya enforced the tributes through violence (App. 218).

13

One day, Shulaya summoned Kutsenko to Avenue X and East 2nd in Brooklyn, where there were 10 to 15 people waiting (App. 199). There, he saw Shulaya cursing and punching a man, known as Painter, in the face (App. 200-201). Painter did not fight back, but was begging for forgiveness as the beating continued for 15 to 20 minutes, which left him bloodied and bruised (App. 201). Shulaya later told Kutsenko he beat Painter because he had said "something disrespectful" about him at a restaurant (App. 202).

About a month later, Shulaya summoned Kutsenko a second time to the apartment at East 2nd and Avenue X (App. 202-203). There, Shulaya again beat Painter, this time because his wife wanted to report the first beating to the police (App. 204-205).

Shulaya then asked Kutsenko about the poker house (App. 206). In response, Kutsenko went to the FBI and started wearing a wire (App. 207).

Shulaya later asked Kutsenko to manage the poker house above the Georgian House restaurant in Brooklyn (App. 208). Three months later, Shulaya told Kutsenko that part of the profits

14

would go to him, part to Shulaya and part to other thieves in law (App. 210).

When one dealer was shuffling the cards to cheat players at the poker house, Kutsenko protested, but Shulaya approved it (App. 211-212).

Shulaya later accused Kutsenko of stealing money from the poker game, and their interaction was recorded on video (App. 213). Khurtsidze then hit him (App. 214, 222, 223).

Shulaya later sent Kutsenko and two others to demand payment from Sergei Demidenko due to poker losses (App. 216-217).

Zurab Dzhanashvili, who was involved in gambling, burglaries, narcotics and credit card fraud (App. 220-221), and testified pursuant to a cooperation agreement (App. 237), said Shulaya told him he had been crowned a vor by other vors in Italy (App. 224).

Dzhanashvili saw Shulaya beat Zurab Natchkepia for disrespecting him, and failing to understand how to talk to a vor (App. 225, 226).

15

Mark Nektalov, who pleaded guilty to fraud for selling $5,200 in forged checks (App. 69, 70), also saw Zurab in an apartment, on his knees, beat up, with blood on his face (App. 66-67). Shulaya said he was unhappy that Mr. Zurab had disrespected him (App. 67). He told Nektalov that it was against the rules to talk this way about a vor v zakonei, a thief-in-law, or a vor (App. 68).

Shulaya also asked Dzhanashvili to follow a hacker in a casino, because he saw him winning all the time at the slot machines (App. 227). Dzhanashvili falsely told the gambler he was with casino security and took him to Shulaya's room (App. 228). There, Shulaya told the man he owed him $2 million (App. 229). Shulaya sent men to the gambler's room and took his watch and about $90,000 (App. 230). They held the man for about ten hours and kept his money, before releasing him (App. 231-232).

After a dispute with Armenian men, Shulaya told Dzhanashvili to retrieve guns (App. 233). Shulaya and Dzhanashvili, accompanied by other men, then went to a pool hall

16

where the Armenians were located, and beat and pistol-whipped
them (App. 234).

## Stolen Property

In December 2014, Slava met with, and recorded, Shulaya
on Ninth Avenue and 15th Street in Manhattan (App. 135, 145).
Shulaya asked Slava " ... do you know who you are talking to?"
and then said "I am actually a little different" (App. 136). Shulaya
explained that "I am just the one who will make sure that you are
safe and everything goes smoothly and (unintelligible) there will
be no betrayal, nothing, and [] everything will go seamlessly and
smoothly" (App. 136-137).

They met again a week or two later at a Starbucks in
Manhattan (App. 137). In another recorded conversation, Slava
told Shulaya he had stolen Rolex watches and fake gold rings
(App. 138-139). Shulaya paid Slava $5,000 for the stolen watches
and then asked him about stolen clothes and cigarettes (App.
140).

On March 23, 2013, Slava met Shulaya with an undercover
FBI agent, Nick Yiannos, in Atlantic City, where Shulaya,

17

accompanied by bodyguards, agreed to buy cigarettes (App. 141-145). Slava and Yiannos sold him two cartons of cigarettes (App. 144).

Yiannos, who posed as Slava's boss, later told Shulaya he had a warehouse with large amounts of stolen property (App. 166).

On February 27, 2015, Hanratty directed Slava to sell Shulaya stolen Rolex watches (App. 95). Slava met Shulaya at the Georgian House Restaurant in Brighton Beach, Brooklyn, New York, sold him the watches and returned to the FBI with United States currency (App. 96).

About a month later, on March 23, 2015, Yiannos, Slava, Shulaya and two of Shulaya's bodyguards met at the Palm, a restaurant at the Tropicana Casino in Atlantic City, to discuss the sale of stolen watches, jewelry, alcohol and clothing, as well as untaxed cigarettes (App. 166-168). Yiannos then went out to his car, and handed Shulaya's bodyguard cigarettes and a bottle of Johnnie Walker Black Label from the back of his car (App. 169-170).

Law Enforcement Actions

On May 20, 2017, Mark Newhouse, a special agent with the FBI in Los Angeles, surveilled Shulaya as he traveled from New York to Los Angeles for a party (App. 153). He was renting a 9,000-square foot home, with five bedrooms and six bathrooms, in Brentwood, California, an affluent neighborhood in Los Angeles, in the Santa Monica Mountains, near the ocean (App. 154).

The FBI later followed him and others in a white BMW and a rented Mercedes G Class SUV to the De Luxe Banquet Hall in Burbank, California (App. 155-156). There, he saw Shulaya talking with Neshan Sargsyan, and Armen Kazarian, as they were surrounded by a number of other men (App. 157).

Less than a month later, on June 7, 2017, Naushaun Richards, an FBI agent with the Eurasian Organized Crime Task Force, arrested Shulaya at Caesars Palace in Las Vegas in Las Vegas, Nevada (App. 239).

Thayne Larson, another FBI agent, searched Shulaya and found a Bank of America card bearing the name of Tropport LLC,

19

and Stella Shulaya (App. 150). He also recovered $20,000 in United States currency in a manila envelope in the safe in his room at Caesars Palace, two Iphones and a Rolex watch (App. 151-152).

On the same day, June 7, 2017, Matthew Callahan, a special agent with the Federal Bureau of Investigation, assigned to the transnational organized crime squad, executed a search warrant, at Shulaya's residence at 100 Alexander Way, in Edgewater, New Jersey (App. 88). There, the FBI recovered his Russian passport (App. 92), 23 cell phones (App. 89), six tablets (App. 90) and gambling vouchers from Casino Gulfstream Park (App. 91).

Bruce Turpin, an FBI agent with the Eurasian Organized Crime Task Force, also seized a safe in Shulaya's residence, which contained two watches, six phones, Ipads, MacBooks, $57,890 in United States currency, Bank of America documents for Tropport LLC, and a rental agreement for the home in the name of Razhden Shulaya (App. 183, 184, 185, 186, 187).

Robert J. Pendergast, a photographer with the Federal Bureau of Investigation, performed search warrant photography

on Shulaya's home (App. 73). On June 7, 2017, he photographed his home at 100 Alexander Way, in Edgewater, New Jersey (App. 74). He took a picture of an electronic device, in Government Exhibit 404 (App. 75). He also took photographs of a credit card that was found in the bottom drawer of a night stand in the master-bedroom, which belonged to Avtandil Khurtsidze (App. 76-77). In a drawer, he also photographed three small glass containers, and one had writing on it that said Razhden (App. 78).

Verdict

Shulaya was convicted of Count One, racketeering conspiracy, Count Two, conspiracy to violate the federal law, stolen property, Count Three, conspiracy to violate federal law, contraband cigarettes, Count Four, conspiracy to commit fraud relating to identity documents, and Count Five, wire fraud conspiracy (App. 248-249).

The jury also found that the government proved that, as a result of Shulaya's use, transfer, or possession of a means of identification of another person, he obtained, or attempted to

21

obtain, anything of value of $1,000 or more during any one-year period (App. 249).

## Sentence

Shulaya was sentenced to 20 years on Count One, Racketeering Conspiracy, five years on Count Two, Conspiracy to Sell and Transport Stolen Goods, to run concurrently, five years on Count Three, Contraband Cigarette Trafficking Conspiracy, to run concurrently, five years on Count Four, Conspiracy to Commit Fraud Relating to Identification, to run consecutively, and 20 years on Count Five, Conspiracy to Commit Wire Fraud, to run consecutively, for a total of 45 years' imprisonment (App. 290-292).

## SUMMARY OF ARGUMENT

Where the jury foreman sent the District Court a note about a holdout juror that was allegedly using "non-law principles," the prospect of a hung jury was so severe that he asked the Court if an "alternate" juror could be seated in his place.

In response, the District Court repeated its standard jury charges that, *inter alia*, "the facts are for the jury to determine and the law is for the Court" and "it would violate your sworn duty to base a verdict upon any other view of the law than that which I give to you."

Yet it failed to instruct the jury that a juror should only reach a unanimous verdict if he did not have to yield a conscientious conviction. Absent this instruction, the holdout juror may have been coerced to reach a unanimous verdict and, in fact, did so immediately after the case was adjourned for the evening and the verdict was returned the next morning.

Where, as here, the Court failed to such cautionary language, the error is structural, and not amenable to harmless error analysis.

23

The District Court then abused its discretion when, over objection, it sentenced Shulaya to 45-year's imprisonment. This sentence was substantively unreasonable because the case turned on contraband, casinos, and cargo, not murder, drugs and guns. A 540-month sentence for these crimes is draconian--especially where Shulaya had no prior criminal record, and his term of imprisonment was an effective life sentence.

The District Court also abused its discretion when it refused to grant incoming retained counsel a one month adjournment to properly prepare for sentence, because that would have not have prejudiced the Government or impacted the administration of justice.

ARGUMENT

POINT I

WHEN THE JURY FOREMAN COMPLAINED TO
THE COURT, IN A JURY NOTE, THAT A
HOLDOUT JUROR WAS "USING NON-LAW
PRINCIPLES," THE DISTRICT COURT
COMMITTED STRUCTURAL ERROR WHEN IT
FAILED TO INSTRUCT THE JURY THAT NO
JUROR SHOULD YIELD A CONSCIENTIOUS
CONVICTION HE MAY HAVE AND, INSTEAD,
MERELY INSTRUCTED IT, OVER OBJECTION,
ON GENERAL PRINCIPLES OF LAW.

During jury deliberations, Judge Katherine B. Forrest said:

We have a note from the jury. Let me read it to you
and then after we're done talking about it, we'll make
it available for inspection by people. It says, "Your
Honor, the jury is deliberating and one of the jurors
is using non-law principles to come to a conclusion
in this case. Is this something we have to sort through
or is this a case an alternate needs to be called?" The
foreperson then has signed this (App. 241).

Co-defense counsel, Megan W. Benett, said "[w]e would
prefer, from the defense side, just a re-instruction on [the] role of
the jury and inferences" (App. 243). The Court then asked
defense counsel, Anthony Cecutti, "I assume you're joining in
Ms. Benett's [application] (App. 243). Counsel replied "Yes, I
am" (App. 243).

25

In denying the defense request, Judge Forrest instructed

the jury:

> So let me remind you of a few instructions and then give you some guidance and then send you back into the jury room.
>
> First of all, as I instructed you at the very, very outset of the case during voir dire and asked you folks to confirm if you had any issue with this, that under our system of law, the facts are for the jury to determine and the law is for the Court. These two areas are separate and distinct and that you are required to accept the law as I explain it to you. It will be your job to determine the facts under my explanation of the law. And then each juror was asked whether or not they could accept that proposition. All of you were sworn as jurors on the faith of your answers at that time.
>
> Another question that I asked during *voir dire* is under what's called ability to serve. And you were asked, 'Do you have any religious, philosophical, or other beliefs that would make you unable to render a guilty verdict if the evidence in this case, in fact, supported it?'
>
> Now, during the jury instruction process itself at the end of the case on page 4 of the instructions that you folks have received, there is the following instruction referring to the role of the Court and a separate instruction on the role of the jury. On the role of the Court, I'm only going to refer you to a piece of it right now, but I encourage you to read the entirety of that instruction if you would find it helpful. I instructed you, 'On these legal matters, you must take the law as I give it to you. Regardless

26

of any opinion that you may have as to what the law may be or ought to be, it would violate your sworn duty to base a verdict upon any other view of the law than that which I give to you.' And then I went on, 'If an attorney or anyone else at trial has stated a legal principle different from that which I state to you, it's my instructions that you must follow.'

In addition, of course, there are instructions on the jury's role, and those I would refer -- you to throughout the instructions there's lots of places where the jury's role is referred to, but on page 5 and where there are descriptions of inferences and competing inferences that may appropriately be drawn on pages 14 and 15, are certain instructions are that useful.

But the role of the jury, it says, 'You are the sole and the exclusive judges of the facts. You pass upon the weight of the evidence or lack of evidence, you determine the credibility of the witnesses, you resolve such conflicts as there may be in the testimony, and draw whatever reasonable inferences you decide to draw.' Then there's a statement about what evidence there is that these inference are being drawn from. The evidence before you consists of the answers given by witnesses and the exhibits and stipulations that were received into evidence.

Then there are inferences and a description of reasonable inferences that can be drawn and competing inferences on pages 14 to 15. So in short, you are required to put to the side personal views of a philosophical, religious, or other personal nature that are inconsistent with the law as I have instructed you on. That doesn't mean that you leave behind your common sense. It doesn't mean that you leave behind what you bring to the essential role of being

27

a jury. If the issue that you're talking about is a matter of competing factual inferences, then it is up to you, the jury, to determine whatever factual inferences based upon the evidence that you deem appropriate.

With that said, and of course as you know from the jury instructions, it's up to you folks to weigh the evidence and to apply the law as I have instructed you. If there are any remaining issues, send me another note, but with those instructions, I send you back to the jury room (App. 244-247).

The Court then adjourned the trial on June 18, 2018 (App. 244-246). The very next morning, on June 19, 2018, the jury returned guilty verdicts (App. 247).

This Court review jury charges that were objected to at trial *de novo*, reversing only "where a charge either failed to inform the jury adequately of the law or misled the jury about the correct legal rule," *United States v. Ford*, 435 F.3d 204, 209-10 (2d Cir. 2006)(citation omitted), and where the error is not harmless. *United States v. Amuso*, 21 F.3d 1251, 1261 (2d Cir. 1994).

Here, the Court misled the jury in general and the holdout juror in particular. The Court's charge had the effect of improperly coercing the minority juror to capitulate to the majority, thereby permitting a conviction by what is, in effect, a

28

majority vote. The Court's failure to address the minority view--the juror who did not agree with the other jurors, and was then accused, by the foreman, of allegedly "using non-law principles"--coerced him, by failing to state that he should only reach a unanimous verdict if he did not have to yield a conscientious conviction. *See United States v. Rao*, 394 F.2d 354, 355 (2d Cir. 1968)(due to "the considerable costs in money and time to both sides if a retrial is necessary certainly justify an instruction to the jury that if it is possible for them to reach a unanimous verdict without any juror yielding a conscientious conviction * * *, they should do so"); *United States v. Kahaner*, 317 F.2d 459, 483 (2d Cir. 1963)(upheld where trial judge said "[i]t is desirable if a verdict can be reached that this be done both from the viewpoint of the defendants and the Government, but that this was true only if the verdict reflects the conscientious judgment of each juror and under no circumstance must any juror yield his conscientious judgment.").

While it is for the trial judge to determine whether the jury was genuinely deadlocked, the judge never considered a number

of factors that clearly indicated the jury was hung. The trial issues were not complex. The crimes turned not on complicated real estate frauds, securities transactions banking schemes, but, rather, simply on stolen property, untaxed cigarettes and poker games. The duration of the trial was not long, beginning on June 4, 2018 and ending 15 days later, on June 19, 2018. The representation of the foreperson was paramount, because his note evinced the deadlocked state of the jury's deliberations.

It is irrelevant that the foreman did not formally state that the jury was hung, which would have automatically warranted a dynamite charge under *Allen v. United States*, 164 U.S. 492, 41 L. Ed. 528, 17 S. Ct. 154 (1896). His note was the functional equivalent of a genuinely hung jury because he could not convince the holdout juror to convict. Had the juror not been a holdout, it is obvious the frustrated foreman never would have sent to the note to the judge--regardless of how he applied the law.

Because the jury was, for all practical matters, deadlocked, the Court was required to reassure the holdout juror that he need

not change his vote and reach a unanimous verdict if that meant he would have to yield his conscientious judgment. *Smalls v. Batista*, 191 F.3d 272, 279 (2d Cir. 1999)(a "necessary component" of an *Allen* charge is "admonish[ing] the jurors not to surrender their own conscientiously held beliefs.").

The juror deadlock was underscored by the tenor of the foreperson's jury note. It was unclear, and did not explain how or why the holdout was relying on alleged "non-law principles." Co-defense counsel noted as much, when she said:

> My concern with the instruction that the Court fashioned was that the note says "non-law principles." I don't know what that means. I don't know if that's religious or philosophical. It may be that some jurors believe that they are not allowed to use their own common sense or experience or perspective from which to draw the inferences that are solely within their province (App. 241).

Given the lack of clarity in the note and the lack of agreement amongst the jurors, it was incumbent on the Court to instruct the jury that no juror should yield his judgment simply for the sake of unanimity.

The foreperson's note also reflected a deeper division in the jury room. He asked if the Court could replace a sitting juror with

31

an alternate juror to overcome the lack of unanimity. While such an action would have been legally improper, it reflected the level of frustration by the foreperson, and the degree of resistance by the holdout.[1] In the face of this apparent acrimony, the Court should have emphasized that a verdict were only just and true if it reflected the judgment of each juror, and, under no circumstance should any juror yield his conscientious judgment.

Such an instruction fell under the rubric of the defense request for a recharge limited to " ... a re-instruction on [the] role of the jury .... "(App. 243). In a jury trial, the role of the jury is to be the judge of the facts, and to apply the facts to the law. Their role will be fulfilled only if they are unanimous in their verdict, which encompassed the principle that no juror yielded their conscientious judgment for the sake of unanimity. Because defense counsel joined in co-defense counsel's argument, this issue is preserved and thus reviewed *de novo*.

---

1. The foreperson's request, and uncertainty, about whether a district court could simply remove a holdout juror in favor of an alternate juror to overcome resistance to a unanimous verdict casts doubt on his similarly dubious claim that the dissenting juror did so because he was relying on "non-law principles."

32

It thus cannot be claimed that the error is plain on the tenuous theory that defense counsel did not ask the Court to use specific language about not yielding a conscientious judgment for the sake of unanimity. Counsel's request for the District Court to re-instruct the jury on the role of the jury necessarily encompassed this language in the context of divided jury, because the role of the jury is to return a unanimous verdict, which means no individual juror has yielded their conscientious judgment.

But even if there were no specific request for this exact instruction, the error would be plain. *United States v. Martinez*, 446 F.2d 118, 120 (2d Cir.)(applying plain error review to an *Allen* charge), *cert. denied*, 404 U.S. 944, 92 S. Ct. 297, 30 L. Ed. 2d 259 (1971).

When reviewing a jury charge for plain error, this Court will reverse if an error is clear or obvious and affects substantial rights. To affect substantial rights, an error must have been prejudicial, and must have affect the outcome of the district court proceedings. *United States v. Ganim*, 510 F.3d 134, 136 (2d Cir. 2007).

33

Here, all of these tests are met. The Court's failure to instruct the holdout juror that he did not have to yield a conscientious conviction was a clear and obvious error, which prejudiced Shulaya, and affected the outcome of the district court because it resulted in a coerced verdict. *See Lowenfield v. Phelps*, 484 U.S. 231, 98 L. Ed. 2d 568, 108 S. Ct. 546 (1988)("Any criminal defendant ... being tried by a jury is entitled to the uncoerced verdict of that body.").

When a trial judge issues an instruction to a divided jury, its propriety turns, at least in part, on whether the charge "tends to coerce undecided jurors into reaching a verdict--that is, whether the charge encourages jurors to abandon, without any principled reason, doubts that any juror conscientiously holds as to a defendant's guilt." *United States v. Vargas-Cordon*, 733 F.3d 366, 377 (2d Cir. 2013)(internal quotation marks omitted).

Here, that occurred when the Court repeated the standard charges to the jury without urging all jurors to hold fast to their conscientiously held beliefs. *See Spears v. Greiner*, 459 F.3d 200 (2d Cir. 2006), *cert. denied*, 549 U.S. 1124, 127 S. Ct. 951, 166

34

L. Ed. 2d 725 (2007)(approving an instruction where court "include[d] cautionary language telling jurors that they had a right to stick to their arguments and stand up for their own strong opinions.").

When, as here, the Court fails to include cautionary language counseling a holdout juror not to surrender their conscientiously held beliefs, the error is structural, and not amenable to harmless error analysis. *Cf. Smalls v. Batista*, 6 F. Supp. 2d 211, 219 (S.D.N.Y. 1998)("Because the charge was coercive and failed to include cautionary language counseling jurors not to surrender their conscientiously held beliefs, and the Appellate Division unreasonably found -- given federal law as determined by the United States Supreme Court -- the *Allen* charge to be proper, Smalls' habeas corpus petition will be granted. Furthermore, the error from the charge was not harmless"), *aff'd*, *Smalls v. Batista*, 191 F.3d 272, 282 (2d Cir. 1999)("Indeed, the district court stated that 'it would appear that a coercive *Allen* charge is akin to improper reasonable doubt instructions, a partial judge, or deprivation of the right to counsel,

35

and therefore a 'structural error' to which harmless error analysis is inapplicable." *Smalls*, 6 F. Supp. 2d at 222-23."). Shulaya's conviction should, therefore, be reversed, and a new trial ordered.

POINT II

APPELLANT'S SENTENCE OF 45 YEARS' IMPRISONMENT WAS SUBSTANTIVELY UNREASONABLE.

The District Court sentenced Shulaya to 20 years on Count One, five years on Count Two, to run concurrently, five years on Count Three, to run concurrently, five years on Count Four, to run consecutively, and 20 years on Count Five, to run consecutively, for a total of 45 years' imprisonment (App. 290-292). Yet defense counsel argued " ... we don't believe that anything more than 15 years would be appropriate" (App. 272). Incoming retained counsel agreed. He " ... joined Mr. Cecutti's application [because] I believe 15 years is appropriate in this particular case" (App. 279).

Whether an appellate challenge to the substantive reasonableness of a sentence requires preservation remains an open question in this Court. *United States v. Garcia*, 665 F. App'x 62, 63 n.1 (2d Cir. 2016)("Although Gil did not object to the length of his sentence in district court, we have not resolved whether plain error review applies to an unpreserved challenge to

the substantive reasonableness of a sentence"); *United States v. Thavaraja*, 740 F.3d 253, 258 n.4 (2d Cir. 2014)("We have not decided whether plain error review applies to an unpreserved challenge to the substantive reasonableness of a sentence"); *United States v. Verkhoglyad*, 516 F.3d 122, 134 (2d Cir. 2008). Here, however, the sufficiency of two separate defense attorney's timely and particularized objections to the length of the sentence cannot be reasonably challenged; hence, the abuse-of-discretion standard prevails. *United States v. Regalado*, 518 F.3d 143, 147 (2d Cir. 2008)("As the Supreme Court recently explained in *Gall v. United States*, 'the appellate court must review the sentence under an abuse-of-discretion standard.'").

This Court reviews a criminal sentence for "unreasonableness." *United States v. Cavera*, 550 F.3d 180, 187 (2d Cir. 2008)(*en banc*)(citation omitted). "Reasonableness review requires an examination of the length of the sentence (substantive reasonableness) as well as the procedure employed in arriving at the sentence (procedural reasonableness)." *United States v. Johnson*, 567 F.3d 40, 51 (2d Cir. 2009). This Court will

"set aside a district court's substantive determination only in exceptional cases where the trial court's decision cannot be located within the range of permissible decisions." *Id*. at 189 (internal quotation marks, citation, and emphasis omitted).

Defense counsel raised four arguments at sentence, each of which has merit on appeal. First, he argued what this "case comes down to is contraband, casinos, and cargo, those three things. It's not about murders. It's not about kilos of cocaine and drugs and narcotics. It's not about guns" (App. 265). He is correct. A 45 year sentence for contraband, casinos, and cargo is unreasonable and, indeed, draconian--especially where Shulaya had no prior criminal record, either as a juvenile or an adult (Probation Report: ¶¶'s 119, 120).

Second, counsel argued the Government emphasized the physical assault against Mamuka Chaganava, yet " ... Chaganava made a full recovery and did not suffer further injuries" (App. 265). Even the violence in this case turned on beatings--not death or disfigurement.

39

Third, he argued the government supplied stolen cigarettes for Shulaya to buy over a long period of time (App. 266). This, he argued, drove "the economic loss" because, "at any point, after year one[,] could have stopped, year two could have stopped, year three could have stopped, but they kept pumping Mr. Shulaya with cigarettes, cases, 500-plus cases, and that as a result, in the presentence report, I believe it's a plus 16. Because of that enhancement, he is exposed to a life sentence under the guidelines. So I think that is very important" (App. 268-269). It is.

The record reflects the Government sold Shulaya $1,788,345 in untaxed cigarettes (Probation Report: ¶ 101). In Spring 2015, the Government presented Shulaya with multiple cartons of cigarettes ( (Probation Report: ¶ 37); on August 9, 2015, it provided him with a case of cigarettes (Probation Report: ¶ 38); on October 16, 2015, it provided him with an additional 30 cartons of cigarettes (Probation Report: ¶ 39); and, in March 2017, it provided him with another 100 cases of contraband cigarettes (Probation Report: ¶ 67).

40

While the District Court was correct that the 16 points also included the " cargo conspiracy, the casino conspiracy, etc., etc[,] [s]o it's not just the untaxed cigarettes that are driving the 16-point increase" (App. 270), the cigarettes totaled $1,788,345 of the $2,989,845 loss--or nearly 60% of the total loss. Clearly, the Government thus increased the sentence by continuing to sell Shulaya the cigarettes.

Fourth, defense counsel argued that "Mr. Shulaya should not receive anywhere close to 65 years [he faced] based upon what other people have received that are similarly situated" (App. 271). In fact, of the 31 other defendants, the longest terrm of imprisonment for any co-defendant was 57 months' imprisonment (Probation Report: p. 5, ¶ 12)(Nazo Gaprindashvili). Shulaya's conduct did not warrant 540 months' imprisonment. Because the sentence was greater than necessary, it should be reduced on appeal.

POINT III

THE DISTRICT COURT ABUSED ITS
DISCRETION WHEN IT REFUSED TO GRANT A
SENTENCING ADJOURNMENT TO INCOMING
RETAINED COUNSEL.

On December 19, 2018, incoming retained counsel, Igor
Niman, moved for a sentencing adjournment before Judge Loretta
Preska (App. 251). He explained: "As I stated in my letter, I just
came from a funeral, and I physically got to read the PSR report
just this morning. I had altogether maybe three to four hours to
look at all of the papers. So I don't feel prepared to go forward.
I am retained counsel. Mr. Shulaya is not going anywhere. I am
fully prepared to take this case forward, but I need time to prepare
and file motions, your Honor" (App. 251).

He argued "I believe we need to file the motions with
respect to sentencing submissions, which I think there is
definitely a need for a *Fatico* hearing .... " (App. 251). He added
that "I am just looking at the PSR report, and I understand that ...
there are certain issues in the PSR report which are not proven
and my client denies those. So we would ask your Honor for a
month adjournment. I don't think it's anything material. Mr.

42

Shulaya is not going anywhere, on one end, and on the other end,

I would be able to speak better on his behalf so as not to commit

malpractice on my own end and to represent him properly. I

believe he is entitled to that, your Honor" (App. 251-253).

At sentence, on December 19, 2018, the Judge Preska

denied the request for an adjournment. She said:

> [f]irst of all, with respect to the request for an
> adjournment, as both Judge Forrest and I have
> pointed out, Mr. Shulaya has used his counsel issues
> in this case repeatedly to seek adjournment after
> adjournment after adjournment.[2] The fact that Mr.
> Niman appeared only yesterday is one more example
> of using counsel issues to secure a delay. I will note
> also Judge Forrest's wisdom in appointing Mr.
> Cecutti so that Mr. Shulaya would have continuity
> of counsel no matter what happened with respect to
> retained counsel. Because I find that Mr. Shulaya
> continues to use counsel issues as an excuse to delay
> proceedings in this case further, the request for an
> adjournment is denied. In any event, with respect to
> the specific issues mentioned by Mr. Niman, as Mr.

---

2. In deciding Shulaya's motion to vacate after sentence, on
April April 30, 2019, Judge Preska, again attacked his "repeated
changes of counsel, abuse of prior counsel, and false claims
regarding counsel." *United States v. Razhden Shulaya*, No. 17 CR
350 (LAP), 2019 U.S. Dist. LEXIS 73031, at *6 (S.D.N.Y. Apr.
30, 2019)(capitals omitted). Yet Shulaya still had the right to the
Sixth Amendment effective assistance of counsel at sentence,
without interference by the Court, when an adjournment would
only have been one month.

Adams points out, there were specific references in the PSR, and to the extent the government dealt with it in its sentencing submission, there were specific references to evidence at trial supporting the allegations. Also, it appears that the loss amounts are on the conservative side, as the PSR seems to point out. Accordingly, the request for an adjournment is denied. I will just point out that yesterday's order did move the sentencing from noon until 2:00 so that Mr. Niman was able to be present." (App. 254).

Of course, "trial courts enjoy very broad discretion in granting or denying trial continuances." *United States v. Stringer*, 730 F.3d 120, 127 (2d Cir. 2013). "Appellate review of a trial court's refusal to delay trial is for abuse of discretion," and an appellate court "will find no such abuse unless the denial was an arbitrary action that substantially impaired the defense." *Id*. (*quoting United States v. O'Connor*, 650 F.3d 839, 854 (2d Cir. 2011)). "A defendant must show 'both arbitrariness and prejudice in order to obtain reversal of the denial of a continuance.'" *Id*. at 128 (*quoting United States v. Miller*, 626 F.3d 682, 690 (2d Cir. 2010)). "This test 'is a stringent one.'" *Al Fawwaz*, 116 F. Supp. 3d at 208-09 (*quoting United States v. Ellenbogen*, 365 F.2d 982, 985 (2d Cir. 1966)). "The burden of showing" a substantial impairment of the defense "is on the party complaining of the lack

44

of a sufficient continuance." *O'Connor*, 650 F.3d at 854; *see also United States v. Tin Yat Chin*, 476 F.3d 144, 146 (2d Cir. 2007)(concluding that a new trial was not required where the defendant was "unable to specify with any particularity how he was prejudiced by not receiving a longer [than one-day] continuance."). Only an "unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." *Id*. at 11-12 (*citing Ungar v. Sarafite*, 376 U.S. 575, 589, 11 L. Ed. 2d 921, 84 S. Ct. 841 (1964)).

Here, Shulaya's right to the effective assistance of counsel was abridged when the District Court arbitrarily denied a one-month adjournment to incoming retained sentencing counsel to review the record and prepare for sentence.

The Court forced retained counsel to defend Shulaya, at sentence, after preparing for the case for only a number of hours. Sentencing counsel, Igor Niman, who appeared in court in good faith, was not afforded any time to review the trial transcript, which totaled 2,084 pages, nearly 500 pages of documents on

45

Pacer and countless trial exhibits. He thus lacked the opportunity to prepare arguments and motions for sentence, based on citations to the record. This gravely prejudiced Shulaya, who, at age 43, was sentenced to 45 years' imprisonment--an effective life sentence.

Given that Shulaya received over four decades in prison, a one-month adjournment would not have prejudiced the Government or interfered with the administration of justice.

Significantly, defense counsel requested a delay that was of short or fixed duration ["one month"], the sought-after legal material was specified with particularity [the trial record], the proposed material was critical to the sentence and the defendant has not been dilatory at the sentence itself. *Cf. United States v. Fawwaz*, 116 F. Supp. 3d 194, 210 (S.D.N.Y. 2015)("[*United States v. White*, 324 F.2d 814 (2d Cir. 1963) ... illustrates circumstances in which continuances are appropriate or perhaps even required. They include instances in which (I) the requested delay is of a short (or at least fixed) duration, (ii) the sought-after evidence is specified with particularity, (iii) the proposed

46

evidence is critical to the defense, and (iv) the defendant has not been dilatory.").

The District Court's finding that Shulaya had retained and discharged prior attorneys does not save its ruling from being arbitrary. Shulaya's right to the counsel of his own choosing at sentence, where he faced an effective life sentence, far outweighed his initial indecision with regard to which counsel to proceed to trial.

The District Court's ruling was thus unreasoning and arbitrary. Its insistence upon expeditiousness, in the face of a justifiable request for an adjournment, violated Shulaya's right to the assistance of counsel at sentence. A sentencing remand is thus warranted.

<u>CONCLUSION</u>

SHULAYA'S CONVICTION SHOULD BE REVERSED, AND HIS SENTENCE SHOULD BE REDUCED OR REMANDED.


*/s/ Arza Feldman*
Arza Feldman,
Attorney for Appellant


Dated: September 3, 2020
      Manhasset, NY

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

───────────────────────────────

UNITED STATES OF AMERICA,

*Appellee*,

v.

RAZHDEN SHULAYA,

*Defendant-Appellant*.

───────────────────────────────

<u>CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32</u>

I, Arza Feldman, hereby certify, pursuant to Rule 32 of the Federal Rules of Appellate Procedure, that this brief does not exceed 1,300 lines and 14,000 words. Rather, it contains <u>8,162 words</u>.

<u>*/s/ Arza Feldman*</u>
Arza Feldman

49

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

---

UNITED STATES OF AMERICA,

      *Appellee*,

       v.

RAZHDEN SHULAYA,

      *Defendant-Appellant*.

---

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 32(a)(1)(E)

I, Arza Feldman, hereby certify that Feldman & Feldman, Attorneys at Law, drafted this brief, in Wordperfect Version X8, scanned it for viruses with Trend Micro, converted it to PDF format, viewable with Adobe Acrobat writer, and caused Gibson Moore Appellate Services to electronically file a version, which is identical to the hard copy, with the Court, on Pacer.

                    */s/ Arza Feldman*
                    Arza Feldman

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

─────────────────────────────

UNITED STATES OF AMERICA,

     *Appellee*,

                                            CERTIFICATE OF
                                            SERVICE

     v.

RAZHDEN SHULAYA,

     *Defendant-Appellant*.

─────────────────────────────

    I, Arza Feldman, affirm, under penalties of perjury, that, on September 3, 2020, we caused Gibson Moore Appellate Services to serve a copy of Appellant's brief and appendix by UPS, on Won S. Shin and Andrew M. Thomas of the United States Attorney's Office, Southern District of New York, 1 Saint Andrews Plaza, New York, NY 10007, and on Razhden Shulaya, 54114-048, 1640 Sky View Drive, Bruceton Mills, WV 26525.

                         */s/ Arza Feldman*
                         Arza Feldman
                         Feldman & Feldman