# 18-1390(L)

**18-2522(CON), 18-2783(CON), 18-3852(CON)**

*To Be Argued By:*
ANDREW C. ADAMS

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

**Docket Nos. 18-1390(L), 18-2522(CON), 18-2783(CON), 18-3852(CON)**

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

AZER ARSLANOUK, RAZHDEN SHULAYA, also known as Brother, also known as Roma, AVTANDIL KHURTSIDZE,

*Defendants-Appellants,*

*(Caption continued on inside cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

AUDREY STRAUSS,
*Acting United States Attorney for the Southern District of New York, Attorney for the United States of America.*
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2200

ANDREW C. ADAMS,
ANDREW M. THOMAS,
ANNA M. SKOTKO,
*Assistant United States Attorneys,*
*Of Counsel.*

ZURAB DZHANASHVILI, also known as Zura, AKAKI UBILAVA, also known as Ako, HAMLET UGLAVA, MAMUKA CHAGANAVA, MIKHEIL TORADZE, NAZO GAPRINDASHVILI, also known as Anna, EVGHENI MELMAN, TIMUR SUYUNOV, ZURAB BUZIASHVILI, GIORGI LOMISHVILI, IVAN AFANASYEV, also known as Vanya, DENIS SAVGIR, BAKAI MARAT-UULU, ANDRIY PETRUSHYN, DIEGO GABISONIA, LEVAN MAKASHVILI, SEMYON SARAIDAROV, also known as Sammy, DENYS DAVYDOV, EREKLE KERESELIDZE, ALEX MITSELMAKHER, also known as Globus, YURIY LERNER, also known as Yuri, AVTANDIL KANADASHVILI, NIKOLOZ JIKIA, VACHE HOVHANNISYAN, ARTUR VINOKUROV, also known as Rizhy,

*Defendants.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  2

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . .  3

    A.   The Government's Case . . . . . . . . . . . . . . .  3

          1.   The Shulaya Enterprise . . . . . . . . . . . .  4

                a.   Trafficking in Stolen Goods and
Contraband Tobacco . . . . . . . . . . . .  6

                b.   The Gambling Operation . . . . . . . .  8

                c.   The Casino Fraud Scheme . . . . . .  10

                d.   Identity Theft and Money
Laundering . . . . . . . . . . . . . . . . . .  15

    B.   The Defense Case . . . . . . . . . . . . . . . . . . . .  16

    C.   Verdict and Sentencings. . . . . . . . . . . . . .  17

ARGUMENT:

POINT I—The District Court Properly Admitted
Certain Expert Testimony . . . . . . . . . . . . . . . .  17

    A.   Relevant Facts . . . . . . . . . . . . . . . . . . . . . .  17

          1.   Expert Notification and Pretrial
Litigation . . . . . . . . . . . . . . . . . . . . . . .  17

          2.   Agent Penza's Trial Testimony . . . . . .  19

    B.   Applicable Law . . . . . . . . . . . . . . . . . . . . . .  22

ii

PAGE

   C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . .  24

        1.  Agent Penza Was Properly Qualified
            as an Expert in Eurasian Organized
            Crime . . . . . . . . . . . . . . . . . . . . . . . . .  24

        2.  Agent Penza's Supervisory Role Did
            Not Preclude His Expert
            Testimony. . . . . . . . . . . . . . . . . . . . . . .  27

        3.  Any Purported Error Was
            Harmless . . . . . . . . . . . . . . . . . . . . . . .  30

POINT II—The District Court Properly Instructed
   the Jury as to Conscious Avoidance. . . . . . . . .  32

   A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . .  32

   B.  Applicable Law . . . . . . . . . . . . . . . . . . . . .  34

   C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . .  36

POINT III—Sufficient Evidence Supported
   Khurtsidze's Conviction for Wire Fraud
   Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

   A.  Applicable Law . . . . . . . . . . . . . . . . . . . . .  40

   B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . .  41

POINT IV—The District Court Properly
   Responded to the Jury's Note. . . . . . . . . . . . . .  43

   A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . .  43

iii

PAGE

B.  Applicable Law . . . . . . . . . . . . . . . . . . . . .  45

C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . .  47

POINT V—Khurtsidze's Sentence Was
Reasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . .  49

A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . .  49

B.  Applicable Law . . . . . . . . . . . . . . . . . . . . .  56

C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . .  58

    1.  Khurtsidze's Sentence Was
        Procedurally Reasonable . . . . . . . . . . .  58

    2.  Khurtsidze's Sentence Was
        Substantively Reasonable . . . . . . . . . .  60

    3.  The District Court Did Not
        Improperly Consider Khurtsidze's
        National Origin . . . . . . . . . . . . . . . . . .  62

POINT VI—Shulaya's Sentence Was
Substantively Reasonable . . . . . . . . . . . . . . . . .  65

A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . .  65

B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . .  66

POINT VII—The District Court Exercised Proper
Judicial Oversight of Shulaya's Changes of
Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  70

iv

PAGE

A.   Relevant Facts . . . . . . . . . . . . . . . . . . . . . .   70

B.   Applicable Law . . . . . . . . . . . . . . . . . . . . .   78

C.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . .   79

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   81

## TABLE OF AUTHORITIES

*Cases*:

*Faretta v. California*,
   422 U.S. 806 (1975) . . . . . . . . . . . . . . . . . . . . . . . .   78

*Gall v. United States*,
   552 U.S. 38 (2007) . . . . . . . . . . . . . . . . . . . . . .   56, 57

*Griffin v. United States*,
   502 U.S. 46 (1991) . . . . . . . . . . . . . . . . . . . . . . . .   39

*Rita v. United States*,
   551 U.S. 338 (2007) . . . . . . . . . . . . . . . . . . . . . . .   67

*Smalls v. Batista*,
   191 F.3d 272 (2d Cir. 1999) . . . . . . . . . . . . . . . .   46

*United States ex rel. Maldonado v. Denno*,
   348 F.2d 12 (2d Cir. 1965) . . . . . . . . . . . . . . . . .   78

*United States v. Adeniji*,
   31 F.3d 58 (2d Cir. 1994) . . . . . . . . . . . . . . . . . .   39

*United States v. Aina–Marshall*,
   336 F.3d 167 (2d Cir. 2003) . . . . . . . . . . . . . . . .   35

v

PAGE

*United States v. Alvarado,*
    838 F.2d 311 (9th Cir. 1987) . . . . . . . . . . . . . . . . 39

*United States v. Amuso,*
    21 F.3d 1251 (2d Cir. 1994) . . . . . . . . . . 22, 26, 29

*United States v. Barbee,*
    968 F.2d 1026 (10th Cir. 1992) . . . . . . . . . . . . . . 39

*United States v. Barrow,*
    400 F.3d 109 (2d Cir. 2005) . . . . . . . . . . . . . . . . 28

*United States v. Beridze,*
    415 F. App'x 320 (2d Cir. 2011) . . . . . . . . . . . . . 40

*United States v. Booker,*
    543 U.S. 220 (2005). . . . . . . . . . . . . . . . . . . . . . . 56

*United States v. Brumer,*
    528 F.3d 157 (2d Cir. 2008) . . . . . . . . . . . . . . . . 79

*United States v. Carlo,*
    507 F.3d 799 (2d Cir. 2007) . . . . . . . . . . . . . . . . 35

*United States v. Carreto,*
    583 F.3d 152 (2d Cir. 2009) . . . . . . . . . . . . . 57, 64

*United States v. Cartwright,*
    6 F.3d 294 (5th Cir. 1993) . . . . . . . . . . . . . . . . . 39

*United States v. Cavera,*
    550 F.3d 180 (2d Cir. 2008) . . . . . . . . . . 56, 57, 61

*United States v. Coplan,*
    703 F.3d 46 (2d Cir. 2012) . . . . . . . . . . . . . . . . . 40

vi

PAGE

*United States v. Coppola,*
 671 F.3d 220 (2d Cir. 2012) . . . . . . . . . . . . . . . . . 24

*United States v. Daniel,*
 570 F. App'x 14 (2d Cir. 2014) . . . . . . . . . . . . . . 37

*United States v. Dinome,*
 86 F.3d 277 (2d Cir. 1996) . . . . . . . . . . . . . . . . . 41

*United States v. Dukagjini,*
 326 F.3d 45 (2d Cir. 2002) . . . . . . . . . . .  27, 28, 30

*United States v. Ebbers,*
 458 F.3d 110 (2d Cir. 2006) . . . . . . . . . .  34, 35, 38

*United States v. Feliciano,*
 223 F.3d 102 (2d Cir. 2000) . . . . . . . . . . . . . . 26, 27

*United States v. Ferguson,*
 676 F.3d 260 (2d Cir. 2011) . . . . . . . . . . . . . . 34, 35

*United States v. Fernandez,*
 443 F.3d 19 (2d Cir. 2006) . . . . . . . . . . . . . . . 57, 66

*United States v. Ferrarini,*
 219 F.3d 145 (2d Cir. 2000) . . . . . . . . . . . . . . . . . 39

*United States v. Ford,*
 435 F.3d 204 (2d Cir. 2006) . . . . . . . . . . . . . . . . . 36

*United States v. Gleason,*
 616 F.2d 2 (2d Cir. 1979) . . . . . . . . . . . . . . . . . . 41

*United States v. Hertular,*
 562 F.3d 433 (2d Cir. 2009) . . . . . . . . . . . . . . . . . 47

vii

PAGE

*United States v. Hopkins,*
    53 F.3d 533 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . 35

*United States v. Irizarry,*
    553 U.S. 708 (2008). . . . . . . . . . . . . . . . . . . . . . . 58

*United States v. Jackson,*
    335 F.3d 170 (2d Cir. 2003) . . . . . . . . . . . . . . . . 40

*United States v. Jamil,*
    707 F.2d 638 (2d Cir. 1983) . . . . . . . . . . . . . . . . 29

*United States v. Johnson,*
    567 F.3d 40 (2d Cir. 2009) . . . . . . . . . . . . . . . . . 59

*United States v. Kaba,*
    480 F.3d 152 (2d Cir. 2007) . . . . . . . . . . . . . . . . 58

*United States v. Kaba,*
    481 F.3d 152 (2d Cir. 2007) . . . . . . . . . . . . . . . . 63

*United States v. Kaplan,*
    490 F.3d 110 (2d Cir. 2007) . . . . . . . . . . . . . . . . 35

*United States v. Kozeny,*
    667 F.3d 122 (2d Cir. 2011) . . . . . . . . . . . . . 34, 35

*United States v. Leung,*
    40 F.3d 577 (2d Cir. 1994) . . . . . . . . . . . . . . 57, 64

*United States v. Locascio,*
    6 F.3d 924 (2d Cir. 1993) . . . . . . . . . . . 22, 25, 26

*United States v. Martino,*
    759 F.2d 998 (2d Cir. 1985) . . . . . . . . . . . . . . . . 41

Case 18-1390, Document 150, 12/11/2020, 2992463, Page10 of 93

PAGE

*United States v. Matera*,
489 F.3d 115 (2d Cir. 2007) . . . . . . . . . . . . . . 22, 26

*United States v. McDonald*,
759 F.3d 220 (2d Cir. 2014) . . . . . . . . . . 46, 47, 48

*United States v. Mejia*,
545 F.3d 179 (2d Cir. 2008) . . . . . . . . . . . . . *passim*

*United States v. Nektalov*,
461 F.3d 309 (2d Cir. 2006) . . . . . . . . . . . . . . 23, 29

*United States v. Paulino*,
445 F.3d 211 (2d Cir. 2006) . . . . . . . . . . . . . . 24, 31

*United States v. Reyes*,
302 F.3d 48 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . 34

*United States v. Rivera*,
944 F.2d 1563 (11th Cir. 1991) . . . . . . . . . . . . . . 39

*United States v. Roman*,
870 F.2d 65 (2d Cir. 1989) . . . . . . . . . . . . . . . 46, 47

*United States v. Roy*,
783 F.3d 418 (2d Cir. 2015) . . . . . . . . . . . . . . . . . 41

*United States v. Samaria*,
239 F.3d 228 (2d Cir. 2001) . . . . . . . . . . . . . . . . . 41

*United States v. Schwartz*,
924 F.2d 410 (2d Cir. 1991) . . . . . . . . . . . . . . . . . 22

*United States v. Siddiqui*,
699 F.3d 690 (2d Cir. 2012) . . . . . . . . . . . . . . . . . 24

ix

PAGE

*United States v. Stevenson,*
    834 F.3d 80 (2d Cir. 2016) . . . . . . . . . . . . . . . . . . 59

*United States v. Svoboda,*
    347 F.3d 471 (2d Cir. 2003) . . . . . . . . . . . . . . . . . 41

*United States v. Traficante,*
    966 F.3d 99 (2d Cir. 2020) . . . . . . . . . . . . . . . . . . 60

*United States v. Ulbricht,*
    858 F.3d 71 (2d Cir. 2017) . . . . . . . . . . . . . . . . . . 65

*United States v. White,*
    552 F.3d 240 (2d Cir. 2009) . . . . . . . . . . . . . . . . . 46

*United States v. Young,*
    745 F.2d 733 (2d Cir. 1984) . . . . . . . . . . . . . . 28, 47

*Williams v. Bartlett,*
    44 F.3d 95 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . 78

*Statutes, Rules & Other Authorities*:

18 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . 53, 59, 65

Fed. R. Crim. P. 30 . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Fed. R. Evid. 614 . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

### Docket Nos. 18-1390(L); 18-2522(c); 18-2783(c); 18-3852(c)

---

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

AZER ARSLANOUK, RAZHDEN SHULAYA, also known as Brother, also known as Roma, AVTANDIL KHURTSIDZE,

*Defendants-Appellants,*

ZURAB DZHANASHVILI, also known as Zura, AKAKI UBILAVA, also known as Ako, HAMLET UGLAVA, MAMUKA CHAGANAVA, MIKHEIL TORADZE, NAZO GAPRINDASHVILI, also known as Anna, EVGHENI MELMAN, TIMUR SUYUNOV, ZURAB BUZIASHVILI, GIORGI LOMISHVILI, IVAN AFANASYEV, also known as Vanya, DENIS SAVGIR, BAKAI MARAT-UULU, ANDRIY PETRUSHYN, DIEGO GABISONIA, LEVAN MAKASHVILI, SEMYON SARAIDAROV, also known as Sammy, DENYS DAVYDOV, EREKLE KERESELIDZE, ALEX MITSELMAKHER, also known as Globus, YURIY LERNER, also known as Yuri, AVTANDIL KANADASHVILI, NIKOLOZ JIKIA, VACHE HOVHANNISYAN, ARTUR VINOKUROV, also known as Rizhy,

*Defendants.*

---

### BRIEF FOR THE UNITED STATES OF AMERICA

---

2

## Preliminary Statement

Defendants Razhden Shulaya and Avtandil Khurtsidze appeal from judgments of conviction entered on December 20, 2018, and September 11, 2018, respectively in the United States District Court for the Southern District of New York, following a trial before the Honorable Katherine B. Forrest, United States District Judge, and a jury.

On April 12, 2018, a grand jury returned a superseding indictment, S9 17 Cr. 350 (KBF) (the "Indictment"), charging Shulaya and Khurtsidze together in two counts: racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) (Count One), and wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count Five). Shulaya was further charged with conspiracy to engage in the sale and transportation of stolen goods, in violation of 18 U.S.C. §§ 371, 2314, and 2315 (Count Two); conspiracy to traffic in contraband tobacco, in violation of 18 U.S.C. §§ 371 and 2342 (Count Three); and conspiracy to commit fraud relating to identification documents, in violation of 18 U.S.C. § 1028(f) (Count Four).

Trial against Shulaya and Khurtsidze commenced on June 4, 2018 and concluded on June 19, 2018, when the jury found Shulaya and Khurtsidze guilty of all counts charged. With respect to Count Four, the jury also found that Shulaya committed the acts that satisfied the prerequisites for a statutory maximum sentence of 15 years' imprisonment, as provided by 18 U.S.C. § 1028(a)(7) and (b)(1)(D).

3

On September 7, 2018, Judge Forrest sentenced Khurtsidze principally to ten years' imprisonment on Counts One and Five, to run concurrently. On December 19, 2018, the Honorable Loretta A. Preska,[1] sentenced Shulaya principally to a total term of forty-five years' imprisonment on Counts One through Five. Khurtsidze timely filed a notice of appeal on September 20, 2018, and Shulaya timely filed a notice of appeal on December 20, 2018.

Shulaya and Khurtsidze are each serving their sentences.

## Statement of Facts

### A.  The Government's Case

The Government's evidence at trial overwhelmingly established that Shulaya was a *vor* who led a criminal syndicate based in the New York City area and that Khurtsidze acted as Shulaya's principal enforcer. The Government's proof included: (i) two confidential sources and an undercover agent, each of whom had infiltrated the Shulaya Enterprise; (ii) multiple cooperating witnesses with direct knowledge of the various aspects of the Shulaya Enterprise's illegal activities; (iii) law enforcement agents involved in the surveillance of Shulaya's illegal activities and the search of various relevant locations; (iv) victims of Shulaya's violence; (v) voluminous photographic and

---

[1]  The case was reassigned to Judge Preska following Judge Forrest's retirement from the bench

4

video evidence of, among other things, Shulaya's trafficking in stolen goods and contraband cigarettes; (vi) video of Khurtsidze's assaults on others in furtherance of the Shulaya Enterprise; (vii) wiretapped telephone calls between Shulaya and others, including Khurtsidze, discussing the details of various aspects of the Shulaya Enterprise's criminal activity; and (viii) documentary proof of Shulaya's laundering activity, identity theft, and Khurtsidze and Shulaya's participation in a sophisticated scheme to defraud casinos.

### 1. The Shulaya Enterprise

Razhden Shulaya is a "*vor v zakone*." *Vor v zakone*, or *vor*, is a Russian phrase that translates to "Thief-in-Law" and refers to an order of elite criminals that dates back to the time of the Russian czars. (Shulaya PSR ¶ 17; Khurtsidze PSR ¶ 13; Tr. 242).[2] Criminal

---

[2] "Khurtstidze PSR" and "Shulaya PSR" refer to the Presentence Investigation Report prepared by the United States Probation Office (the "Probation Office") in connection with their respective sentencings; "Khurtsidze Br." refers to Khurtsidze's brief on appeal; "Shulaya Br." refers to Shulaya's brief on appeal; "A." refers to the joint appendix filed by Khurtsidze; "Shulaya A." refers to the supplemental appendix filed by Shulaya; "Tr." refers to the trial transcript; "SA" refers to the Government's supplemental appendix filed with this brief; and "Dkt." refers to District Court docket entries in this case. Unless otherwise noted, case text quotations omit all internal quotation marks, alterations, emphases, footnotes, and citations.

networks operating under the authority of a *vor* may engage in a wide variety of illegal activity, all under the authority of the *vor* to whom tribute payments are made from the revenue of that activity. Traditionally, *vors* are nominated to their status by existing *vors* after a period of proving their worth as criminal overseers. Once crowned, *vors* demand and receive tribute from criminals and laypersons within the *vor*'s protection, license criminal activity by others, and resolve disputes between members of the criminal community. *Vors* also use funds provided in tribute to fund and maintain an *obshchak*, a secretive fund used to pay for such things as legal bills or family subsistence in the event that a *vor* or an underling is arrested. Particular iconography is associated with *vors* and their networks, including an eight-pointed star used to symbolize the *vors*' refusal to cooperate with government authorities. (Tr. 245-48, 1067, 1071, 1093, 1202).

Shulaya, in his capacity as a *vor*, led a large-scale racketeering conspiracy that operated in New York City, Las Vegas, Florida, and elsewhere (the "Shulaya Enterprise"). (Shulaya PSR ¶¶ 18-22; Tr. 697, 1065, 1067, 1072, 1397). Shulaya oversaw loyal subordinates who participated in criminal activities with his permission and for his benefit, who received his protection and extended it to others, and who enforced his authority through intimidation and violence. (Shulaya PSR ¶¶ 25-27, 30; Khurtsidze PSR ¶¶ 16-19). Shulaya asserted his status as a *vor* through a series of vicious beatings administered with the help of his underlings, including Khurtsidze, over the course of his time in the United States (*e.g.*, Shulaya PSR ¶¶ 25-27, 30; Khurtsidze PSR ¶¶ 16-19). Khurtsidze, a former professional

6

fighter, was often referred to as "Chuqucha" or "Chuquecha," a Georgian word translating to "hammer." (A. 1470).

Among other things, the Shulaya Enterprise transported and sold stolen property, including contraband tobacco (Shulaya PSR ¶¶ 54-58; Tr. 750-62, 770); used false identification documents, forged checks, and stolen counterfeit credit cards (Tr. 349-50, 867-68, 1436-37); ran an illegal gambling parlor and extorted debtors to its gambling operations (Shulaya PSR ¶¶ 44-52; Khurtsidze PSR ¶¶ 18-23); laundered criminal proceeds (Shulaya PSR ¶¶ 73-75; Tr. 946); and executed an elaborate scheme to defraud casinos of winnings purportedly earned from gambling on slot machines (Shulaya PSR ¶¶ 82; Khurtsidze PSR ¶¶ 15, 20). Every aspect the Shulaya Enterprise relied in some way on the threat and actual infliction of violence.

### a.  Trafficking in Stolen Goods and Contraband Tobacco

Under the direction of the Federal Bureau of Investigation ("FBI"), a confidential source ("CI-1") posing as a Pennsylvania-based broker of stolen goods met with Shulaya in December 2014 to discuss the acquisition of stolen jewelry and other stolen items. (Tr. 570). In a subsequent meeting in March 2015, Shulaya inquired as to whether CI-1 would be able to provide Shulaya with stolen cigarettes. (Tr. 341, 585). CI-1 represented to Shulaya that he could provide stolen cigarettes, and Shulaya then arranged for the purchase of that product from CI-1. Over the course of the investigation, Shulaya arranged to receive 509 cases of

7

purportedly stolen cigarettes, representing approximately 6,000,000 individual cigarettes and $2,097,102 in intended federal, state, and local tax loss. (Shulaya PSR ¶ 55; Tr. 505).

The investigation of Shulaya's stolen goods trafficking scheme provided a window into various other criminal activities of the Shulaya Enterprise and demonstrated the interconnected nature of those crimes. For example, gambling debts extorted from a debtor to the Shulaya Enterprise's gambling operation were quickly repurposed for the purchase of additional contraband tobacco shipments, (Shulaya PSR ¶ 56); and CI-1's relationship with Shulaya provided insights into the Shulaya Enterprise's scheme to defraud casinos, as well as evidence that the proceeds of Shulaya's stolen goods trafficking were used, in part, to fund the Shulaya Enterprise's casino scheme (Tr. 505, 700).

When Shulaya believed one of this underlings, Mamuka Chaganava, was failing to provide Shulaya with the profits of his sales of stolen, contraband cigarettes, as was required by Shulaya in his role as a *vor*, Shulaya had Khurtsidze and others beat him. A photograph later found on one of Shulaya's personal cellphones showed Chaganava's bruised and beaten face. (Tr. 705-07; SA 81). When later discussing this incident with CI-1 on a recorded call, CI-1 asked Shulaya how Chaganava reacted to this treatment, to which Shulaya responded, "Nothing. For him [Chaganava], I am a god." (Tr. 711).

8

### b.    The Gambling Operation

A second FBI confidential source ("CI-2") infil-
trated the Shulaya Enterprise through the Enter-
prise's illegal gambling operation, known as the
"Poker House." Shulaya initially met CI-2 at a sepa-
rate illegal poker game run by CI-2 prior to his work
as a confidential source. (Tr. 1065-66). Shulaya re-
vealed himself as a *vor* to CI-2 and began accepting
tribute payments derived from CI-2's illegal activities
(Tr. 1093). Eventually, Shulaya recruited CI-2 to as-
sist Shulaya in setting up the Poker House and, later,
to manage certain regular games at the Poker House.
(Tr. 1096, 1101). In his role as a "manager" of the
Poker House, CI-2 received access to the Poker House's
digital surveillance system, which CI-2 was able to ac-
cess and view remotely. (Tr. 1112-13). This video sur-
veillance showed the scope and scale of the Shulaya
Enterprise's gambling operation, and captured two
separate assaults committed by Khurtsidze at the
Poker House. (Shulaya PSR ¶ 51; Khurtsidze PSR
¶ 23).

With Shulaya's permission, members of the
Shulaya Enterprise also defrauded its own gambling
patrons at the Poker House. (Tr. 1468-69, 1656-57).
One of Shulaya's dealers at the Poker House used an
electronic device, hidden in a cigarette lighter or car
key fob, that was capable of reading subtly inscribed
"bar codes" etched in to the side of a stacked deck of
cards. (Tr. 1644-45). The device determined the pre-
cise order of the cards in the stacked deck based on the
pattern of the etching on the side of the deck. Through
a small transmitter and an earpiece, the device told

9

the dealer which player had the winning hand. (Tr. 1645). Working with a player at the game, the dealer then directed the cheating player to bet or fold based on that player's likelihood of winning the hand. (Tr. 1646).

Violence in service of the Poker House operations included an assault by both Shulaya and Khurtsidze against CI-2 himself. Shulaya, surrounded by his principal enforcer Khurtsdize and other Enterprise members, had accused CI-2 of theft from the Poker House's profits following a particularly long game. At one point in this confrontation, CI-2 tossed a small knife on to the table in front of Shulaya and Khurtsidze, and asked that, if they believed CI-2 to have stolen from the Enterprise, that Shulaya kill him with the knife. (Tr. 1126). In response to a direction from Shulaya, Khurtsidze struck CI-2 in the face without warning (Tr. 1479), followed by CI-2 being made to stand and Shulaya striking CI-2 in the face. (Tr. 1125-31; Shulaya PSR ¶ 45; Khurtsidze PSR ¶ 19). Following this accusation and assault, Shulaya demoted CI-2 within the Shulaya Enterprise. Rather than manage the Poker House, Shulaya tasked CI-2 with accompanying other members of the Enterprise, including Khurtsidze, to shake down gambling debtors for sums owed to the Poker House. (Tr. 1168-1177; Shulaya PSR ¶¶ 47-50; Khurtsidze PSR ¶¶ 21-23).

In addition to using violence and threats of violence to intimidate others into paying their gambling debts (*see, e.g.*, Tr. 420-21, 1170; SA 96), it was also used to subdue and punish those who were untruthful or dis-

10

loyal to Shulaya. For example, when Shulaya sus-
pected another underworld manager known as "Pel-
men" was being untruthful with Shulaya about his
sale of illegal drugs, Shulaya slapped him, while
Khurtsidze provided support while a third co-defend-
ant wielded a knife. (Tr. 1092-93). Pelmen later gave
Shulaya a crossbow as a gift in tribute to the *vor*.
(Tr. 292, 464, 948, 1094).

### c. The Casino Fraud Scheme

The Shulaya Enterprise's scheme to defraud casi-
nos was perhaps its most elaborate and sophisticated
criminal undertaking. In brief, the scheme worked as
follows: a particular model of electronic slot machine,
the Mark VI model produced by Aristocrat Technolo-
gies ("Aristocrat"), relied on "pseudo[-]random number
generator" software—essentially a computer program
that is designed to simulate random behavior.
(Tr. 827-28). "[I]n the context of the slot machine, it is
designed to run an algorithm in the background [of the
game] that then presents an outcome to the player on
the screen of the slot machine." (Tr. 827-28). The
games played on the Aristocrat Mark VI program "are
designed to give the appearance of a random outcome
every time an individual plays a slot machine" and a
player, unaided by the kind of technology described be-
low, would not be able to identify a pattern to the out-
comes of the game. (Tr. 828).

This pseudo-random aspect of the Mark VI is used
in part to adjust the "minimum return to player"
("RTP"), that is, the statistical probability of winning

11

at the game over a period of time. Different jurisdictions require games such as those running the Mark VI program to be set to a specific RTP. For example, if RTP is set to 85%, over the course of the life of a machine, a casino that owns the machine can expect that 85% of the funds put into the machine by its customers will be paid out to the players of the game, with the casino keeping 15% of those funds. (Tr. 831). No jurisdiction or casino sets the RTP at 100% because offering a game with that RTP would result in the casino purchasing and hosting that machine to receive no revenue. (Tr. 831-32).

The Shulaya Enterprise's casino scheme used covert electronic devices and programs designed to "crack" the Mark VI's software in order to accurately predict which "spins" of the electronic slot machine would result in a win for the player. In essence, while entering the casino under the false pretense of wishing to engage in permissible gambling, Shulaya Enterprise members in fact secretly sought to convert the RTP for the Enterprise to 100%.

The Enterprise developed this scheme through unlawful and violent means. First, in or about 2014 in Las Vegas, Shulaya and others kidnapped and extorted key software and programs from an individual who was already in possession of that software. Having obtained the code for developing the scheme,

12

Shulaya returned to the New York area with a set of thumb drives containing the code.[3]

Shulaya turned to CI-1 to obtain an electronic slot machine in order to test his stolen code. (Tr. 399-400). At the FBI's direction, CI-1 provided Shulaya with a slot machine running the Mark VI Aristocrat software in an effort to further investigate the then-nascent casino scheme that Shulaya had described to CI-1. (Tr. 401). The machine was accepted by two of Shulaya's associates, Akaki Ubilava and Khurtsidze, and then transported inside the home of co-defendant Nazo Gaprindashvili. (Tr. 403-04).

Shulaya, however, was unable to operate the programs due to lack of technical proficiency. To solve for that problem, Shulaya forced Evgheni Melman to assist him. Melman, who testified as a cooperating witness, studied computer programming before immigrating to the United States and was directed to follow

———————

[3] On May 6, 2014, Shulaya was pulled over for speeding eastbound on Interstate 70 and, during a search of his car, officers found "three thumb or zip drives wrapped in cellophane plastic that were located along with four cellphones." (Tr. 1751-52). Thumb drives were later seized from Shulaya's New Jersey residence and found to include the various software and "seed codes" necessary for developing the casino scheme (Tr. 794, 933-34). The dates of those programs, as they appeared on the thumb drives, were from 2014, consistent with the timing of the kidnapping. (Tr. 933-34).

13

Shulaya to a location where Melman would debug a software program. (Tr. 843). Upon arriving at the house, which Melman identified as belonging to Gaprindashvili, Melman saw "Diego" (co-defendant Diego Gabisonia) working on a laptop and the same slot machine provided by CI-1. (Tr. 845).

Through his conversations with Shulaya and his examination of Shulaya's electronic devices and the slot machine itself, Melman learned that Shulaya's efforts to "hack" electronic slot machines depended on the ability to use a program to quickly input the pattern of images that appeared on the slot machine as it was played over a small number of rounds of play. (Tr. 846-53). For example, a player might "spin" the wheel of the machine and the game would visually display a row of four icons, such as a pelican and three lighthouses. (Tr. 852-53). By rapidly inputting that visual information into a program that Shulaya was attempting to develop, one could, after several "spins," capture sufficient information to then reverse-engineer the pseudo-random number generator program as it was set up on a particular slot machine. (Tr. 863).

The computer processing power for this step of the scheme was significant, resulting the Shulaya's purchase and rental (with fake and stolen credit cards, as well as proceeds of the contraband cigarette scheme) of various servers. (Tr. 868, 877-78, 918, 926). Shulaya shipped some of the servers to co-conspirators in Russia, and subsequent processing of data was transmitted through electronic communications from the United States to Russia in furtherance of the scheme. (Tr. 879, 882, 943).

14

With this program, a person could then conduct the next stages of the scheme. A co-conspirator would enter a casino, sit in front of the specific compromised slot machine, and use a concealed smart phone to quickly input the visual symbols seen on the machine during a handful of initial "spins." The same smart phone, to which the program used to compromise the machine was uploaded, would calculate the particular moment at which a player could press the "spin" button on the machine and result in a winning play. (Tr. 918-35, 687-89).

Melman successfully debugged Shulaya's stolen code. (Tr. 889). After Shulaya's sample slot machine was moved to the Poker House, Melman further assisted in calibrating the Enterprise's program, accompanied by Khurtsidze on at least one occasion. (Tr. 888-89). Shulaya, Khurtsidze, and others then proceeded to gather "seed" data and to test the program at actual victim-casinos. Khurtsidze drove Melman to a casino to collect data for the scheme. (Tr. 1024). Khurtsidze obtained short videos of slot machines consistent with the raw data needed to create the programs for the Enterprise's casino scheme. (Tr. 415, 836, 1039-40). Khurtsidze also collected data from other co-conspirators tasked with gathering that information—a role consistent with Khurtsidze's understanding of the purpose of those images and his intent to subsequently provide that data to Shulaya in furtherance of the casino fraud. (Tr. 1038, 1053).

Shulaya wished to finance aspects of the scheme through the sale of contraband and stolen cigarettes, obtained through CI-1, and therefore invited CI-1 and

15

his "partner" (in fact, an undercover agent) to participate in the casino scheme. (Tr. 693). Shulaya demonstrated the scheme to CI-1 by sending Diego Gabisonia with CI-1 to a casino in the Philadelphia area, which the FBI monitored through the casino's in-house surveillance system. (Tr. 809-13). Shulaya boasted to both Melman and CI-1 that the scheme, once operational, would result in millions of dollars in fraudulent proceeds, and that the scheme could generate as much as $30,000 per day without attracting attention. (Tr. 700, 860, 944).

### d.    Identity Theft and Money Laundering

In addition to theft, gambling, extortion, and violence, the Shulaya Enterprise further traded in fraud and money laundering. In addition to demanding tribute based on credit card fraud, as described above, Shulaya and his underlings funded certain of their illegal activities through the use of credit cards stolen from mail boxes or obtained through the submission of fake applications and false identification documents. (Tr. 868). These cards, along with proceeds of the Enterprise's stolen good and contraband tobacco scheme, were to be used for, among other things, the purchase and rental of expensive servers and data processing services in connection with the Shulaya Enterprise's casino scheme. (Tr. 700, 703, 867-68).

Shulaya's used a company known as "Tropport LLC" as a front for opening bank accounts through which fraudulently obtained money would flow.

16

(Shulaya PSR ¶¶ 73-75; Tr. 946). "Tropport," a pur-
ported vodka business, was in fact simply a laundering
operation. Among other things, the company received
the proceeds of Shulaya Enterprise member Nazo
Gaprindashvili's theft of funds from the bank account
of her vulnerable employer, who had hired Gaprin-
dashvili as a home health aide following a debilitating
stroke in 2011, and whose name and bank account
numbers Gaprindashvili compromised to Shulaya's
benefit. (Shulaya PSR ¶ 74; Tr. 349).

Cooperating witness and former Shulaya lieuten-
ant Zurab Dzhanashvili recounted acts of violence
committed by members of the Shulaya Enterprise to
maintain its status. During a melee at a pool hall, for
example, a group of approximately 30 Shulaya associ-
ates descended on a rival group of approximately five
Armenian men. (Tr. 1426-29). In preparation for that
fight, Shulaya had procured several firearms, and the
fight ended with Shulaya pistol-whipping his own
nephew, who had failed in some manner to display
proper respect for the *vor* (Tr. 1426-32).

## B. The Defense Case

Neither defendant testified at trial, and Shulaya
presented no witnesses or evidence. Khurtsidze called
two witnesses who testified about Khurtsidze's char-
acter and training as a boxer. (Tr. 1762, 1767). Neither
defense witness testified as to having knowledge of
any of the events or locations discussed throughout the
Government's case, or as to the video footage depicting
Khurtsidze's assaults of people in the Shulaya Enter-
prise's Poker House.

17

## C. Verdict and Sentencings

On June 19, 2018, the jury returned a verdict of guilty for Shulaya and Khurtsidze on all charged counts.

On September 7, 2018, Judge Forrest sentenced Khurtsidze principally to ten years' imprisonment on Counts One and Five, to run concurrently. On December 19, 2018, Judge Preska sentenced Shulaya principally to a total term of forty-five years' imprisonment on Counts One through Five.

## ARGUMENT

### POINT I

### The District Court Properly Admitted Certain Expert Testimony

#### A. Relevant Facts

##### 1. Expert Notification and Pretrial Litigation

Prior to trial, in a letter dated April 12, 2018 ("Penza Expert Notice"), the Government provided notice of its intent to call Special Agent John Penza to testify as an expert witness on certain matters relating to the organization and operation of Eastern European and Russian criminal groups, specifically: (1) the structure of Eurasian organized criminal groups; (2) the history of *vors* and the factions they lead; (3) traditional rules governing the conduct of *vors*; (4) the meaning of certain foreign terms; (5) the methods and

18

means by which Eurasian criminal groups generate income; and (6) the structure, financing, and operation of Eurasian organized crime groups. (A. 214-15).

The Penza Expert Notice set forth Penza's qualifications and his role as the supervisor of squad C-24 (A. 214-15), the squad overseeing the Shulaya investigation. At the time of trial, Agent Penza had served as a Special Agent with the FBI since 2001, with assignments focused on counter-terrorism and organized crime (including both "traditional" organized crime, that is, La Cosa Nostra, and "nontraditional" organized crime). (A. 214; Tr. 119). In June of 2011, Agent Penza transferred to the squad that specialized in the investigation of Eurasian organized criminal groups operating in the New York area. (A. 214; Tr. 117-18). In January of 2014, Penza assumed supervisory responsibilities for that squad. (A. 214; Tr. 118).

Agent Penza actively participated in at least ten investigations of Eurasian criminal enterprises. (Tr. 223). Through these investigations, Agent Penza conducted surveillance, participated in Title III wiretap monitoring, executed search warrants, interviewed witnesses and debriefed confidential sources. Agent Penza also reviewed files from prior investigations. (Tr. 226). Based on these experiences, Agent Penza developed familiarity with, and opinions concerning, the structure, history, terminology and symbols of Eurasian organized criminal groups. (Tr. 224-26). Agent Penza had also lectured foreign law enforcement officials on Eurasian organized crime, including on the topics of his anticipated testimony. (A. 214, 229-230).

19

The defendants moved to preclude Agent Penza's testimony on the grounds that it would necessarily rely on out-of-court statements, thus violating the defendants' rights under the Sixth Amendment (A. 217-19), and that the testimony did not satisfy the requirements of Federal Rules of Evidence 702 and 703 (A. 219-24). Khurtsidze also maintained that the proposed testimony was inadmissible under Rule 403 because it was more prejudicial than probative. (A. 224-25). In a thorough decision, the District Court denied Khurtsidze's motion in its entirety. (Dkt. 804 at 24-25).

## 2. Agent Penza's Trial Testimony

At trial, Agent Penza testified regarding his qualifications, including his years of experience in organized crime and his expertise in various investigative techniques. (Tr. 118-24, 224-25). Agent Penza acknowledged his role as supervisor, which included payroll and mentoring responsibilities, and that he had "supervisory authority" over the Shulaya investigation. (Tr. 118, 124). Agent Penza, however, emphasized that he lacked substantive involvement in the case: he did not conduct any surveillance, debrief witnesses, or execute search warrants. (Tr. 14-25). The Government then offered Agent Penza as an expert witness. (Tr. 125).

Defense counsel renewed its objection to Agent Penza's qualifications. After the District Court reviewed and described the relevant case law on the record, the District Court permitted the defense a *voir dire* to confirm Agent Penza's expertise and to clarify the nature of his supervisory capacity over the

20

Shulaya investigation. (Tr. 226-34). The District Court reserved decision on the admissibility of the testimony until after the Government had established Agent Penza's qualifications and after the defense completed the *voir dire*. Additionally, before permitting Agent Penza's testimony to proceed, the District Court expressly ensured that Agent Penza had sufficient expertise in the field such that he would be able to offer his opinion on Eurasian organized crime without referencing or relying on work done in the Shulaya investigation (Tr. 220, 234-35, 237), and that Agent Penza would not offer any testimony that established the facts at issue or crimes charged (Tr. 214, 220). After the Government addressed those foundational matters, the District Court ruled that Agent Penza could testify as an expert. (Tr. 235).

The District Court repeatedly offered to provide a limiting instruction to the jury that clarified that Agent Penza's testimony was not based on information drawn from the Shulaya investigation. (*E.g.*, Tr. 132, 216-17, 235). Specifically, the District Court proposed to instruct the jury that:

> Special Agent Penza has been proffered [as] an expert in [Eurasian Organized Crime]. . . . .
>
> Accordingly, Special Agent Penza is not testifying based upon information related to the investigation in this case. He is, instead, basing his testimony on the expertise that he has gleaned from the other sources which you have heard him testify

> here about. It will be up to you to evalu-
> ate Special Agent Penza's testimony and
> to weigh it as you would any other evi-
> dence in this case.

(Tr. 216-17). Defense counsel declined the special in-
struction and further declined to have the District
Court strike testimony regarding his role as supervi-
sor. (Tr. 235-38). The District Court did instruct the
jury that "it is up to you to decide what weight to give
to Special Agent Penza's testimony, and you should
consider it as you would all testimony and other evi-
dence in this case." (Tr. 241-42).

On direct examination, Agent Penza testified, con-
sistent with the Government's disclosure, as to the
structure of Eurasian organized criminal groups under
a *vor a zakone* (Tr. 242-45); the history of these groups
and how their organization has evolved (Tr. 242-45);
the internal protocols governing these groups (for ex-
ample, that proceeds from the criminal activities of
lower-ranking criminal associates are transferred up
to the senior *vor*) (Tr. 244); the terminology used by
Eurasian organized criminal groups, including terms
such as *vor* (thief-in-law) and *obshchak* (criminal fund
maintained for use by *vors*) (Tr. 245, 247); the illegal
means by which such organizations generate income,
including bookmaking, gambling, and extortion
(Tr. 246); and the symbols and norms associated with
these operations, such as tattoos and typical meeting
locations (Tr. 248-50). Agent Penza testified only as an
expert. At no point did Agent Penza provide testimony
on the specific facts, individuals, or criminal enterprise
at issue in the case.

22

## B.  Applicable Law

Expert testimony is generally admissible to "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). The decision to admit expert testimony rests soundly with the discretion of the trial court. *See United States v. Schwartz*, 924 F.2d 410, 425 (2d Cir. 1991). This Court has routinely approved of the admission of expert testimony—indeed, expert testimony by law enforcement officers—in organized crime cases "to help explain the operation, structure, membership, and terminology of organized crime families." *United States v. Locascio*, 6 F.3d 924, 936 (2d Cir. 1993) (finding the expert testimony by an FBI agent "on the nature and function of organized crime families, imparting the structure of such families and disclosing the 'rules' of La Cosa Nostra," was admissible); *see also United States v. Amuso*, 21 F.3d 1251, 1263-64 (2d Cir. 1994) (approving the admission of an FBI agent's expert testimony "regarding the organization, structure and terminology of organized crime families"); *United States v. Matera*, 489 F.3d 115, 121 (2d Cir. 2007) (affirming the admission of expert testimony by an investigator at the U.S. Attorney's Office about the "composition and structure" of organized crime families generally).

Law enforcement expert testimony, however, is not without limits. In *United States v. Mejia*, 545 F.3d 179, 190 (2d Cir. 2008), this Court re-affirmed the admissibility of expert testimony in organized crime cases but noted that its application must be confined to instances where generalized "sociological knowledge" is appropriate to explicate esoteric organizations, and

23

their practices and terminology. *Id.* Problems arise
where:

> Th[e] officer becomes, rather than a soci-
> ologist describing the inner workings of a
> closed community, a chronicler of the re-
> cent past whose pronouncements on ele-
> ments of the charged offense serve as
> shortcuts to proving guilt. As the officer's
> purported expertise narrows from 'orga-
> nized crime' to 'this particular gang,' from
> the meaning of 'capo' to the criminality of
> the defendant, the officer's testimony be-
> comes . . . more corroborative of the wit-
> nesses, and more like a summary of the
> facts than an aide in understanding
> them.

*Id.* at 190-91. In short, problems arise where the ex-
pert's area of expertise "happens to be the defendant."
*Id.* at 191. One way in which an officer may "stray" be-
yond the bounds of appropriate expert testimony
would be to interpret the operations of insular criminal
groups "based on knowledge gained through involve-
ment in the case," such as hearsay and custodial inter-
rogations in violation of Rule 703 or the Sixth Amend-
ment's Confrontation Clause, "rather than by refer-
ence to the fixed meaning" of relevant concepts and
terms. *Id.* at 193.

This Court reviews a district court's evidentiary
rulings for abuse of discretion and will reverse "only
when the court acted arbitrarily or irrationally."
*United States v. Nektalov*, 461 F.3d 309, 318 (2d Cir.
2006). Review of a district court's ruling under Rule

24

403 "is highly deferential in recognition of the district court's superior position to assess relevancy and to weigh the probative value of evidence against its potential for unfair prejudice." *United States v. Coppola*, 671 F.3d 220, 244 (2d Cir. 2012).

Even if a district court's evidentiary ruling is "manifestly erroneous," a defendant is not entitled to a new trial if that error was harmless. *United States v. Siddiqui*, 699 F.3d 690, 702 (2d Cir. 2012). An evidentiary error is harmless if this Court determines with "fair assurance that the jury's judgment was not substantially swayed by error." *United States v. Paulino*, 445 F.3d 211, 219 (2d Cir. 2006).

## C.  Discussion

On appeal, Khurtsidze challenges the District Court's admission of Agent Penza's expert testimony. Khurtsidze claims that (1) Agent Penza lacked sufficient expertise to qualify as an expert and (2) Agent Penza's supervisory authority over the Shulaya investigation should have precluded his testimony. These challenges are meritless. The District Court's decision to admit Agent Penza's testimony rested on a robust record of Agent Penza's qualifications and expertise and incorporated strict limits on the boundaries of the testimony.

### 1.  Agent Penza Was Properly Qualified as an Expert in Eurasian Organized Crime

The District Court properly admitted Agent Penza's testimony pursuant to Rule 702 of the Federal Rules of Evidence.

25

First, the District Court recognized that Agent Penza possessed sufficient knowledge and experience to be qualified as an expert in Eurasian organized crime. (Tr. 234). At the time of trial, (i) Agent Penza had served as a Special Agent or Supervisory Special Agent with the FBI for approximately seventeen years; (ii) since June of 2011, Agent Penza's work concentrated on Eurasian organized crime; and (iii) since January of 2014, Agent Penza supervised the FBI squad tasked with disrupting Eurasian organized criminal groups. (Tr. 117-18, 230). Agent Penza's experience compares favorably to other officer-experts this Court has recognized in this past. *See, e.g.*, *Locascio*, 6 F.3d at 937 (holding that an officer who "had been an FBI agent for seventeen years, and for five years had been on the FBI's Organized Crime Program" qualified as having the "specialized knowledge" that permitted his designation as an expert). Further, while with the squad handling Eurasian organized crime investigations, Agent Penza conducted surveillance, executed search warrants, interviewed witnesses, debriefed confidential sources, and trained other law enforcement personnel. (Tr. 224). The District Court acted within its discretion in deciding that Agent Penza had developed considerable experience, as this this Court has repeatedly recognized that those types of activities may convey. *See Mejia*, 545 F.3d at 193-194 (affirming an officer's qualification as an expert on a particular gang where the officer had considerable experience investigating that gang, namely performing surveillance, executing search warrants, debriefing over one hundred gang members, and training

other law enforcement personnel); *United States v. Feliciano*, 223 F.3d 102, 109 (2d Cir. 2000) (describing an officer as having "extensive experience" with a particular gang based on the officer's execution of search warrants at gang locations, authorization and review of electronic surveillance, and participation in a joint task force for five years).

Second, the District Court correctly rejected Khurtsidze's argument that Agent Penza could not be qualified as an expert because (i) he had not published in his field, (ii) had not received formal training, and (iii) had not testified as an expert in the past. (*See* Tr. 234-35; Khurtsidze Br. 38). "Rule 702 only requires that an expert witness have scientific, technical, or other specialized knowledge gained through 'knowledge, skill, experience, training, or education.'" *Locasio*, 6 F.3d at 937. This Court has repeatedly recognized that law enforcement officers may obtain sufficient expertise from their work to qualify as expert witnesses within the meaning of Rule 702. *See, e.g.*, *id.*; *Amuso*, 21 F.3d at 1263-64; *Matera*, 489 F.3d at 121. As the District Court noted, "somebody's got to be able to write the manual." (Tr. 234). *See Locasio*, 6 F.3d at 937 ("Although [the agent] had never before been qualified as an expert witness, even the most qualified expert must have his first day in court.").

Nor is Agent Penza's expertise undermined by the fact that he gained experience through supervision of the investigation of the Shulaya Enterprise, in addition to numerous other investigations over his career. (Tr. 233; *see also* Tr. 119 (testifying to participation in

27

"over 50" organized crime investigations)). The District Court carefully exercised its gatekeeping role to ensure that Agent Penza possessed sufficient experience in Eurasian organized crime to be qualified as an expert without considering knowledge acquired through the Shulaya investigation. (Tr. 216). Agent Penza's inability at times to easily sort information he learned through the Shulaya investigation from the information he learned from other cases did not undermine his expertise. Rather, as the District Court found, the fact that Agent Penza's knowledge from this case was corroborative of the understanding of these groups that he developed in prior cases merely confirmed his consistent understanding of the "fixed meaning" of terms and concepts within his field of expertise (Tr. 233). *See Mejia*, 545 F. 3d at 193 (contrasting proper expert testimony regarding the "fixed meaning" of criminal terms from improper testimony about slang understood through involvement in the case on trial).

### 2. Agent Penza's Supervisory Role Did Not Preclude His Expert Testimony

Agent Penza's supervision of the Shulaya investigation did not preclude his testimony as an expert. This Court has expressly "decline[d] to prohibit categorically the use of case agents as experts." *United States v. Dukagjini*, 326 F.3d 45, 56 (2d Cir. 2002). And this Court has repeatedly upheld convictions based on expert testimony by a case agent who also testified as a fact witness. *See, e.g., Feliciano*, 223 F.3d at 121 (specifically affirming the admissibility of expert testi-

mony by a case agent who also testified as a fact witness and noting that "[s]uch dual testimony is not objectionable in principle"); *United States v. Young*, 745 F.2d 733, 760 (2d Cir. 1984) ("[I]t was not improper for the government to elicit expert testimony from law enforcement officers who also testified as fact witnesses."); *see also United States v. Barrow,* 400 F.3d 109, 124 (2d Cir. 2005) (same). So the mere fact that Agent Penza supervised the case agents creates no categorical bar to the admission of Agent Penza's testimony, and the District Court did not err in rejecting the unfounded defense assertion that it did. (*See* Tr. 219-20).

Further, Agent Penza's testimony did not pose a risk that an "expert" designation may "give his factual testimony an unmerited credibility." *Cf. Mejia*, 545 F.3d at 192. Here, Agent Penza was *not* a fact witness and he did not testify about the facts of the underlying investigation. *Compare Dukagjini*, 326 F.3d at 55 (rejecting proposed expert testimony where the proffered expert was also a percipient fact witness and case agent whose "expert" testimony was "drawn largely from his knowledge of the case file and upon his conversations with co-conspirators"). To the contrary, Agent Penza did not conduct surveillance in the case, did not debrief witnesses in the case, and did not participate in the execution of search warrants in the case. (*See* Tr. 224-25). Khurtsidze's arguments regarding the risks of dual testimony by case agents are therefore entirely inapposite. (Khurtsidze Br. 36-37, 40-41).

To that end, Agent Penza's testimony was not "cumulative and unnecessary," as Khurtsidze asserts

29

(Khurtsidze Br. 40). Agent Penza's testimony did not "replicate[ ] other admitted evidence." *See United States v. Jamil*, 707 F.2d 638, 643 (2d Cir. 1983). Agent Penza was the second witness at trial, and the first witness to discuss Russian organized crime. Any subsequent overlapping fact testimony is not improperly cumulative. *Amuso*, 21 F.3d at 1263-64 (allowing an expert-agent to testify "about a broad range of topics" including gang terminology and the existence and structure of organized crime families, despite the fact that some of his testimony overlapped with that of Government's fact witnesses).

Agent Penza's testimony benefited the Government in the same way any expert's testimony benefits the party who calls the expert: by helping the jury appreciate the significance of fact testimony. Here, that meant apprising the jury of matters not readily understood by an average juror, such as the typical structure of Russian organized crime groups, their conventions, jargon, symbols, and methods (Tr. 242-48).

The District Court's decision to qualify Agent Penza was not arbitrary or irrational, as is required to find an abuse of discretion, but measured and well-reasoned. *See Nektalov*, 461 F.3d at 318. The defense had the full opportunity to *voir dire* Agent Penza and the District Court expressly ensured that Agent Penza had sufficient experience in his field such that he would be able to offer his expertise "without referencing or relying on work . . . done in the Shulaya [investigation]." (Tr. 149). The District Court vigilantly enforced the limits of Agent Penza's testimony, stating at various

30

points that he would not be permitted to offer any testimony that proved the facts at issue or crimes charged. *Compare Dukagjini*, 326 F.3d at 55-56 (finding that the district court failed to fulfill its "gatekeeping" function in allowing the expert to "stray" beyond the scope of permissible expert testimony and offer conclusions about the defendant's conduct based upon his knowledge of the case) *with* (Tr. 214, 220). Moreover, the District Court took affirmative steps to prevent prejudice, instructing the jury immediately after qualifying Agent Penza that it should "decide what weight to give to Special Agent Penza's testimony . . . as it would all other testimony and evidence in this case." (Tr. 241-42). The District Court also repeatedly offered to provide a special limiting instruction reminding the jury that Agent Penza's testimony was not based on information gathered in the course of the Shulaya investigation, which defense counsel declined (Tr. 132, 215-16, 235-36).

### 3. Any Purported Error Was Harmless

Any purported error in admitting Agent Penza's expert testimony was harmless in light of the overwhelming evidence of Khurtsidze's guilt on Counts One and Five. The Government introduced compelling evidence of the existence of an enterprise organized under Shulaya, and Khurtsidze's role within the enterprise, through other witnesses. *E.g.*, Tr. 1393-99, 1407, 1449, 1454, 1462). A plethora of visual surveillance, witness testimony, and audio recordings confirmed Khurtsidze's participation in assaults on behalf of the organization, (Tr. 448, 1125-33, 1340-41, 1407), and threats of violence to collect debt from players in

31

Shulaya's Poker House (Tr. 1169-72; SA 229). Additionally, robust evidence supports Khurtsidze's role in the scheme to rig slot machines to defraud casinos: Khurtsidze transported the slot machine on multiple occasions, traveled to casinos with Melman to collect data for scheme, electronically stored data material to the conspiracy on his iPhone, and directly discussed the scam with Shulaya. (Tr. 403-05, 836, 885-88, 1709-12; SA 104-08). The foregoing evidence, which included visual surveillance footage, witness testimony, recorded phone calls, and raw data obtained from Khurtsidze's cellphone, overwhelmingly established his knowing participation in the conspiracy and intent to further its objectives.

Agent Penza's testimony was limited: after his *voir dire* and qualification, the record reflects less than twenty-five pages of testimony by Agent Penza regarding the general structure and operations of Eurasian criminal groups (Tr. 239-63 (including cross examinations)). Even if not properly admitted through Agent Penza's testimony, much of this information regarding the "codes and language of Eurasian criminal organizations," would, by the defendant's own admission, have been introduced through "two other cooperating government witnesses, [CI-2] and Zurab Dzhanashvili." (Khurtsidze Br. 40; *see* Tr. 1189-90, 1394, 1397-1400). Thus, even if the District Court erred, the nature and volume of the evidence against Khurtsidze renders Agent Penza's testimony "unimportant in relation to everything else the jury considered on the issue." *Paulino*, 445 F.3d at 219.

## POINT II

## The District Court Properly Instructed the Jury as to Conscious Avoidance

### A.  Relevant Facts

Khurtsidze opened his defense at trial by, among other things, disputing his knowledge of the object of the wire fraud scheme: "The evidence that will be elicited during this trial, however . . . will, we have confidence, leave you with . . . reasonable doubt about what Mr. Khurtsidze knew about the operation of these rigged slot machines." (Tr. 66).

During trial, the Government introduced substantial evidence that the Shulaya Enterprise went to great lengths to steal software, acquire "test" machines, and obtain the required "seed" data in the form of visual displays, in an effort to convert casino slot machines into a risk-free means of obtaining money through the false pretense of gambling at affected casinos. Khurtsidze participated in retrieving the "test" machine on which the Enterprise practiced and perfected the fraud. (Tr. 403). Khurtsidze was captured on surveillance video accepting and transporting the machine along with another co-conspirator. (Tr. 403-44). Khurtsidze, in his role as a principal bodyguard and enforcer for Shulaya, also acted as a guard for this test slot machine, which the Enterprise eventually moved into its illegal gambling establishment, the Poker House. Melman testified, and the Poker House's internal surveillance video depicted, Khurtsidze escorting Melman into the Poker House for Melman to fix the machine. (Tr. 888-89). Khurtsidze later participated in

33

returning the same slot machine to CI-1, who had originally provided it. (Tr. 1790-91).

Khurtsidze also facilitating the gathering of data for the penultimate stage of the fraud, namely the calibration of the Enterprise's covert cell phones that would be used to cheat at those games. Khurtsidze drove Melman to a casino for the purpose of gathering the visual data required to mirror a particular target machine. (Tr. 941, 1024). Videos of slot machine images consistent with the raw data needed to create the programs for the Enterprise's casino scheme were also found on Khurtsidze's cell phone. (Tr. 415, 836, 1038). These images, and similar images found on the devices of other co-conspirators, comprised the necessary data for calibrating cell phones that Enterprise members would later use to defraud targeted casinos.

In his summation, Khurtsidze argued, among other things, that the Government had, at best, proven Khurtsidze associated with Shulaya but not that he had "knowingly and willfully participated in a conspiracy, and was aware of its illegal objectives, intending to further those objectives." (Tr. 1885).

The Government sought a conscious avoidance instruction for both Shulaya and Khurtsidze.[4] The District Court denied the Government's request with respect to Shulaya but granted that request with respect to Khurtsidze. (Tr. 1312-14). The District Court found

————

[4]    The Government's proposed charges, submitted in advance of trial, included a conscious avoidance instruction applicable to each defendant. (SA 5-6).

34

that the record contained facts from which the jury could conclude that Khurtsidze was "aware of a high probability of the fact of dispute and consciously avoided confirming that fact," specifically noting Khurtsidze's chauffeuring of Melman in silence, his visit to casinos, and his transportation of the test machine. (Tr. 1313).

## B. Applicable Law

"A conscious-avoidance charge is appropriate when (a) the element of knowledge is in dispute, and (b) the evidence would permit a rational juror to conclude beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact." *United States v. Ebbers*, 458 F.3d 110, 124 (2d Cir. 2006); *see also United States v. Ferguson*, 676 F.3d 260, 277-78 (2d Cir. 2011). That is because "in addition to actual knowledge, a defendant can also be said to know a fact if he is aware of a high probability of its existence, unless he actually believes it does not exist." *United States v. Reyes*, 302 F.3d 48, 54 (2d Cir. 2002). Indeed, the instruction is particularly appropriate where "a defendant's involvement in the criminal offense [is] so overwhelmingly suspicious that the defendant's failure to question the suspicious circumstances establishes the defendant's purposeful contrivance to avoid guilty knowledge." *United States v. Kozeny*, 667 F.3d 122, 134 (2d Cir. 2011).

The Government "need not choose between an 'actual knowledge' and a 'conscious avoidance' theory."

35

*Ferguson*, 676 F.3d at 278. That is, a conscious avoidance instruction "is not inappropriate merely because the government has primarily attempted to prove that the defendant had actual knowledge, while urging in the alternative that if the defendant lacked such knowledge it was only because he had studiously sought to avoid knowing what was plain." *United States v. Hopkins*, 53 F.3d 533, 542 (2d Cir. 1995); *see United States v. Carlo*, 507 F.3d 799, 802 (2d Cir. 2007); *United States v. Kaplan*, 490 F.3d 110, 128 n.7 (2d Cir. 2007). To the contrary, in many cases, the evidence supporting actual knowledge will be the same evidence that supports a conscious avoidance theory. As this Court has observed, "the same evidence that will raise an inference that the defendant had actual knowledge of the illegal conduct ordinarily will also raise the inference that the defendant was subjectively aware of a high probability of the existence of illegal conduct." *Kozeny*, 667 F.3d at 133-34.

In assessing the propriety of jury instructions, this Court reviews the District Court's instructions *de novo*, *Ebbers*, 458 F.3d at 124, and views the evidence in the light most favorable to the Government, drawing all permissible inferences from that evidence in the Government's favor, *id.* at 113. To secure reversal based on a flawed jury instruction, a defendant must demonstrate both error and ensuing prejudice. *See United States v. Aina–Marshall,* 336 F.3d 167, 170 (2d Cir. 2003). While this Court reviews a claim of error in jury instructions *de novo,* reversal is only required where the charge, viewed as a whole, "either failed to inform the jury adequately of the law or misled the

jury about the correct legal rule," *United States v. Ford,* 435 F.3d 204, 209-10 (2d Cir. 2006).

## C.  Discussion

The District Court's instruction was supported by a sufficient factual foundation and was legally proper. By ignoring damaging testimony and evidence, and belatedly complaining of testimony offered in response to a proper question by the Court, Khurtsidze now attempts to reconstruct a trial at which there was no evidence that Khurtsidze was aware of a high probability of the operation of the casino scheme in which he was involved. However, the actual trial evidence belies that claim. As detailed above, Khurtsidze participated in the transportation of a "test" slot machine at the direction of his *vor* and into the apartment of another co-conspirator; assisted in overseeing the Poker House into which that machine was later fixed by cooperating witness Melman; returned that machine to CI-1; drove Melman, in silence, to a casino for the purpose of gathering critical data about target machines; collected still more data in the form of electronic images sent to Khurtsidze's cell phone; and expressly discussed the fear of yet another co-conspirator involved in the scheme. In each of these instances, Khurtsidze assisted Shulaya under circumstances that fairly screamed of a high probability that these efforts were in furtherance of a fraud.

On appeal, Khurtsidze takes an artificially narrow view of the relevant evidence and then attempts to dismiss it as not credible. Specifically, Khurtsidze claims

that Melman's testimony regarding Khurtsidze's driv-
ing him to a casino for the purpose of furthering the
casino scheme was the "central, if not sole" factual ba-
sis for the Court's instruction and was not credible.[5]
(Khurtsidze Br. 25, 44). Finally, Khurtisidze com-
plains that the District Court's conscious avoidance
instruction applied to both counts against Khurtsidze
(Khurtsidze Br. 44), without recognizing that the wire
fraud underlying the casino scheme was expressly
charged in both counts against Khurtsidze.

Khurtsidze impliedly concedes that, even had Mel-
man's testimony about a long, silent drive to a casino
been the sole evidence bearing on Khurtsidze's willful
blindness (and it was not), that testimony would have
provided a factual basis for a conscious avoidance
charge. Khurtsidze attempts to avoid that testimony
by asserting that it was not credible. (Khurtsidze

--------

[5]   Khurtsidze also appears to suggest that the fact
that Melman's testimony was elicited by the District
Court, rather than a party, somehow impacts its evi-
dentiary value (Khurtsidze Br. 43). The Federal Rules
of Evidence expressly provide that the court may ex-
amine a witness, regardless of which party called that
witness, and that a party may object to that examina-
tion either contemporaneously or "at the next oppor-
tunity when the jury is not present." Fed. R. Evid. 614.
Where no objection is lodged below, this Court applies
a plain error standard of review. *See United States v.
Daniel*, 570 F. App'x 14 (2d Cir. 2014) (summary order)
(applying plain error to unpreserved challenge to Dis-
trict Court's questioning of three defense witnesses).

38

Br. 43). That baseless assertion contravenes the settled law that, on review, this Court views the evidence in the light most favorable to the Government, drawing all permissible inferences from that evidence in the Government's favor. *Ebbers,* 458 F.3d at 113.

Khurtsidze further asserts that his "defense was not that Khurtsidze lacked specific knowledge but, rather, that the facts were not sufficient to support the government's charge that he moved the slot machine to further a wire fraud conspiracy; and that Melman had erred in identifying Khurtsidze as his driver." (Khurtsidze Br. 43). This is directly contradicted by Khurtsidze's own opening statement, which declared that "[t]he evidence that will be elicited during this trial, however . . . will, we have confidence, leave you with . . . reasonable doubt about what Mr. Khurtsidze knew about the operation of these rigged slot machines." (Tr. 66). From the beginning, Khurtsidze's trial strategy centered on his knowledge of the casino scheme. Khurtsidze continued that theme throughout the trial and into closing arguments, when Khurtsidze's counsel repeatedly acknowledged Khurtsidze's involvement in certain events while simultaneously disclaiming knowledge of the illegal purpose. (Tr. 1905).

Finally, the District Court's instruction properly applied to each of the two counts in which Khurtsidze was charged. Count One expressly included wire fraud (*i.e.*, the casino scheme) as a predicate act underlying the charged racketeering conspiracy. (A. 189-90, 194, 196). Count Five charged the casino scheme as its own wire fraud conspiracy. (A. 204). It was, therefore,

proper to apply the conscious avoidance instruction as to each count. In any event, any error was harmless in light of the overwhelming evidence of Khurtsidze's *actual* knowledge of the existence, methods, and goals of the Shulaya Enterprise, generally, and the wire fraud conspiracy, in particular. *See United States v. Adeniji*, 31 F.3d 58, 63 (2d Cir. 1994) ("[T]he lack of evidence of conscious avoidance, coupled with the evidence of actual knowledge, compels a finding of harmless error."); *United States v. Ferrarini*, 219 F.3d 145, 157 (2d Cir. 2000) (conscious avoidance instruction harmless "because there was overwhelming evidence that [defendant] actually knew of the fraudulent nature of the loans and the jury was properly instructed on actual knowledge"); *see also United States v. Cartwright*, 6 F.3d 294, 301 (5th Cir. 1993) ("Where there is no evidence of conscious ignorance . . . [t]he instruction is surplusage and thus does not create the risk of prejudice"); *United States v. Barbee*, 968 F.2d 1026, 1033-35 (10th Cir. 1992) (harmless error to give instruction where there is substantial evidence of actual knowledge); *United States v. Rivera*, 944 F.2d 1563, 1572 (11th Cir. 1991) (same); *United States v. Alvarado*, 838 F.2d 311, 317 (9th Cir. 1987) (same); *accord Griffin v. United States*, 502 U.S. 46, 56-58 (1991) (jury presumed to disregard factually inadequate theory of guilt).

40

## POINT III

### Sufficient Evidence Supported Khurtsidze's Conviction for Wire Fraud Conspiracy

#### A. Applicable Law

"As a general matter, a defendant challenging the sufficiency of the evidence that led to his conviction at trial bears a heavy burden, as the standard of review is exceedingly deferential." *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012). Specifically, this Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *Id.* "Although sufficiency review is *de novo,* [this Court] will uphold the judgments of conviction if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*

"Both the existence of a conspiracy and a defendant's participation in it with the requisite knowledge and criminal intent may be established through circumstantial evidence, provided it is sufficient to prove these elements beyond a reasonable doubt." *United States v. Beridze*, 415 F. App'x 320, 326 (2d Cir. 2011) (summary order). With respect to conspiracy convictions, the deference accorded the verdict is "especially important . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003). Moreover,

"[a] conspiracy need not be shown by proof of an ex-
plicit agreement but can be established by showing
that the parties have a tacit understanding to carry
out the prohibited conduct." *United States v. Samaria*,
239 F.3d 228, 234 (2d Cir. 2001). To be "convicted as a
member of a conspiracy, a defendant need not know
every objective of the conspiracy," every "detail of its
operation," or "the identity of every co-conspirator."
*United States v. Gleason*, 616 F.2d 2, 16 (2d Cir. 1979);
*United States v. Martino*, 759 F.2d 998, 1003-04 (2d
Cir. 1985).

The elements of a conspiracy to commit wire fraud
are: (1) the existence of the conspiracy charged; and (2)
that the defendant knowingly became a member of
that conspiracy. *See generally United States v. Svo-
boda*, 347 F.3d 471, 476 (2d Cir. 2003) (Section 371 el-
ements); *United States v. Roy*, 783 F.3d 418 (2d Cir.
2015) (holding that Section 1349 has no overt act re-
quirement). As to the object of the conspiracy, the es-
sential elements of a wire fraud violation are (1) a
scheme to defraud through the means of false or fraud-
ulent "pretenses, representations, or promises;" (2)
money or property [as the object of the scheme]; and
(3) use of the interstate wires to further the scheme.
*See United States v. Dinome*, 86 F.3d 277, 283 (2d Cir.
1996); *see also* 18 U.S.C. § 1343.

## B. Discussion

The evidence presented at trial was more than suf-
ficient for a jury to conclude that Khurtsidze knew or
consciously avoided knowing the illegal purpose of his
acts in furtherance of the wire fraud scheme. First,

Khurtsidze received critical data needed to target particular slot machines, namely short video clips of particular slot machines spinning. (SA 109). The incoming electronic communications containing these files were marked in Khurtsidze's phone as "read" on or about January 13, 2017. (SA 109). Second, he transported and assisted co-conspirators, including Melman, in the acquisition of the equipment and information needed to successfully execute the scheme. (Tr. 403-404, 886-87). Third, Khurtsidze had direct communications with the leader of the scheme about co-conspirators involvement. During one call from Shulaya to Kurtsidze, Shulaya discussed another set of co-conspirators in the midst of the scheme, referencing how they would "press the button" and "hit[ ] the target" and how Khurtsidze "should press the best" and "will have the rhythm." (Tr. 1713-1; SA 106). Shulaya's references to aspects of the casino scheme without elaboration or explanation were met with no query from Khurtsidze, demonstrating Khurtsidze's preexisting familiarity with the nature and mechanics of the scheme.

In sum, a rational jury could easily have concluded from the evidence presented at trial that a scheme to defraud casinos through the deceptive and false pretense of engaging in legitimate gambling under the common rules of the victim casino (and without the aid of covert technology designed to subvert those rules) existed; that the scheme's purpose of was to obtain funds from unwitting, victimized casinos; and that the scheme was accomplished in part through the use of interstate wire communications (including telephonic communications and the electronic communication of data from New York and New Jersey to, among other

43

places, California and Russia). The jury was further well placed to find that an agreement among members of the Shulaya Enterprise, including Shulaya and Melman, existed, and that Khurtsidze knowingly joined in that conspiracy with knowledge of its illegal object. Consequently, Khurtsidze's sufficiency of the evidence argument should be rejected.

## POINT IV

### The District Court Properly Responded to the Jury's Note

#### A.  Relevant Facts

During the first day of jury deliberations, the jury sent a note stating: "Your Honor, the jury is deliberating and one of the jurors is using non-law principles to come to a conclusion in this case. Is this something we have to sort through or is this a case an alternate needs to be called?" (Tr. 2063). The note did not indicate the position of the juror referred to in the note, the position of other jurors, or whether the single juror's "non-law" principles were leading that person to a conclusion on the ultimate verdict different in outcome from those of the other jurors.

The District Court, after having read the note to the parties and proposed restate certain of the instructions already provided. (Tr. 2065-66). The District Court suggested responding as follows:

> [U]nder our system of the law the facts are for the jury to determine and the law

44

is for the Court. These two areas are sep-
arate and distinct and that you are re-
quired to accept the law as I explain it to
you and it will be your job to determine
the facts under my explanation of the law
and that's an instruction. And the jurors
were also asked to confirm that they were
neither unwilling or unable to do so. In
addition, they were each asked, did they
have any religious, philosophical, or
other beliefs that would make them una-
ble to render a guilty verdict in this crim-
inal case. . . . So it is the law with the facts
and it is the law as I instruct them. Put
another way, if they have a philosophical
view, a religious view, or something else
that they believe is inconsistent with the
law, they must put that to the side and
apply the law as I have given it to them.
How they weigh the evidence, however, is
entirely up to them.

(Tr. 2065-66).

The Government had no objection to the proposed
supplemental instruction. (Tr. 2066). The defendants
raised no objection to any of the points of law or accu-
racy of the supplemental instruction, but requested
that the District Court elaborate on the last sentence
by reminding the jurors that "it is for them and them
alone to decide what inferences to draw [from direct
and circumstantial evidence]." (Tr. 2066-67).

Khurtsidze's counsel acknowledged that she did
not know specifically to what the jury was referring in

45

their note and noted that counsels' request could be satisfied by providing "just a re-instruction on role of the jury and inferences." (Tr. 2067-68). Shulaya's counsel joined in that request (Tr. 2071).

With the jury in the courtroom, the District Court read its supplemental instruction, which reiterated the instructions regarding the role of the court and of the jury. (Tr. 2073-76). To address a concern raised by Khurtsidze's counsel that "using non-law principles may be using common sense, which is entirely proper" (Tr. 2069), the District Court included in its instruction a reminder that the jurors were "to put to the side personal views of a philosophical, religious, or other personal nature that are inconsistent with the law as I have instructed you on. That doesn't mean that you leave behind your common sense." (Tr. 2075). In conclusion, the District Court stated that, "as you know from the jury instructions, it's up to you folks to weigh the evidence and to apply the law as I have instructed you." (Tr. 2075).

Neither defendant raised an objection to the charge after it was read. The jury continued deliberating and rendered a verdict of guilty on all counts as to each defendant the following day. The verdict was confirmed to be unanimous through an individual polling of each of the twelve jurors. (Tr. 2077-79).

## B. Applicable Law

"When a trial judge issues a supplemental instruction to a divided jury, its propriety turns, at least in part, on whether the charge tends to coerce undecided jurors into reaching a verdict—that is, whether the

46

charge encourages jurors to abandon, without any principled reason, doubts that any juror conscientiously holds as to a defendant's guilt." *United States v. McDonald*, 759 F.3d 220, 225 (2d Cir. 2014). This Court "consider[s] the supplemental charge given by the trial court in its context and under all the circumstances," *id.*, adopting the viewpoint of a juror in the minority position, *see Smalls v. Batista*, 191 F.3d 272, 280-81 (2d Cir. 1999). An instruction in response to a jury note that is "merely a clarification of the jurors' individual responsibilities without an exhortation that they reach a decision," *United States v. Roman*, 870 F.2d 65, 77 (2d Cir. 1989), is not an *Allen* charge. *See also id.* (describing a supplemental instruction consisting in "simply rereading the portion of the charge that explained the rules for deliberation and reminding the jury to consider each count separately" as not a "real" *Allen* charge).

Supplemental jury instructions to which no objection is raised are reviewed for plain error. "This standard requires there to be (1) error, (2) that is plain, and (3) that affect[s] substantial rights." *United States v. White*, 552 F.3d 240, 249-50 (2d Cir. 2009); *see also* Fed. R. Crim. P. 30 (d) ("A party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate. An opportunity must be given to object out of the jury's hearing and, on request, out of the jury's presence. Failure to object in accordance with this rule precludes appellate review, except as permitted under Rule 52(b).""). A defendant who not only fails to object to a challenged jury charge,

47

but also endorses that charge has invited the purported "error," and is entitled to no appellate review in light of that "true waiver." *United States v. Hertular*, 562 F.3d 433, 444 (2d Cir. 2009); *see also United States v. Young*, 745 F.2d 733, 752 (2d Cir. 1984) (holding that "not even the plain error doctrine permits reversal on the ground that the trial court granted a defendant's request to charge").

## C.  Discussion

The District Court's response to the jury's note was both legally proper and consistent with the request by the defense. The defendants' challenges on appeal are waived and, in any event, meritless.

As an initial matter, at no point in the supplemental instructions did the District Court encourage the jury to seek a unanimous verdict, include an "exhortation that they reach a decision," *Roman*, 870 F.2d at 77, or even suggest that any juror might reconsider his or her views.[6] In short, the District Court did not provide an *Allen* charge, much less a coercive *Allen* charge. *See McDonald*, 759 F.3d at 225 (distinguishing *Allen*-type charges from charges of the kind provided here, noting that "[t]he court's instruction correctly carried no implication that any juror opposing conviction was obligated to reconsider her views. We need not address whether any type of *Allen* charge would

––––––––––

[6]  Shulaya's speculation that the foreperson "could not convince the holdout juror to convict," (Shulaya Br. 30), is without basis in the record.

48

have been permissible here, because that issue is not before us.").

Instead, the District Court reiterated principles of law that it had included, without objection, in its original instructions; referenced specific pages of those instructions; provided the specific "reminders" that the defendants had requested; and sent the jury back to continue deliberations. "[T]he court's brief instruction, on its face, left open the possibility that the jurors would have principled disagreements that would prevent them from reaching a unanimous verdict." *Id.* at 224 ("The context in which the instruction was given further supports our conclusion that the charge was not coercive. The district court told the jury to continue its deliberations 'in light of all of the instructions that I have given you.' This instruction referenced the court's original charge, which both required the jurors to engage in robust deliberation and urged them to hold fast to their conscientiously held beliefs.").

Further, the defendants did not object to the instruction issued by the District Court. Nor did they have any reason to—the District Court provided every instruction that the defendants' requested throughout their shifting colloquy regarding the supplemental instruction. Thus, any purported error was invited by the defendants and should not be reviewed on appeal.

Nevertheless, their challenges on appeal are meritless. To the extent their final request, that is, that the defense "would prefer . . .just a re-instruction on [the] role of the jury and inferences," (Tr. 2071), can be construed as an objection below, that challenge is wholly without merit. The Court's instructions about the role

49

of the court in articulating the law as it applied to the facts found by the jury was directly responsive to the jury's note, legally sound, and cumulative of earlier instructions. In the implausible event that a charge *solely* on the role of the court might have been understood somehow to discourage a juror's use of their common sense, that misunderstanding was mitigated in precisely the manner that the defendants had requested, namely by reminding the jury of their own role as to determining the facts and drawing inferences from evidence.

## POINT V

### Khurtsidze's Sentence Was Reasonable

#### A. Relevant Facts

In the Presentence Report prepared in advance of Khurtsidze's trial, the Probation Office applied the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") to Khurtsidze's offenses and concluded that the applicable Guidelines range was 57 to 71 months' imprisonment. (Khurtsidze PSR ¶¶ 86, 89, 111).

Among other things, the Khurtsidze Presentence Report set forth Khurtsidze's involvement—either as a primary actor or as a witness—in a variety of assaults and threats of violence, including: accompanying Shulaya as he "severely" beat an older man and left him "kneeling and bloodied on the floor" (Khurtsidze PSR ¶ 16); guarding Shulaya while Shulaya berated and assaulted Pelmen, whom Shulaya accused of being disloyal to Shulaya in the course of Pelmen's narcotics

50

sales (Khurtsidze PSR ¶ 17); "physically assault[ing]" an FBI confidential source at Shulaya's direction in an effort to collect a perceived gambling debt from the source (Khurtsidze PSR ¶ 19); threatening debtors to the Shulaya Enterprise with violence if they did not pay (Khurtsidze PSR ¶¶ 21, 22); and assuring Shulaya that he stood ready to commit acts of violence at Shulaya's direction (Khurtsidze PSR ¶ 24).

The Presentence Report also described how, following trial, Khurtsidze had participated in a brawl at the detention facility at which he and Shulaya had been held. The violence resulted from Shulaya's effort to take an open cell in the unit for himself. When other inmates assaulted Shulaya, Khurtsidze intervened to fight them off—suffering serious injuries in the process. (Khurtsidze PSR ¶¶ 9-10).

Khurtsidze's written sentencing submission advocated for a below-Guidelines in order to "return Mr. Khurtsidze to his home, his family and his native Georgia as soon as possible[.]" (Dkt. 989 at 14). Among other things, Khurtsidze described his upbringing in the Republic of Georgia, his rise through the world of professional boxing, his status as "a star" in the "small Georgian community of Brooklyn," and how he met "Shulaya, who surrounded himself with Georgian and Russian fighters." (Dkt. 989 at 2, 3-10). Khurtsdize emphasized that "certain deportation" would follow a custodial sentence and that "[w]hen [Khurtsidze] returns to Georgia, he still will have so much to offer his family, his community and his people." (Dkt. 989 at 3). Khurtsidze supplied the District Court with numerous letters of support, including letters from friends and

51

family in Georgia. (*See* Attachment 1 to Dkt. 989 (collecting letters)).

In its sentencing submission the Government argued for "a significant period of incarceration" and a sentence "greater than that captured by the United States Sentencing Guidelines calculation." (Dkt. 993 at 1). Among other things, the Government argued that Khurtsidze deserved an above-Guidelines sentence because "Khurtsidze chose to use his status and his strength as a weapon in the service of a notorious criminal" and "participated in vicious beatings, personally threatened and assaulted Shulaya's targets, and became among the most prominent and intimidating members of Shulaya's criminal entourage." (Dkt. 993 at 1). The Government specifically noted that "Khurtsidze's own fame helped draw [others] into the Enterprise" and that "Khurtsidze's loyalty [to Shulaya] was gratuitous and violent." (Dkt. 993 at 6).

Khurtsidze appeared for sentencing on September 7, 2018. The District Court began the proceeding by confirming that Khurtsidze had reviewed the Presentence Report and that neither he nor his counsel had objections to the factual statements in it. (A. 1840). The District Court then calculated the Guidelines, ultimately arriving at an advisory sentencing range of 57 to 71 months. (A. 1844). Both parties agreed with that calculation. (A. 1844).

The District Court then offered counsel and the defendant an opportunity to speak. In its remarks, the Government emphasized how Khurtsidze differed from many of his codefendants because "[h]e was not,

52

like some of the other defendants in this case, moti-
vated by addiction. He was not, like some of the other
defendants in this case, motivated by financial difficul-
ties. He was not motivated by a crime of opportunity[.]"
(A. 1846). The Government further argued that the
Guidelines failed to capture the "complete moral defi-
cit" apparent from Khurtsdize's conduct, exemplified
by standing guard over Shulaya as he violently beat
multiple people. (A. 1846-47).

Defense counsel argued that the Guidelines fairly
captured the seriousness of Khurtsdize's conduct and
appropriately excluded any credit for acceptance of re-
sponsibility. (A. 1849). Rather than "relitigate the
trial," defense counsel urged the District Court to con-
sider the "vast majority of Avtandil Khurtsidze's life."
(A. 1850). To that end, defense counsel summarized
Khurtsidze's upbringing, his personal challenges and
professional success, and characterized Khurtsidze as
"redeemaable." Counsel argued that the District Court
should impose a below-Guidelines sentence because, in
part, Khurtsidze would be deported to the Republic of
Georgia, "where he became his best self, and . . . where
he can become that person again." (A. 1849-52, 1854,
1859). To bolster the argument that Khurtsidze would
be rehabilited in Georgia, counsel noted that "[h]e has
the support of a nation" and "can't very well go back to
Georgia and fall into the shadows" because "he will be
expected by an entire country to rise to the occasion."
(A. 1853).

The District Court then inquired about the jail
brawl, expressing concern that the episode demon-
strated "ongoing support and willingness to engage in

53

violent conduct on behalf of [Shulaya.]" (A. 1854-55). Counsel argued, in part, that the episode strengthened the rationale for ensuring Khurtsidze returned quickly to Georgia so that Khurtsidze could distance himself from Shulaya and enjoy the support of the Georgian community and his family in Georgia. (A. 1855-57). Counsel then remarked, "As far as sending a message to the community, I think that that is a message that will not be heard by the community. I would argue that there is another individual who can more appropriately send that message or more appropriately be used to send that message." (A. 1857).

Khurtsidze declined the opportunity to address the District Court prior to sentence. (A. 1859).

Before imposing sentence, the District Court explained that it had considered the Guidelines, the 18 U.S.C. § 3553(a) factors, and the statutes of conviction. (A. 1859-64). The District Court then stated that it viewed Khurtsidze as "a full participant" in the Shulaya Enterprise and a "confidante" of Shulaya's. (A. 1864-65). The District Court emphasized Khurtsidze's direct participation in assaults as an "enforcer" but also as someone to "ensure" that Shulaya's assaults were "able to occur without interference." (A. 1865-66). The District Court expressed particular concern over Khurtsidze's role in the Chaganava assault, though it noted Khurtsidze did not "lay a hand on Mr. Chaganava" but rather brought Chaganava to the room where Shulaya beat Chaganava "to an absolute pulp." (A. 1866). The District Court further expressed concern over Khurtsidze's "clear demonstration of loyalty" to Shulaya—captured in a recorded

54

conversation—to the point of doing whatever Shulaya commanded, "without much questioning." (A. 1868-69). The District Court noted that Khurtsidze's unique role in the Enterprise, his status as "a well known and famous boxer in the country of Georgia," and his skills as a boxer distinguished him from other defendants because he was able to "intimidate in a way that was different from others, but also to attract participants to the Shulaya [E]nterprise." (A. 1874-75).

The District Court further remarked on its consideration of general deterrence and its consideration of the defense arguments about a speedy deportation to the Republic of Georgia, noting that "general deterrence does play a role here that is not adequately taken into consideration with the guidelines." (A. 1876). The District Court reasoned that:

> [I]ndividuals who are willing to engage and to support and facilitate organized crime within the United States need to understand that the legal justice system here, the criminal justice system here will deal with it extraordinarily seriously. You cannot come to the shores of the United States, act lawlessly, and then because of a willingness to return to your home country, escape the full significance of that conduct. There needs to be a message sent out that you will face very serious consequences here in the United States. That Russian organized crime that seeks to come to the shores of the United States, should pay quite a bit of

55

            attention to the fact that individuals who are caught will be dealt with, with the power of our criminal justice system.

(A. 1876-77).

    After further considering the Section 3553(a) factors and the possibility of an upward variance, the District Court announced its intention to impose a sentence of 120 months' imprisonment on each count, to run concurrently. (A. 1878).

    Khurtsidze objected to the District Court's sentence. Among the objections, Khurtsidze objected to basing the deterrence component of the sentence on the duration of Khurtsidze's participation, when others participated in the scheme for equal time. (A. 1882). The District Court explained that its primary motivation was Khurtsidze's willingness "to engage in assaultive conduct and to protect others who were going to engage in assaultive conduct, which is really quite breathtaking and extraordinary." (A. 1883). Khurtsidze also objected to basing a sentence in part on "the nature of [Khurtsidze's] relationship with Mr. Shulaya." (A. 1885). The District Court clarified that it was not "loyalty alone" that figured into the sentence but "loyalty . . . translated into a willingness to engage in enforcer behavior." (A. 1885). And Khurtsidze objected to any attempt punish Khurtsidze to deter specific other individuals or specific other groups. (A. 1886). The District Court explained that Khurtsidze differed from his co-defendants, in terms of general deterrence, because he was "a world champion boxer" with "fame" who "can walk into various places, within the Georgian community here in the United

States and be recognized and be seen." (A. 1886). The District Court then specifically noted that Khurtsidze "utilize[d] that same fame and that same ability to be recognized within the Georgian community as a way of further Mr. Shulaya's own enforcement abilities and reputation[.]" (A. 1887).

## B. Applicable Law

A district court's sentence is reviewed for reasonableness. *United States v. Booker*, 543 U.S. 220, 261-62 (2005). This Court's review of a district court's sentence "encompasses two components: procedural review and substantive review." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*). "A district court commits procedural error where it fails to calculate the Guidelines range (unless omission of the calculation is justified), makes a mistake in its Guidelines calculation, [ ]treats the Guidelines as mandatory[,] . . . does not consider the § 3553(a) factors, or rests its sentence on a clearly erroneous finding of fact." *Cavera*, 550 F.3d at 190; *see also Gall v. United States*, 552 U.S. 38, 51 (2007) (procedural error includes "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range"). As this Court has held, so far as procedural reasonableness is concerned, "we presume, in the absence of record evidence suggesting otherwise, that a sentencing judge has faithfully discharged her duty to

consider the statutory factors." *United States v. Fernandez*, 443 F.3d 19, 30 (2d Cir. 2006).

If this Court determines that there was no procedural error, it "then consider[s] the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." *Gall*, 552 U.S. at 51. When conducting that review, this Court must "take into account the totality of the circumstances, giving due deference to the sentencing judge's exercise of discretion, and bearing in mind the institutional advantages of district courts." *Cavera*, 550 F.3d at 190. This Court cannot "substitute [its] own judgment for the district court's on the question of what is sufficient to meet the § 3553(a) considerations in any particular case," and should "set aside a district court's *substantive* determination only in exceptional cases where the trial court's decision cannot be located within the range of permissible decisions." *Id.* at 189.

The "judicial system takes seriously the proposition that not only must justice be done, it also must appear to be done." *United States v. Carreto*, 583 F.3d 152, 159 (2d Cir. 2009). "A defendant's race or nationality may play no adverse role in the administration of justice, including at sentencing." *United States v. Leung*, 40 F.3d 577, 586 (2d Cir. 1994). "When a sentencing judge comments on a defendant's national origin in a negative or seemingly negative manner, at a minimum, the appearance of justice is compromised." *Carreto*, 583 F.3d at 159. Whether a district court improperly considers a defendant's national origin is a question of law, and thus this aspect of a sentencing is reviewed

2992463, Page69 of 93

58

*de novo. United States v. Kaba*, 480 F.3d 152, 156-57 (2d Cir. 2007).

## C. Discussion

### 1. Khurtsidze's Sentence Was Procedurally Reasonable

Khurtsidze argues that the District Court committed procedural error by (i) failing to give Khurtsidze fair notice that it was considering an above Guidelines sentence, (ii) failing to avoid unwarranted sentencing disparities by sentencing Khurtsidze above the Guidelines range, and (iii) basing its sentence on an erroneous view of Khurtsidze's participation in various assaults. None of these arguments has merit.

As Khurtsidze concedes, a sentencing court need not forecast a possible variance in advance of sentencing. *United States v. Irizarry*, 553 U.S. 708, 715 (2008). Nor is there any basis in this record to conclude that the District Court had resolved to impose an above-Guidelines sentence prior to the sentencing proceeding itself. The District Court listened to, and engaged with, counsel for both parties, before stating its sentence. (A. 1845-1859). In any event, Khurtsidze had notice that the Government was seeking a sentence above the applicable Guidelines range through its written sentencing submission, filed three days prior to the sentencing. (*See* Dkt. 993). The District Court probed that recommendation at the start of the sentencing hearing. (A. 1844-45 ("I would particularly like to understand from the government the basis for the upward variance[.]")).

59

Next, contrary to Khurtsidze's claims, his sentence does not reflect a failure of the District Court to consider unwarranted sentencing disparities between co-defendants. The District Court repeatedly acknowledged its responsibility to consider the Section 3553(a) factors, discussed the need to avoid the perception of disparity in a co-defendant's lenient sentence, and specifically responded to defense counsel's objection that the sentence reflected an unfair disparity. (A. 1861-63, 1882). Given that a sentencing court "may—but is not required to consider sentencing disparity among co-defendants," *United States v. Johnson*, 567 F.3d 40, 54 (2d Cir. 2009), the District Court's express consideration of this concept does not reflect any procedural error. *See also United States v. Stevenson*, 834 F.3d 80, 84 (2d Cir. 2016) ("18 U.S.C. § 3553(a)(6) requires that a sentencing court consider 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct,' not that it consider the disparities between co-defendants.").

Khurtsidze next challenges the District Court's assessment of the factual record, particularly as it relates to Khurtsdize's involvement in Shulaya's assault of (i) an associate who had disrespected Shulaya; (ii) an associate nicknamed "Pelmen," whom Shulaya accused of being disloyal; and (iii) Chaganava, who had failed to pay sufficient tribute to Shulaya from the sale of contraband cigarettes. These arguments are baseless. While Khurtsidze now quarrels with the District Court's summary of the trial testimony about these events (*see* Khurtsidze Br. 51-53), Khurtsidze did not object to the portions of the Presentence Report that

60

discussed those assaults. (*See* Khurtsidze PSR ¶¶ 16-19 (describing assaults); A. 1840 (defense counsel, and the defendant, indicating no objection to the facts set forth in the Presentence Report)).

Khurtsidze also misconstrues the record when he argues that the District Court "conflated" Shulaya's behavior and Khurtsidze's during the assaults; in fact, the District Court repeatedly discussed Khurtsidze's "guard" role in those events—as distinct from his "enforcer" role in those beatings he administered himself—and, with respect to the assault of Chaganava, the District Court expressly acknowledged that Khurtsidze did not "lay a hand" on Chaganava. (A. 1866). Because the uncontested facts set forth in the Presentence Report describe Khurtsidze's involvement in the violent episodes that Khurtsidze now disputes, Khurtsidze cannot show, as he must, that the District Court selected its sentence based on "clearly erroneous facts." *See United States v. Traficante*, 966 F.3d 99, 102 (2d Cir. 2020) (finding no procedural error in imposing an above Guidelines sentence based "on facts set forth in the PSR, to which [the defendant] did not object.").

## 2. Khurtsidze's Sentence Was Substantively Reasonable

Khurtsidze's claim that his sentence was substantively unreasonable also fails. As the District Court observed, Khurtsidze distinguished himself from his codefendants through his "breathtaking and extraordinary" willingness "to engage in assaultive conduct and to protect others who were going to engage in assaultive conduct." (A. 1883). Not only did Khurtsidze

61

strike, and threaten to strike, others at Shulaya's di-
rection, Khurtsidze stood guard while Shulaya com-
mitted beatings of his own. While Khurtsidze seeks to
diminish the import of any particular assault by argu-
ing that others joined in each act (*see, e.g.*, Khurtsidze
Br. 51-52), he fails to appreciate that his continuity of
presence at each episode, his professional training,
and his fearsome reputation made his involvement un-
usual even within the Enterprise. Finally, Khurtsidze
neglects to mention that his violent conduct continued
even after trial, demonstrating, as the District Court
observed, "ongoing support and willingness to engage
in violent conduct on behalf of [Shulaya]" (A. 1855)—a
fact that further separated Khurtsidze from his code-
fendants. Khurtsidze may disagree with the District
Court's assessment of Khurtsidze's culpability, but
that disagreement falls far short of demonstrating
that his sentence is the exceptional case where the sen-
tencing court's decision "cannot be located within the
range of permissible decisions." *Cavera*, 550 F.3d at
189.

For similar reasons, Khurtsidze misses the mark
when he argues that his sentence was disproportion-
ate and unreasonable when compared with the sen-
tences of his codefendants generally and with the sen-
tence of co-defendant Nikoloz Jikia in particular.
(Khurtsidze Br. 51). While Jikia's offense conduct
stands out for its depraved character—he suggested to
collaborators, for example, that they dissolve the body
of a prospective murder victim in acid—Jikia's crimi-
nal plans did not come to fruition, Jikia acted at the
periphery of the Shulaya Enterprise, and Jikia's crim-
inal conduct arose within the context of poverty and

62

drug abuse. (*See* Dkt. 1 (Complaint, *United States v. Jikia and Marat-Uulu*, 17 Mag. 4235); Dkt. 621 at 6-7, 9 (Jikia Sentencing Transcript)). By contrast, Khurtsidze repeatedly delivered on his promises of violence, Khurtsidze's participation in the Shulaya Enterprise spanned years and involved his close association with Shulaya himself, and Khurtsidze's criminal activities unfolded while he achieving fame through prizefights. Indeed, as the Government argued, and as the District Court found, one characteristic that distinguished Khurtsidze from his co-defendants was his willingness to continue with the Enterprise even when he had so many other, legitimate pathways to financial success. (*See, e.g.*, A. 1874, 1887).

### 3. The District Court Did Not Improperly Consider Khurtsidze's National Origin

Lastly, Khurtsidze argues that the District Court created the appearance that it imposed a lengthy sentence, in part, because Khurtsidze was a citizen of the Republic of Georgia. This bold claim stands at odds with the record.

To be clear, Khurtsidze's Georgian nationality and community were first raised and emphasized by Khurtsidze, starting with the first paragraph of his written sentencing memorandum and continuing at the sentencing hearing. (*E.g.*, Dkt. 989 at 1-2; A. 1852-53). Khurtsidze sought a below-Guidelines sentence expressly on the theory that, as a Georgian national with no status in the United States, he had the "unique ability to return to Georgia focused on repaying his

debt to his family and his country" and would be "returned to a nation that only wishes to foster his redemption." (Dkt. 989 at 14). Khurtsidze even appended to his sentencing submission the letters of persons who spoke of Khurtsidze's "great reputation in our small country of Georgia" and his national pride. (*E.g.*, Dkt. 989-1 at 14). Khurtsidze's fame, particularly within the Georgian community, also figured into an aspect of the offense conduct because it "further[ed] Mr. Shulaya's own enforcement abilities and reputation[.]" (A. 1887). The evidence at trial demonstrated that Khurtsidze participated in criminal activity that he and his co-conspirators organized, in part, around common language, custom, and community ties among the participants. (*See, e.g.*, PSR ¶ 12). And Khurtsidze himself acknowledged that he was drawn into Shulaya's orbit, in part, by the comfort of a shared heritage. (*See* Dkt. 989 at 2, 14).

In light of this posture, the District Court's acknowledgement of Khurtsidze's Georgian nationality represents its appropriate consideration of the arguments raised by counsel and facts developed at trial. While a District Court may not treat nationality as an adverse fact for sentencing, *United States v. Kaba*, 481 F.3d 152, 156 (2d Cir. 2007), neither the law nor the appearance of justice requires a sentencing court to blind itself to a defendant's participation in a nationalistic- or ethnically-homogeneous criminal enterprise. Here, no objective, rational observer of Khurtsidze's sentencing could perceive unfair animus from the District Court's acknowledgement of the "Russian" and "Georgian" dimension to Khurtsidze's conduct in light of the nature of the offense. The plain import of

64

general references to "Russian organized crime" and the "Georgian community" were not to stress Khurtsidze's ethnicity or nationality as such but to reflect accurately the structure, membership, and loyalty to Shulaya that were the hallmarks of the Shulaya Enterprise.

Khurtsidze's general arguments fare no better when reduced to the specifics. With respect to the District Court's consideration of deterrence, for example, Khurtsidze glosses the District Court's remarks to suggest that the District Court intended to deter those of Georgian nationality in particular, likening the remarks to those of the sentencing court in *United States v. Leung*, 40 F.3d 577 (2d Cir. 1994). Khurtsidze appears to base this argument on the District Court's acknowledgment that he was famous among Georgians. (A. 1886-87). But, unlike in *Leung*, the District Court here expressly conceived that those who might be deterred by its sentence were "*individuals* who are willing to engage and to support and facilitate organized crime within the United States need to understand that the legal justice system here, the criminal justice system here will deal with it extraordinarily seriously" and not particularly people from Georgia. (A. 1876). Because the District Court addressed its remarks "to anyone who would engage in these types of crimes, no matter where they came from," the District Court did not adversely consider Khurtsidze's national origin in imposing sentence. *Carreto*, 583 F.3d at 161 (rejecting argument that sentencing judge improperly considered the defendant's national origin when it intended to deter others who would consider committing similar

65

crimes and not specifically those from the defendant's country of origin).

Khurtsidze's further efforts to shade the District Court's intentions in light of its separate observation that the Shulaya case "may well be watched by the Georgian community, both here and abroad" also fall short. (A. 1876). The District Court explained that it viewed general deterrence as a meaningful component of sentencing because the case was in the "press" and "has had some high-profile aspects to it." (A. 1876). It would have been error for the District Court to refuse to consider general deterrence, of course, *see* 18 U.S.C. § 3553(a)(2)(B), and the District Court's reasoning that the case's notoriety and the defendant's individual fame would support a general deterrence component to sentencing was both logical and permissible. *See, e.g.*, *United States v. Ulbricht,* 858 F.3d 71, 133 (2d Cir. 2017) (affirming sentence based, in part, on deterrent effect due to the case's publicity).

## POINT VI

## Shulaya's Sentence Was Substantively Reasonable

### A.   Relevant Facts

In advance of his sentencing, Shulaya's counsel submitted an extensive brief in support of a below-Guidelines sentence of 180 months' imprisonment. (Dkt. 999 at 18). In his written submission, and through counsel's presentation at sentencing, Shulaya focused the District Court on his purportedly difficult upbringing and his purported cocaine and gambling

addiction. (Shulaya A. 275; Dkt. 999 at 18). Despite the overwhelming evidence of his actual power and his infliction of pain in support of that power, counsel attempted to minimize the gravity of Shulaya's crimes ("fundamentally, what this case comes down to, again, is contraband, casinos, and cargo") and to depict Shulaya as a "faux vor, an amateur criminal." (Shulaya A. 265, 275). Shulaya was given an opportunity to address the District Court, and essentially declined: "I don't know what to say. Thank you, your Honor." (Shulaya A. 280).

Judge Preska, after addressing the applicable Guidelines provisions and challenges to certain aspects of the applicable Guidelines, as described in more detail below, adopted the Probation Office's Guideline calculation, resulting in an applicable Guidelines sentence of 65 years, the statutory maximum sentence. (Shulaya A. 286; Shulaya PSR at 38). Judge Preska imposed a below-Guidelines sentence despite Shulaya's leadership role in a large, sophisticated, and violent criminal enterprise.

## B. Discussion

Shulaya's claim on appeal that his below-Guidelines sentence is substantively unreasonable should be rejected. "[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *Fernandez*, 443 F.3d at 27. This is because "by the time an appeals court is considering a within-Guidelines sentence on review,

67

*both* the sentencing judge and the Sentencing Commission will have reached the *same* conclusion as to the proper sentence in the particular case. That double determination significantly increases the likelihood that the sentence is a reasonable one." *Rita v. United States*, 551 U.S. 338, 347 (2007) (emphasis in original).

Here, the seriousness of Shulaya's offense, his role, and the particular need for specific and general deterrence, counseled in favor of the lengthy, but below-Guidelines sentence he received. Shulaya oversaw a network of overlapping criminal activity that required the management of multiple, interlocking crews; he oversaw and tracked the revenues of those underlings in order to maintain his status and criminal livelihood, punishing those who underpaid their expected tributes; and he stalked and kidnapped a computer programmer in order to begin a multi-year plot to cheat casinos. (*See* Tr. 691, 694, 703, 866-67, 879). Shulaya was not a small-time grifter; he was, as his title announced, a recalcitrant criminal kingpin.

Shulaya revisits substantially the same sentencing arguments as those raised he raised before Judge Preska at sentencing, all of which are meritless. Shulaya glibly argues that his criminal organization consisted only in "contraband, casinos, and cigarettes," while omitting the extensive violence, from kidnapping to severe beatings, committed by Shulaya and others at his direction. While minimizing his role in

the kidnapping of a computer programmer and the severe beating of Chaganava,[7] he simply ignores the beatings of one man who insulted Shulaya's status (Tr. 82-85, 1076-83); the pistol-whipping of his own nephew in the midst of a melee with a rival gang (Tr. 1426-32); the assaults of various people inside Shulaya's Poker House, including Chaganava and CI-2; the extortionate threats against Poker House debtors (Shulaya PSR ¶¶ 44-52); and other threats of violence against various rivals or underlings (*e.g.,* Tr. 1195-200). Shulaya's suggestion that his conduct was not sufficiently serious to warrant a lengthy sentence, is simply wrong.

Shulaya also asserts that his contraband cigarette scheme should be discounted because it was conducted as part of an operation overseen by the Government.[8] Shulaya does not acknowledge, however, that it was Shulaya himself who proposed the contraband tobacco scheme. (Tr. 341, 585). Further, to the extent that Shulaya argues that the loss amount attributable to

---

[7] That Chaganava may have recuperated from this beating is a stroke of luck for which Shulaya deserved neither credit nor clemency.

[8] Shulaya's contraband tobacco scheme resulted in approximately $1,788,345 in cognizable tax losses for purposes of a Guidelines calculation. (Shulaya PSR ¶ 101). Shulaya has never objected to the calculation of tax loss under the Guidelines as a procedural matter.

69

this scheme was the driving force behind his substantial sentence, the record belies that claim. In fact, Judge Preska expressly rejected Shulaya's position on this point, noting that:

> As the government has pointed out, before the untaxed cigarette situation obtained, that is, before April of 2015, Mr. Shulaya had already engaged in serious violent acts, including kidnappings, beatings, pistol-whipping, and he had begun the gambling enterprise. So there is no truth to the fact that it is the government that drove these criminal enterprises.

(Dkt. 1089 at 39-40).

Finally, contrary to Shulaya's claims, no similarly situated defendant existed in this case. Shulaya sat at the pinnacle of a criminal empire of his own creation, maintained through violence doled out at his direction. Shulaya built his position through a career of criminality and has shown no remorse for his actions. Indeed, Shulaya declined to make any statement of contrition at his sentencing. Moreover, apart from Khurtisdize, Shulaya is the sole defendant in this case to reject entirely every opportunity to express some degree of contrition or acceptance of responsibility.

70

## POINT VII

### The District Court Exercised Proper Judicial Oversight of Shulaya's Changes of Counsel

#### A. Relevant Facts

Shulaya retained at least three attorneys in the course of this case, and benefited from the work of two court-appointed attorneys who ultimately tried Shulaya's case and prepared an extensive sentencing submission on his behalf. Upon his presentment in this District, Shulaya retained the services of Peter Kapitonov, Esq. (Dkt. 124). Through the representation of Mr. Kapitonov, Shulaya sought release on bail, resulting in a hearing at which Shulaya offered a perjurious witness in an attempt to secure release pending trial. (*See* Dkt. 1273 at 4 (acknowledging the falsity of evidence presented on Shulaya's behalf at the original bail hearing)). Following his failed bail hearing, Christopher Shella, Esq., entered a notice of appearance as Shulaya's additional retained counsel. (Dkt. 225).

Through Mr. Shella's representation, Shulaya and an associate circumvented the District Court's protective orders and made false representations to the Bureau of Prisons and the District Court.(Dkt. 341 (Government Letter Requesting *Curcio* Hearing)). The District Court held a conference to discuss the allegations of misrepresentations and abuse of her discovery orders, after which the District Court relieved Mr. Shella as counsel. (Dkt. 360). The District Court also remarked on the prospect that the proceedings would be disrupted by frequent changes of counsel:

71

> I am starting to be concerned that we are
> going to have sort of a rotating series of
> lawyers. Hence, it's my view that the CJA
> attorney may be an individual who we re-
> tain for the duration of the case as neces-
> sary who may be joined by cocounsel but
> who perhaps will not be released. So the
> retention of counsel may not be some-
> thing that results in the elimination of
> the CJA counsel.

(Dkt. 360 at 6).

On October 23, 2017, the District Court appointed Anthony Cecutti, Esq., to represent Shulaya pursuant to the Criminal Justice Act. (Dkt. 367). Two months later, Elizabeth Macedonio, Esq., an attorney whom Shulaya had retained, entered her appearance. (Dkt. 482). In light of the history of his repeated changes in counsel to that date, the District Court did not relieve Mr. Cecutti at that time, and Mr. Cecutti continued to represent Shulaya together with Ms. Macedonio.

Shulaya continued to claim difficulties with his counsel after he hired Ms. Macedonio. By letter dated February 13, 2018, the Government informed the District Court of a potential conflict of interest reflected in a newly discovered website which, among other things, contained derogatory comments regarding Shulaya's legal team, including that: 1) "His current CJA attorney [Mr. Cecutti] has no motives or interest on the case as well as another attorney [Ms. Mace-donio] who seems to take money and vanish. We can't get to know the case because the defense team still didn't provide any discovery in Russian to Razhden of

72

why he has been held in a Federal Jail"; and 2) "We do not hire unlicensed, unprofessional scumbags, and thats who we were dealing with. So far, our attorney just take money and vanish with no work progress whatsoever. But even without defense team help, so much has been discovered." (Dkt. 565).

In late February 2018, the District Court convened a conference to address the content of the website. (Dkt. 584). At that time, Shulaya, through his retained counsel Ms. Macedonio, "indicate[d] that he [did not] know who created the website, nor [did] he want to know." (Dkt. 645 at 3). The District Court then addressed Shulaya directly, asking whether he had seen or knew about the website. Shulaya responded as follows: "I could not have known about this website at all, because I am isolated from society. . . As for my attorneys, they're very qualified attorneys, very good attorneys. Compared to the other attorneys that I previously had that stood before you, your Honor, deceived you. So I could not compare them to the previous ones at all." (Dkt. 645 at 4).

One month later, on March 29, 2018, the District Court convened another conference to address Shulaya's claim of discontentment with his counsel. During the conference, the District Court relieved Ms. Macedonio, confirmed that Mr. Cecutti would resume his role as Shulaya's lead counsel, and appointed Jennifer Louis-Jeune, Esq., as associate counsel to assist Mr. Cecutti. (Dkt. 658; SA 22-39). The District Court specifically inquired into whether Shulaya was satisfied with Mr. Cecutti's representation; Shulaya de-

73

murred and instead falsely repeated the claim (de-
bunked by the District Court's own prior inquiries and
representations of Shulaya's counsel) that he had yet
to receive the discovery in the case. (SA 27-28, 34).

At this conference, Shulaya did not request to pro-
ceed *pro se* or indicate that he was prepared to retain
yet another attorney to replace Ms. Macedonio. To the
contrary, Shulaya, under penalty of perjury, submit-
ted an affidavit describing his purported lack of assets
such that continued representation by Mr. Cecutti and
Ms. Louis-Jeune was appropriate. (SA 40-42). At no
time, including at that conference or otherwise prior to
or during trial, did any other attorney enter a notice of
appearance, move to appear as substitute or co-coun-
sel, or indicate to the District Count in any way a de-
sire to appear on Shulaya's behalf. Mr. Cecutti and Ms.
Louis-Jeune remained Shulaya's counsel through
trial.

Several months after trial, Shulaya began to send
a series of petitions to the District Court via fax or
mail. These letters purported to be from Shulaya act-
ing *pro se*, although each was drafted (like Shulaya's
supplemental brief on appeal) with a command of the
English language and legal jargon far beyond
Shulaya's personal capacity, as he himself made clear
in those very filings.[9] First, on October 11, 2018,

––––––––––

[9] Because these communications were not filed
through the public ECF system, they appear as exhib-
its and attachments to the Government's opposition

page

74

Shulaya submitted under seal and *ex parte* a letter complaining of his trial counsel Mr. Cecutti. (Dkt. 1047-1; *see also* SA 17).[10] This letter sought the appointment of new CJA counsel, while also seeking the disgorgement of fees previously paid to Ms. Macedonio in order to permit Shulaya the ability to retain new counsel. (SA 18). As with his prior filings and statements in Court, the letter made no reference to an attorney named Sanford Schulman.

In response, the District Court, with Judge Preska now presiding, convened a status conference. (SA 43). At that conference, Mr. Cecutti noted that he and co-counsel Ms. Louis-Jeune had been "shocked" by Shulaya's letter in light of their recent meetings with Shulaya and their collaboration with him in the preparation of his sentencing materials. (SA 44). Questioned directly, Shulaya announced for the first time

—————

briefing filed with the District Court throughout November 2018.

[10] In many instances, the ECF docketing system's automatic header obscures information purporting to reflect a fax's sender. As noted in the Government's filings with the District Court, although these numbers purport to be from a "BOP Inmate," the fax number associated with Shulaya's purportedly "pro se" filings was not an actual Bureau of Prisons fax line. The Government has included the filings themselves, without the ECF header, as part of the Addendum on appeal. (*See* SA 64-79 (Government letter describing the false fax number and attaching purportedly *pro se* filings)).

75

that had wished to retain an attorney identified by Shulaya as "Shulman," but "was not permitted to do so." (SA 47). Shulaya requested additional time to retain new counsel, and the District Court set a new conference date for mid-November 2018. (SA 48).

On October 15, 2018, Shulaya, *pro se*, sent another motion to the District Court. (SA 70). This letter purported to be a motion for a judgment of acquittal or, alternatively, for a new trial, pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure. The letter asserted that "defendant retained Sanford A. Schulman, Esq., to represent him at trial," but that the District Court had "declined to allow Mr. Schulman to represent this Defendant as lead counsel, or even as co-counsel." (SA 76). The filing claimed that Shulaya had received a letter from Schulman on or about May 11, 2018, informing him of this purported (and entirely invented) rejection of his appearance, and attached a copy of that letter. (SA 77).

On October 19, 2018, Shulaya, again purporting to proceed *pro se*, faxed another letter to the District Court, again seeking to relieve Mr. Cecutti and the disgorgement of fees from Ms. Macedonio, without which he would purportedly not be in a position to hire his fourth retained attorney in this matter. (SA 20). On November 19, 2018, at another conference convened to discuss Shulaya's various motions, the District Court inquired as to the basis for Shulaya's continued request to substitute new counsel for Mr. Cecutti. Shulaya responded with a rambling series of newly invented complaints regarding motion practice. (SA 54-

55). Judge Preska, citing to Judge Forrest's prior find-ings and to Shulaya's new motions, found that Shulaya's recent filings were "yet another attempt to delay the proceeding" and that Shulaya had not "artic-ulated any good reason for his disagreement with Mr. Cecutti's continuing [as counsel]." (SA 55-56).[11] Shulaya's sentencing remained scheduled for Decem-ber 19, 2018.

On December 18, 2018, attorney Igor Niman, Esq., filed a letter announcing that he had been retained to represent Shulaya the day before. (Dkt. 1065). Mr. Niman's letter claimed that he was unable to attend Shulaya's sentencing because he would be attending a funeral on the morning of December 19, 2018. Mr. Niman expressed a desire to submit further sentenc-ing briefing, supplementing Mr. Cecutti's two prior

---

[11]   Immediately following Judge Preska's ruling on this point, yet another attorney working on Shulaya's behalf took the podium—Stephen Preziosi, Esq., who had not entered an appearance but who had filed a mo-tion to unseal every filing and docket entry in this thirty-three defendant matter, ostensibly for the pur-pose of assessing the merits of an appeal and the cost of his retainer agreement. (SA 56-60). The Govern-ment opposed the obvious overbreadth of that request, and ultimately Mr. Preziosi agreed to consult with Mr. Cecutti about relevant filings prior to filing any re-newed motion. (SA 60).

sentencing submissions, and requested an adjourn-
ment of sentencing without proposing a new date.
(Dkt. 1065).[12] The District Court accommodated Mr.
Niman by moving the sentencing proceeding to a time
on December 19, 2018, that he could attend in light of
his representations regarding a scheduling conflict,
but did not otherwise delay. Judge Preska wrote, in
denying the bulk of the adjournment request, "Mr.
Shulaya has repeatedly attempted to delay these pro-
ceedings, ostensibly to forestall confrontation with the
consequences of his crimes. The time has come, how-
ever, to conclude these proceedings." (Dkt. 1068).

On December 19, 2018, Shulaya appeared for sen-
tencing, along with Mr. Cecutti, Ms. Louis-Jeune, and
Mr. Niman. (Dkt. 1089). When asked why he wished
to delay sentencing, Mr. Niman stated that he believed
that a hearing to determine the applicable loss amount
under the Guidelines was required in light of pur-
ported denials of culpability by Shulaya. (Shulaya
A. 250-51).[13] Mr. Niman lodged his objections and ar-
gued on Shulaya's behalf, but the Government noted,

---

[12]  Mr. Cecutti's sentencing submissions included a
compilation of videotaped interviews of various char-
acter witnesses, which Mr. Cecutti and Ms. Louis-
Jeune had compiled by traveling to Russia and con-
ducting more than 20 such interviews. (Dkt. 999 at 5
n.3).

[13]  The transcript of this proceeding refers to Mr.
Cecutti as the speaker at line 21 and line 1 of Shulaya

78

and the District Court ultimately and correctly found, that the Presentence Report's loss calculation was a conservative estimate based on extensive trial evidence, and that the challenge by Mr. Niman would not alter the Guidelines loss calculation or warrant further factual findings. (Shulaya A. 254, 261-62, 269). The District Court further found that Mr. Niman's belated appearance in the case was simply "one more example of using counsel issues to secure a delay," and denied further adjournment on the basis of that illegitimate basis. (Shulaya A. 254).

## B.  Applicable Law

The right to self-representation is unqualified if invoked before the start of trial. *United States ex rel. Maldonado v. Denno*, 348 F.2d 12, 15 (2d Cir. 1965). This right derives not from statute but from the United States Constitution. *Maldonado*, 348 F.2d at 15; *see also Faretta v. California*, 422 U.S. 806 (1975) (holding that under the Sixth Amendment, the accused is guaranteed the right of electing to represent himself). A criminal defendant may proceed pro se if he "knowingly, voluntarily, and unequivocally" waives his right to appointed counsel. *Williams v. Bartlett*, 44 F.3d 95, 99 (2d Cir. 1994).

Substitution of counsel—including substitution with retained counsel—is properly restricted by the

————

Appendix pages 250 and 251, respectively. As the subsequent transcript demonstrates, this is in error; Mr. Niman was the speaker at that time.

District Court in situations where substitution would unduly delay proceedings. "While a defendant has a right to counsel of his choice under the Sixth Amendment, it is not an absolute right. Absent a conflict of interest, a defendant in a criminal case does not have the unfettered right to retain new counsel." *United States v. Brumer,* 528 F.3d 157, 160 (2d Cir. 2008). "In determining whether to allow a defendant to retain new counsel, the court must consider the risks and problems associated with the delay, and whether substitutions would disrupt the proceedings and the administration of justice." *Id.* (alterations omitted).

This Court reviews a district court's denial of a request to substitute counsel for abuse of discretion. *Id.* at 161.

## C.  Discussion

In his *pro se* filing, Shulaya argues that the District Court improperly deprived him of his Sixth Amendment right to counsel of choice. Of course, three of the attorneys that Shulaya retained in this case—Mr. Kapitonov, Mr. Shella, and Ms. Macedonio—each withdrew from representation of Shulaya as a result of irreconcilable conflicts with Shulaya himself, rather than any act of the District Court or the Government. Likewise, Mr. Schulman was never retained by Shulaya, never attempted to appear in this case, and the only reference to Mr. Schulman anywhere in the record is through Shulaya's statements and filings submitted months after his trial. There is no support in the record, and Shulaya provides no citation to the contrary, that suggests the District Court refused or

80

would have refused to permit Mr. Schulman to join in representing Shulaya at trial.

Moreover, the record in this case demonstrates that Shulaya submitted a financial affidavit specifically in support of maintaining his representation by Mr. Cecutti. (SA 23). The record further reflects Shulaya's consistent assertions that he wished to retain an attorney but could not. (*See, e.g.*, SA 18). And indeed, the letter purportedly to Shulaya by Mr. Schulman does not state that he was retained or that the District Court rejected his appearance. In short, Shulaya's difficulties with his counsel were a reflection of his efforts to delay his case; the District Court did not interfere with these relationships in any sense, and the assertion that the District Court "wrongfully denied" Shulaya the right to be represented by counsel of choice is not supported by the record.

Shulaya's counseled brief on appeal advances a similarly meritless claim specific to Judge Preska's reasoned decision to reject delay of sentencing on the basis of the belated appearance of Mr. Niman. Shulaya refers to the District Court's "finding that Shulaya had retained and discharged prior attorneys" (Shulaya Br. 47), but neglects to mention that Shulaya had engaged in an unabated string of dilatory and misleading tactics relating to his counsel for over a year, involving falsehoods as grave as perjured testimony and as superfluous as mocking up false faxes. The District Court properly determined that Mr. Niman's requested fact hearing was unnecessary and rightly identified his belated appearance, twenty-four hours before Shulaya's long-scheduled sentencing, for what it was: the latest

81

(though not the last) in a string of efforts to avoid the consequences of his criminal conduct.

## CONCLUSION

**The judgments of conviction should be affirmed.**

Dated:     New York, New York
           December 11, 2020

                         Respectfully submitted,

                         AUDREY STRAUSS,
                         *Acting United States Attorney for the*
                         *Southern District of New York,*
                         *Attorney for the United States*
                              *of America.*

ANDREW C. ADAMS,
ANDREW M. THOMAS,
ANNA M. SKOTKO,
     *Assistant United States Attorneys,*
                  *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 18908 words in this brief.

AUDREY STRAUSS,
*Acting United States Attorney for the*
*Southern District of New York*

By: ANNA M. SKOTKO,
*Assistant United States Attorney*